UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA, and the states
of CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE, FLORIDA,
GEORGIA, HAWAII, ILLINOIS, INDIANA,
IOWA, LOUISIANA, MARYLAND,
MICHIGAN, MINNESOTA, MONTANA,
NEVADA, NEW JERSEY, NEW MEXICO,
NEW YORK, NORTH CAROLINA,
OKLAHOMA, RHODE ISLAND, TENNESSEE,
TEXAS, WASHINGTON, WISCONSIN, the
COMMONWEALTHS of MASSACHUSETTS
and VIRGINIA and the DISTRICT of
COLUMBIA, ex rel. BENJAMIN A. VAN
RAALTE, M.D., MICHAEL J. CASCIO, M.D.
and JOHN J. MURTAUGH,

Civil Action Case No.: 6:14 CV 283 GJK

          Plaintiffs/Relators,

v.

HEALOGICS, INC., SOUTH BALDWIN
REGIONAL MEDICAL CENTER,
SOUTHEAST ALABAMA MEDICAL
CENTER, JACKSON HOSPITAL, DCH
REGIONAL MEDICAL CENTER, RUSSELL
MEDICAL CENTER, TRINITY MEDICAL
CENTER, CRESTWOOD MEDICAL CENTER,
NORTHWEST WOUND CARE AND
HYPERBARIC MEDICINE, CULLMAN
REGIONAL MEDICAL CENTER, MARSHALL
MEDICAL CENTERS, RIVERVIEW
REGIONAL MEDICAL CENTER,
STRINGFELLOW MEMORIAL HOSPITAL,
CHANDLER REGIONAL MEDICAL CENTER,
ARROWHEAD HOSPITAL, WEST VALLEY
HOSPITAL, MOUNTAIN VISTA MEDICAL
CENTER, ST. MARY'S HOSPITAL, TUSCON
MEDICAL CENTER,  HAVASU REGIONAL
MEDICAL CENTER, YUMA REGIONAL
MEDICAL CENTER, VALLEY VIEW
MEDICAL CENTER, ST. VINCENT WOUND

**\*FILED UNDER SEAL\***
**PURSUANT TO  31 U.S.C. § 3730(b)**
**& RELATED STATE FALSE CLAIM ACTS**



CARE CENTER, CONWAY REGIONAL
HEALTH SYSTEM, MEDICAL CENTER OF
SOUTH ARKANSAS, BAXTER REGIONAL
MEDICAL CENTER, FIVE RIVERS MEDICAL
CENTER, PIONEERS MEMORIAL
HEALTHCARE DISTRICT, GLENDALE
MEMORIAL HOSPITAL, HOAG MEMORIAL
HOSPITAL PRESBYTERIAN, CORONA
REGIONAL MEDICAL CENTER,
SADDLEBACK CENTER FOR ADVANCED
WOUND HEALING, ST. JOHN'S PLEASANT
VALLEY HOSPITAL, COMMUNITY
MEMORIAL HOSPITAL, ST. BERNARDINE
MEDICAL CENTER, PALOMAR HEALTH-
SAN MARCOS, POMERADO HOSPITAL-
POWAY, GOLETA VALLEY COTTAGE
HOSPITAL, SONORA REGIONAL MEDICAL
CENTER, SANTA YNEZ COTTAGE
HOSPITAL, GOOD SAMARITAN HOSPITAL,
GOLETA VALLEY COTTAGE HOSPITAL,
WASHINGTON HOSPITAL, SUTTER DELTA
MEDICAL CENTER, JOHN MUIR MEDICAL
CENTER, MERCY MEDICAL CENTER
REDDING, ST. ANTHONY NORTH
HOSPITAL, ST. ANTHONY HOSPITAL,
PARKER ADVENTIST HOSPITAL, THE
HOSPITAL OF CENTRAL CONNECTICUT –
BRISTOL, THE HOSPITAL OF CENTRAL
CONNECTICUT, MIDSTATE MEDICAL
CENTER, CHARLOTTE HUNGERFORD
HOSPITAL, SAINT MARY'S HOSPITAL,
MANCHESTER MEMORIAL HOSPITAL,
GRIFFIN HOSPITAL, SHARON HOSPITAL,
WILMINGTON HOSPITAL, BAYHEALTH
MEDICAL CENTER, INC., TALLAHASSEE
MEMORIAL HOSPITAL, BAPTIST
HOSPITAL, BAPTIST BEACHES, UF
HEALTH F/K/A SHANDS HOSPITAL,
MUNROE REGIONAL MEDICAL CENTER,
THE VILLAGES REGIONAL HOSPITAL,
FLORIDA HOSPITAL FISH MEMORIAL,
LEESBURG REGIONAL MEDICAL CENTER,
BERT FISH MEDICAL CENTER, PASCO
REGIONAL MEDICAL CENTER, LAKELAND
REGIONAL MEDICAL CENTER, BARTOW
REGIONAL MEDICAL CENTER, MANATEE

MEMORIAL HOSPITAL, DR. P. PHILLIPS
HOSPITAL, ORLANDO HEALTH F/K/A
SOUTH SEMINOLE HOSPITAL,
WUESTHOFF MEDICAL CENTER-
ROCKLEDGE, ST. CLOUD REGIONAL
MEDICAL CENTER, SOUTH LAKE
HOSPITAL, HEART OF FLORIDA
REGIONAL MEDICAL CENTER, PARRISH
MEDICAL CENTER, SEVEN RIVERS
REGIONAL MEDICAL CENTER,
HIGHLANDS REGIONAL MEDICAL
CENTER, WUESTHOFF MEDICAL CENTER,
MEMORIAL HOSPITAL PEMBROKE, HOLY
CROSS HOSPITAL, BROWARD HEALTH
CORAL SPRINGS, BETHESDA MEMORIAL
HOSPITAL, INC., WELLINGTON REGIONAL
MEDICAL CENTER, JUPITER MEDICAL
CENTER PAVILION, PHYSICIANS
REGIONAL HEALTHCARE, LEHIGH
REGIONAL MEDICAL CENTER, INDIAN
RIVER MEDICAL CENTER, SEBASTIAN
RIVER MEDICAL CENTER, VENICE
REGIONAL MEDICAL CENTER, LAKE
WALES MEDICAL CENTER, SOUTHEAST
GEORGIA HEALTH SYSTEM, ST. JOSEPH'S
HOSPITAL, WEST GEORGIA MEDICAL
CENTER, REDMOND REGIONAL MEDICAL
CENTER, SOUTHERN REGIONAL MEDICAL
CENTER, ATLANTA MEDICAL CENTER,
SPALDING REGIONAL MEDICAL CENTER,
CLEARVIEW REGIONAL MEDICAL
CENTER, BARROW REGIONAL MEDICAL
CENTER, MEDICAL CENTER OF CENTRAL
GEORGIA, OCONEE REGIONAL MEDICAL
CENTER, STEPHENS COUNTY HOSPITAL,
THE QUEEN'S MEDICAL CENTER,
PORTNEUF MEDICAL CENTER, GRITMAN
MEDICAL CENTER, NORTHWESTERN
LAKE FOREST HOSPITAL, HOLY FAMILY
MEDICAL CENTER, CENTEGRA HOSPITAL-
WOODSTOCK, RESURRECTION MEDICAL
CENTER, ST. FRANCIS HOSPITAL,
GOTTLIEB MEMORIAL HOSPITAL,
VANGUARD WEISS MEMORIAL HOSPITAL,
WEST SUBURBAN MEDICAL CENTER,
RUSH UNIVERSITY MEDICAL CENTER,

ADVENTIST BOLINGBROOK HOSPITAL,
ADVENTIST LAGRANGE MEMORIAL
HOSPITAL, PROVENA ST. JOSEPH
MEDICAL CENTER, ADVOCATE SOUTH
SUBURBAN HOSPITAL, PALOS
COMMUNITY HOSPITAL, RUSH OAK PARK
HOSPITAL, GALESBURG COTTAGE
HOSPITAL, THE METHODIST MEDICAL
CENTER OF ILLINOIS, TRINITY HOSPITAL
MOLINE, TRINITY HOSPITAL, ST. JOHN'S
HOSPITAL, SPRINGFIELD CLINIC, ALTON
MEMORIAL HOSPITAL, ADVOCATE
BROMENN MEDICAL CENTER, DECATUR
MEMORIAL HOSPITAL, ST. ELIZABETH'S
WOUND CARE CENTER, ST. JOSEPH'S
HOSPITAL, ST. JOSEPH MEMORIAL
HOSPITAL, HERRIN HOSPITAL, PORTER
REGIONAL HOSPITAL, IU HEALTH BALL
MEMORIAL HOSPITAL, HANCOCK
REGIONAL HOSPITAL, ST. JOSEPH
HOSPITAL, HANCOCK REGIONAL
HOSPITAL SHELBY COUNTER, JOHNSON
MEMORIAL HOSPITAL, DECATUR
COUNTY MEMORIAL HOSPITAL,
PARKVIEW HOSPITAL RANDALLIA,
SAINT JOSEPH REGIONAL MEDICAL
CENTER - PLYMOUTH CAMPUS, INC.,
TERRE HAUTE REGIONAL HOSPITAL,
FLOYD MEMORIAL HOSPITAL, UNION
HOSPITAL,  SAINT JOSEPH REGIONAL
MEDICAL CENTER, INC. (MISHAWAKA),
IU HEALTH GOSHEN HOSPITAL (F/K/A
GOSHEN GENERAL HOSPITAL),
MARSHALLTOWN MEDICAL AND
SURGICAL CENTER, OTTUMWA
REGIONAL HEALTH CENTER, TRINITY
WOUND HEALING CENTER,  ALLEN
MEMORIAL HOSPITAL CORPORATION,
POCAHONTAS COMMUNITY HOSPITAL,
IOWA METHODIST MEDICAL CENTER,
MERCY MEDICAL CENTER, GREAT RIVER
MEDICAL CENTER, ST. CATHERINE
HOSPITAL, HAYS MEDICAL CENTER,
SHAWNEE MISSION MEDICAL CENTER
SHAWNEE, SHAWNEE MISSION MEDICAL
CENTER AT PRAIRIE STAR, OLATHE

MEDICAL CENTER, STORMONT-VAIL
HEALTH CARE, WILSON COUNTY
HOSPITAL (WILSON MC REESE CAMPUS),
VIA CHRISTI HOSPITALS / VIA CHRISTI
HEALTH, HUTCHINSON REGIONAL
MEDICAL CENTER, INC. (N/K/A PROMISE
RMC), FRANKFORT REGIONAL MEDICAL
CENTER, NORTON BROWNSBORO
HOSPITAL, SAINT JOSEPH HOSPITAL,
BAPTIST HOSPITAL EAST, EPHRAIM
MCDOWELL REGIONAL MEDICAL
CENTER, NORTON AUDUBON HOSPITAL,
ST. ELIZABETH HOSPITAL COVINGTON,
ST. ELIZABETH HOSPITAL FT. THOMA,
LAKE CUMBERLAND REGIONAL
HOSPITAL, LLC, PIKEVILLE MEDICAL
CENTER, INC., PAUL B. HALL REGIONAL
MEDICAL CENTER, OUR LADY OF
BELLEFONTE HOSPITAL, INC., JENNIE
STUART MEDICAL CENTER, OWENSBORO
MEDICAL HEALTH MULTI CARE - OHIO
COUNTY, LOURDES HOSPITAL,
MUHLENBERG COMMUNITY HOSPITAL,
TWIN LAKES REGIONAL MEDICAL
CENTER, ST. FRANCIS MEDICAL CENTER,
CORNERSTONE HOSPITAL WEST
MONROE, WINN PARISH MEDICAL
CENTER, OUR LADY OF LOURDES
REGIONAL MEDICAL CENTER, OAKDALE
COMMUNITY HOSPITAL, LAKE CHARLES
MEMORIAL HOSPITAL, LINCOLN CBOC
YORK COUNTY CENTER, WASHINGTON
ADVENTIST HOSPITAL, DOCTORS
COMMUNITY HOSPITAL, SHADY GROVE
HOSPITAL, LAUREL REGIONAL HOSPITAL,
UNIVERSITY OF MARYLAND CHARLES
REGIONAL MEDICAL CENTER,
BALTIMORE WASHINGTON MEDICAL
CENTER, ST. AGNES MEDICAL CENTER,
UNIVERSITY OF MARYLAND MEDICAL
CENTER MIDTOWN CAMPUS, UNION
HOSPITAL OF CECIL COUNTY, ATLANTIC
GENERAL HOSPITAL, PENINSULA
REGIONAL MEDICAL CENTER, MEDSTAR
ST. MARY'S HOSPITAL, GREATER
BALTIMORE MEDICAL CENTER,

FRANKLIN SQUARE HOSPITAL CENTER,
MERCY MEDICAL CENTER,
FAIRVIEW HOSPITAL (BERKSHIRE
REGIONAL CENTER), BOURNE HEALTH
CENTER, BEVERLY HOSPITAL, HEYWOOD
HOSPITAL, HARRINGTON HOSPITAL,
BERKSHIRE MEDICAL CENTER, GOOD
SAMARITAN MEDICAL CENTER, A
STEWARD FAMILY HOSPITAL, EMERSON
HOSPITAL, STEWARD ST. ELIZABETH'S
MEDICAL CENTER OF BOSTON, INC.,
CARNEY HOSPITAL, WINCHESTER
HOSPITAL, SOUTHCOAST HOSPITALS
GROUP (AKA CHARLTON MEMORIAL
HOSPITAL), BETH ISRAEL DEACONESS
HOSPITAL, PORT HURON HOSPITAL,
CRITTENTON HOSPITAL MEDICAL
CENTER, HURON MEDICAL CENTER,
SPARROW HOSPITAL ST. LAWRENCE
CAMPUS, MIDMICHIGAN MEDICAL
CENTER-GRATIOT, WEST BRANCH
REGIONAL MEDICAL CENTER, OAKLAWN
HOSPITAL, BRONSON BATTLE CREEK
HOSPITAL, COMMUNITY HEALTH CENTER
OF BRANCH COUNTY, THREE RIVERS
HEALTH CENTER, ALLEGAN GENERAL
HOSPITAL, METRO HEALTH HOSPITAL,
OLMSTEAD MEDICAL CENTER, ST. CLOUD
HOSPITAL, BILOXI REGIONAL MEDICAL
CENTER, SOUTH CENTRAL REGIONAL
MEDICAL CENTER, ANDERSON REGIONAL
MEDICAL CENTER, GILMORE MEMORIAL
REGIONAL MEDICAL CENTER, BOLIVAR
MEDICAL CENTER, NORTHWEST
MISSISSIPPI REGIONAL MEDICAL
CENTER, CENTRAL MISSISSIPPI MEDICAL
CENTER, RIVER OAKS HOSPITAL, KING'S
DAUGHTERS' MEDICAL CENTER,
SAMARITAN HOSPITAL, NORTH KANSAS
CITY HOSPITAL, ST. MARY'S HOSPITAL OF
BLUE SPRINGS, ROCK HAVEN SPECIALTY
CLINIC, BOONE HOSPITAL, BOTHWELL
REGIONAL HEALTH CENTER, LAKE
REGIONAL HEALTH SYSTEM, MISSOURI
BAPTIST SULLIVAN HOSPITAL, DES PERES
HOSPITAL, CHRISTIAN HOSPITAL,

NORTHEAST-NORTHWEST, POPLAR
BLUFF REGIONAL MEDICAL CENTER,
TWIN RIVERS REGIONAL MEDICAL
CENTER, OZARKS MEDICAL CENTER,
ST. VINCENT'S HEALTHCARE, GREAT
PLAINS WOUND HEALING CENTER,
FREMONT AREA MEDICAL CENTER,
CARSON TAHOE CONTINUING CARE
HOSPITAL, NORTHERN NEVADA MEDICAL
CENTER, VALLEY HOSPITAL MEDICAL
CENTER, DESERT SPRINGS HOSPITAL, ST.
ROSE DOMINICAN HOSPITAL, ST. ROSE
DOMINICAN HOSPITAL - ROSE DE LIMA
CAMPUS, PORTSMOUTH REGIONAL
HOSPITAL, PARKLAND MEDICAL CENTER,
CATHOLIC MEDICAL CENTER,  FRISBIE
MEMORIAL HOSPITAL, SPEARE
MEMORIAL HOSPITAL, THE MEMORIAL
HOSPITAL AT NORTH CONWAY, OUR
LADY OF LOURDES MEDICAL CENTER,
INC., ATLANTICARE REGIONAL MEDICAL
CENTER – EGG HARBOR, ATLANTICARE
REGIONAL MEDICAL CENTER-
HAMMONTON, TRINITAS REGIONAL
MEDICAL CENTER, SELECT MEDICAL, ST.
CLARE'S HOSPITAL-DOVER, ST. PETER'S
UNIVERSITY HOSPITAL, BAYSHORE
COMMUNITY HOSPITAL, SAINT PETER'S
UNIVERSITY HOSPITAL, SELECT
MEDICAL, OCEAN MEDICAL CENTER,
JERSEY SHORE UNIVERSITY MEDICAL
CENTER, HOPE MEDICAL CENTER –
HOPEWELL, HUNTERDON MEDICAL
CENTER, GERALD CHAMPION REGIONAL
MEDICAL CENTER, FLUSHING HOSPITAL
MEDICAL CENTER, MONTEFIORE
MEDICAL CENTER, MOUNT VERNON
HOSPITAL, NYACK HOSPITAL, SOUTH
NASSAU COMMUNITIES HOSPITAL,
NORTHERN WESTCHESTER HOSPITAL AT
CHAPPAQUA CROSSINGS, BROOKHAVEN
MEMORIAL HOSPITAL MEDICAL CENTER,
BROOKHAVEN MEMORIAL HOSPITAL
MEDICAL CENTER, GLENN FALLS
HOSPITAL, NORTHERN DUTCHESS
HOSPITAL, ST. ELIZABETH MEDICAL

CENTER, ADIRONDACK MEDICAL
CENTER, CVPH MEDICAL CENTER,
CAYUGA MEDICAL CENTER, CLIFTON
SPRINGS HOSPITAL AND CLINIC, ST.
JOSEPH'S HOSPITAL HEALTH CENTER,
UNIVERSITY OF ROCHESTER MEDICAL
CENTER, UNITY HOSPITAL, UNITED
MEMORIAL MEDICAL CENTER, CLAXTON
HEPBURN MEDICAL CENTER, NORTH
CAROLINA BAPTIST HOSPITAL (WAKE
FOREST), LEXINGTON MEMORIAL
HOSPITAL, INC., DAVIS REGIONAL
MEDICAL CENTER, IREDELL MEMORIAL
HOSPITAL, INC. , CAROLINAS WOUND
CARE AND HYPERBARIC CENTER - A
FACILITY OF CMC – NORTH EAST
WESLEY LONG HOSPITAL, STANLY
REGIONAL MEDICAL CENTER, WILKES
REGIONAL MEDICAL CENTER, CAROLINA
EAST MEDICAL CENTER, CAROLINAS
MEDICAL CENTER MERCY, FIRSTHEALTH
MOORE REGIONAL HOSPITAL, TRIANGLE
ORTHOPAEDIC ASSOCIATES, P.A., DUKE
RALEIGH HOSPITAL, BETSY JOHNSON
REGIONAL HOSPITAL, WILSON MEDICAL
CENTER, WAYNE MEMORIAL, NASH
HOSPITALS, INC., SAMPSON REGIONAL
MEDICAL CENTER, FIRSTHEALTH – HOKE,
HALIFAX REGIONAL MEDICAL CENTER,
CLEVELAND REGIONAL MEDICAL
CENTER, CATAWBA VALLEY MEDICAL
CENTER, SOUTHEASTERN REGIONAL
MEDICAL CENTER, CARTERET GENERAL
HOSPITAL, SCOTLAND MEMORIAL
HOSPITAL, VALDESE HOSPITAL,
MARGARET R. PARDEE MEMORIAL
HOSPITAL, CLERMONT HOSPITAL,
SOUTHERN OHIO MEDICAL CENTER,
THE JEWISH HOSPITAL, HOLZER MEDICAL
CENTER-JACKSON, FAIRFIELD WOUND
CARE CENTER, BERGER HEALTH SYSTEM,
WEXNER MEDICAL CENTER, O'BLENESS
HOSPITAL, SPRINGFIELD REGIONAL,
MERCY MEMORIAL, KNOX COMMUNITY
HOSPITAL, GENESIS HOSPITAL, FORT
HAMILTON HOSPITAL, TOWNSHIP

DISTRICT MEMORIAL HOSPITAL,
MARIETTA MEMORIAL HOSPITAL,
BELPRE MEDICAL CAMPUS, UNION
HOSPITAL, AFFINITY MEDICAL CENTERS,
AULTMAN HOSPITAL, WOOSTER
COMMUNITY HOSPITAL, EMH REGIONAL
MEDICAL CENTER, LUTHERAN HOSPITAL,
UNIVERSITY HOSPITAL- BEDFORD
MEDICAL CENTER, SOUTH POINTE
HOSPITAL, SUMMA AKRON CITY AND ST.
THOMAS HOSPITALS, LAKE HEALTH
ROBINSON MEMORIAL HOSPITAL, WOOD
COUNTY HOSPITAL, INTEGRIS MAYES
COUNTY MEDICAL CENTER, SHAWNEE
WOUND CARE CENTER, MEDICAL CENTER
OF SOUTHEASTERN OKLAHOMA,
MIDWEST REG. MEDICAL CENTER,
NORMAN REGIONAL HOSPITAL,
ST. MARY'S REGIONAL MEDICAL CENTER,
COMANCHE COUNTY MEMORIAL
HOSPITAL, COMMANCHE COUNTY
MEMORIAL HOSPITAL, ASHLAND
COMMUNITY HOSPITAL, MCKENZIE-
WILLAMETTE MEDICAL CENTER –
MCKENZIE-WILLAMETTE MEDICAL CTR
WILLIAMETTE VALLEY MEDICAL
CENTER, CHESTER COUNTY HOSPITAL,
PENN PRESBYTERIAN MEDICAL CENTER,
ROXBOROUGH MEMORIAL HOSPITAL,
HEART OF LANCASTER REGIONAL
MEDICAL CENTER, JEANES HOSPITAL,
THE READING HOSPITAL AND MEDICAL
CENTER, HANOVER HOSPITAL, CARLISLE
REGIONAL MEDICAL CENTER, CARLISLE
REGIONAL MEDICAL CENTER-
SHIPPENSBURG, GOOD SAMARITAN
HOSPITAL, OHIO VALLEY GENERAL
HOSPITAL-MT. NEBO, OHIO VALLEY
GENERAL HOSPITAL, JEFFERSON
HOSPITAL N/K/A JEFFERSON REGIONAL
MEDICAL CENTER, JEFFERSON REGIONAL
MEDICAL CENTER (BETHEL PARK),
ELLWOOD CITY HOSPITAL, SOUTHWEST
REGIONAL MEDICAL CENTER, SOMERSET
HOSPITAL, GUTHRIE ROBERT PACKER
HOSPITAL, BERWICK HOSPITAL,

EVANGELICAL COMMUNITY HOSPITALS,
GEISINGER-COMMUNITY MEDICAL
CENTER, GRAND VIEW HOSPITAL,
EASTON HOSPITAL, MILLCREEK
COMMUNITY HOSPITAL,
ABINGTON MEMORIAL HOSPITAL -
WARMINSTER CAMPUS, NAZARETH
HOSPITAL, ST. MARY MEDICAL CENTER,
PRESBYTERIAN COMMUNITY HOSPITAL,
CAYEY MENNONITE GENERAL HOSPITAL,
AIBONITO MENNONITE GENERAL
HOSPITAL, CENTRO DE SALUD FAMILIAR,
BELLA VISTA HOSPITAL, INC., ST. JOSEPH
HEALTH SERVICES OF RHODE ISLAND,
SOUTH COUNTY HOSPITAL, LAURENS
COUNTY HEALTH CARE SYSTEM,
BAPTIST EASLEY HOSPITAL,
AIKEN REGIONAL MEDICAL CENTERS,
GAFFNEY MEDICAL CENTER,
BEAUFORT MEMORIAL HOSPITAL,
CANDLER HOSPITAL (MOSS CREEK
REGIONAL CENTER), TUOMEY REGIONAL
MEDICAL CENTER, CAROLINA PINES
REGIONAL MEDICAL CENTER,
UNIVERSITY MEDICAL CENTER, JELLICO
COMMUNITY HOSPITAL, TURKEY CREEK
MEDICAL CENTER, JAMESTOWN
REGIONAL MEDICAL CENTER, LAUGHLIN
MEMORIAL HOSPITAL, HARTON
REGIONAL MEDICAL CENTER,
MIDDLE TENNESSEE MEDICAL CENTER,
SUMNER REGIONAL MEDICAL CENTER,
BAPTIST HOSPITAL- NASHVILLE, MAURY
REGIONAL MEDICAL CENTER, GATEWAY
MEDICAL CENTER, HARDIN MEDICAL
CENTER, JACKSON-MADISON COUNTY
GENERAL HOSPITAL, GOOD SHEPHERD
MEDICAL CENTER - MARSHALL F/K/A
MARSHALL REGIONAL MEDICAL CENTER,
NORTHWEST TEXAS HOSPITAL,
COVENANT HOSPITAL, PALESTINE
REGIONAL MEDICAL CENTER, EAST
TEXAS MEDICAL CENTER,
NACOGDOCHES MEDICAL CENTER, GOOD
SHEPHERD MEDICAL CENTER,
PRESBYTERIAN HOSPITAL OF

KAUFMANN, HUNTSVILLE MEMORIAL
HOSPITAL, HOPKINS COUNTY MEMORIAL
HOSPITAL, TITUS REGIONAL MEDICAL
CENTER, HUNT REGIONAL MEDICAL
CENTER, MISSION TRAIL BAPTIST
HOSPITAL, BAPTIST MEDICAL CENTER
ST. LUKE'S BAPTIST, NORTHEAST
BAPTIST HOSPITAL, CENTRAL TEXAS
MEDICAL CENTER, HEALTHSOUTH
REHABILITATION HOSPITAL OF AUSTIN,
POST ACUTE MEDICAL AT VICTORIA, LLC
(F/K/A WARM SPRINGS SPECIALTY
HOSPITAL OF VICTORIA),
ROLLINS-BROOK COMMUNITY HOSPITAL,
METROPLEX ADVENTIST HOSPITAL, GULF
COAST MEDICAL CENTER, MIDLAND
MEMORIAL HOSPITAL, SIERRA
PROVIDENCE EMC, TEXAS HEALTH
HARRIS METHODIST HOSPITAL -
STEPHENVILLE (F/K/A HARRIS-
METHODIST ERATH COUNTY HOSPITAL),
PROVIDENCE HEALTH CENTER, PARIS
REGIONAL MEDICAL CENTER,
HUNTSVILLE MEMORIAL HOSPITAL,
MEMORIAL HERMANN REHABILITATION
HOSPITAL KATY, L.L.C. (KATY
REHABILITION HOSPITAL), MEMORIAL
HERMANN SUGAR LAND HOSPITAL,
VALLEY BAPTIST MEDICAL CENTER
BROWNSVILLE, THE MEDICAL CENTER OF
PLANO, TEXAS HEALTH PRESBYTERIAN
HOSPITAL PLANO, LIFECARE HOSPITALS,
METHODIST RICHARDSON, MEDICAL
CITY DALLAS HOSPITAL, TEXAS HEALTH
PRESBYTERIAN HOSPITAL OF ALLEN,
METHODIST DALLAS MEDICAL CENTER,
LAKE POINTE MEDICAL CENTER,
DALLAS REGIONAL MEDICAL CENTER,
METHODIST CHARLTON MEDICAL
CENTER, METHODIST MANSFIELD
MEDICAL CENTER, MEMORIAL HERMANN
BAPTIST BEAUMONT HOSPITAL, TEXAS
HEALTH HARRIS METHODIST HOSPITAL,
HURST-EULESS-BEDFORD, TEXOMA
MEDICAL CENTER, BRATTLEBORO
MEMORIAL HOSPITAL, MARY

WASHINGTON HOSPITAL, SENTARA
WILLIAMSBURG REGIONAL MEDICAL
CENTER, MARY WASHINGTON HOSPITAL,
FAUQUIER HOSPITAL, ST. MARY'S
HOSPITAL, MEMORIAL REGIONAL
MEDICAL CENTER, SOUTHSIDE
REGIONAL MEDICAL CENTER, SENTARA
ROCKINGHAM MEMORIAL HOSPITAL,
KADLEC REGIONAL MEDICAL CENTER,
VALLEY GENERAL HOSPITAL,
MULTICARE AUBURN MEDICAL CENTER,
CASCADE VALLEY HOSPITAL AND
CLINICS, NORTHWEST HOSPITAL &
MEDICAL CENTER, ST. JOSEPH HOSPITAL
(TACOMA) , PEACE HEALTH SOUTHWEST,
ST. JOSEPH HOSPITAL (PEACEHEALTH),
GRAYS HARBOR COMMUNITY HOSPITAL,
MEDSTAR GEORGETOWN UNIVERSITY
HOSPITAL, UNITED HOSPITAL CENTER,
RIVERVIEW HOSPITAL, ASPIRUS WAUSAU
HOSPITAL, FORT MEMORIAL HOSPITAL,
OCONOMOWOC MEMORIAL HOSPITAL,
WAUKESHA MEMORIAL HOSPITAL, ST.
VINCENT HOSPITAL, BELLIN MEMORIAL
HOSPITAL, AMERY REGIONAL MEDICAL
CENTER, ST. JOSEPH'S HOSPITAL, ST.
JOSEPHS, EAU CLAIRE RIVERTON
MEMORIAL HOSPITAL,

                             Defendants.

_____/

## AMENDED COMPLAINT UNDER THE FALSE CLAIMS ACT 31 U.S.C. § 3730(b)
## AND RELATED STATE FALSE CLAIMS ACTS

## Table of Contents

I.   **Parties** ............................................................................................ **14**

    A. Relator Dr. Van Raalte............................................................15

    B. Relator Dr. Cascio...................................................................15

    C. Relator John Murtaugh...........................................................16

    D. Defendants.............................................................................16

II.  **Jurisdiction and Venue**.............................................................. **17**

III. **Factual Background** .................................................................... **18**

    A. Up-Coding of Debridements...................................................22

    B. CMS Guidelines and Background on Debridements..............24

    C. Dr. Van Raalte's Experience..................................................28

    D. Dr. Cascio's and John Murtaugh's Experience......................32

    E. Unnecessary Use of Hyperbaric Oxygen Treatments.............38

    F. Healogics iHeal Software........................................................41

    G. Osteomyelitis.........................................................................42

    H. CMS Coverage of Hyperbaric Oxygen Treatments..............43

    I.  John Murtaugh' S Experience with HBO...............................48

    J.  Overutilization of Transcutaneous Oxygen Measurement (TCOM) Testing...............51

    K. CMS Guidelines (Transcutaneous Oxygen Tension Measurements)........................55

IV.  **Allegations Common to All Defendant Hospitals** ................................. **58**

V.   **The False Claims Acts** .............................................................. **59**

    A. Cost Reporting and Claims Processing Procedures Under The Medicare Program.........60

    B. Conditions of Participation and Conditions of Payment.....................63

    C. Medical Necessity and Appropriateness Requirements.......................63

    D. Obligation to Refund Overpayments......................................63

    E. Other Federally-Funded Health Care Programs.....................64

(1)  Medicaid ................................................................................ **64**

(2)  Tricare, Formerly Known as CHAMPUS.................................... **65**

VI.  **Prayer for Relief**........................................................................ **69**

VII. **Demand for Jury Trial** ............................................................. **140**

Plaintiffs/Relators, Benjamin A. Van Raalte, M.D, Michael J. Cascio, M.D., and John J. Murtaugh (hereinafter referred to collectively as "Relators"), by and through the undersigned counsel, hereby file their Amended Complaint in accordance with the requirements of the False Claims Act, 31 U.S.C. §3730(b) (hereinafter FCA) and the above named states' False Claims Acts[1] and further state as follows:

## I.    Parties

1.      Under the FCA and state False Claim Acts, a person or persons with knowledge of false or fraudulent claims against the government (a "Relator") may bring an action on behalf of the federal government, state government, and themselves.

2.      Relators herein are "original sources" of the information upon which this Amended Complaint is based, as that term is used in the False Claims Acts relied on herein and

---

[1] California False Claims Act, Cal. Gov. Code §§12650, et seq.; Colorado Medicaid False Claims Act, Col. Rev. Stat. 25.5-4-304, et. seq.; Connecticut False Claims Act For Medical Assistance Programs, Conn. Gen. Stat. Sec. 17b-301a, et. seq.; Delaware False Claims and Reporting Act, 6 Del. C. §§1201; the District of Columbia False Claims Act, D.C. Code §§2-30814, et seq.; the Florida False Claims Act, Fla. Stat. §68.081 et seq.; Georgia State False Medicaid Claims Act. Ga. Code §49-4-168, et seq.; the Hawaii False Claims Act, False Claims to the State, HRS §§661-21, et seq.; the Illinois False Claims Act, 740 ILCS 175, et seq.; the Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. §5-11-5.5. et seq.; Iowa False Claims Act, Iowa Code Ch. 685 et. seq.; the Louisiana Medical Assistance Programs Integrity Law, La, R.S. §§46:437, et seq.: Maryland False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 et. seq.; Massachusetts False Claims Act ALM GL ch12 §§5A, et seq.; the Michigan Medicaid False Claims Act, MCLS §§400.601, et seq.; Minnesota False Claims Act, Minn. Stat. §15C.01 et. seq.; the Montana False Claims Act, Mont Code §§17-8-401, et seq.; the Nevada False Claims Act, Submission of False Claims to State or Local Government, Nev. Rev. Stat. Ann. §§357.010 et seq., the New Mexico False Claims Act, N.M. Stat Ann. §§27-14-1 et seq.; New Mexico Fraud Against Taxpayers Act, N.M. Stat. §§44-9-1 et seq.; New Jersey False Claims Act, N.J. Stat. §§2A:32C-1.the New York False Claims Act, NY CLS St Fin, §§187 et seq.; North Carolina False Claims Act, NCGSA § 1-607 et. seq.; Oklahoma Medicaid False Claims Act, 63 Okla. Stat. §§5053, et seq.; Rhode Island State False Claims Act. R.I. Gen. Laws §§9-1.1-1, et seq.; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-181, et seq.;: the Tennessee False Claim Act, Tenn. Code Ann. §4~18-101, et seq.; the Texas Medicaid Fraud Prevention Act, Tex. Hum, Res. Code, §36.001, et seq.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1, et seq.; Washington State Medicaid Fraud False Claims Act, RCWA § 74.66.005 et. seq. and the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §§20.931, et seq.

have previously voluntarily disclosed to the government the information and allegations giving rise to the instant matter.

**A. Relator Dr. Van Raalte**

3.      Benjamin A. Van Raalte, M.D. is a resident of Davenport, Iowa.  Dr. Van Raalte is a Board Certified Diplomat of the American Board of Plastic Surgery and the National Board of Medical Examiners and is licensed to practice in the states of Iowa, Wisconsin and Illinois.

4.      Dr. Van Raalte began working in Healogics Inc. wound care centers, located in Bettendorf, Iowa and Moline, Illinois, in mid-May 2009.[2]  Dr. Van Raalte originally began working one half day per week then progressed to a full day, and he worked additional days when other wound care physicians would go on vacation.  Dr. Van Raalte worked for Defendant, Healogics, Inc., until June 2012, when his contract was not renewed.

5.      Dr. Van Raalte presently practices plastic surgery in Bettendorf, Iowa.

**B. Relator Dr. Cascio**

6.      Relator Michael J. Cascio, M.D., is a resident of Orlando, Florida.  Dr. Cascio is a Board Certified Diplomat of the American Academy of Family Physicians, is Board Certified in Undersea and Hyperbaric Medicine and is licensed to practice in the state of Florida.  He practices Wound Care and Hyperbaric Medicine full-time and is a Certified Wound Care Specialist.

7.      From November 2007 through May 11, 2014, Dr. Cascio served as the Medical Director for the Wound Care & Hyperbaric Medicine Centers at South Seminole Hospital, 555 W. State Road 434, Longwood, Florida and the Dr. P. Phillips Wound Care Center, 9400 Turkey Lake Road, Orlando, Florida.

---

2 Dr. Van Raalte technically worked for Diversified Clinical Services, Inc. or DCS, which merged with national Healing Corp to form Healogics, Inc. during his tenure in 2012.

8.　　　As a result of his refusal to commit fraud, Dr. Cascio was removed as medical director and ultimately forced out of Healogics, Inc. effective June 30, 2014.

## C. Relator John Murtaugh

9.　　　Relator John Murtaugh is a resident of Orlando, Florida. John Murtaugh received a Bachelor's of Science in Business Administration from the University of Central Florida in 2000. Mr. Murtaugh has over thirteen years in the medical products field as a sales representative for several wound care companies.

10.　　　John Murtaugh began working for Healogics Inc. as a Program Director of the wound care center in Dr. Phillips Hospital in Orlando, Florida, in April 2013. As a result of John Murtaugh's refusal to implement the Defendants' fraudulent scheme he was constantly pressured, harassed and monitored. Relator Murtaugh was employed by Healogics Inc. as a Program Director until he left in October 2013.

## D. Defendants

11.　　　Defendant Healogics, Inc. (hereinafter Healogics) is a for-profit Florida corporation with headquarters located at 5220 Belfort Road, Suite 200, Jacksonville, FL 32256. Healogics was formed when National Healing Corporation merged with Diversified Clinical Services in April 2012.

12.　　　Healogics is the nation's largest for-profit provider of wound care services and has partnered with over 600 hospitals throughout the United States to operate wound care centers. Healogics provides treatment for various chronic and non-healing wounds, including venous ulcers, pressure ulcers, arterial ulcers, osteoradionecrosis, necrotizing infections, surgical wounds and burns, soft-tissue radionecrosis, diabetic lower extremity ulcers, and osteomyelitis.

13.     In May of 2014, private equity firm Clayton, Dubilier & Rice announced plans to acquire Healogics for $910 million.  The transaction is expected to close in the third quarter of 2014.

14.     The remaining named Defendants are hospitals that contracted with Healogics in connection with the allegations herein.  These Defendants are referred to herein collectively as Defendant Hospitals, or when geographically aggregated by state as Defendant [State] Hospitals.  A spreadsheet listing the name and address of each hospital has been created and is attached hereto as "Attachment 1."[3]

## II.     Jurisdiction and Venue

15.     Healogics is headquartered in and transacts business in the Middle District of Florida in Jacksonville, Florida.

16.     This Court has jurisdiction over this case pursuant to 31 U.S.C. 3732 (a), as well as under 28 U.S.C. § 1345, where the acts proscribed by 31 U.S.C. S 3729 et seq. and complained of herein occurred in the Middle District of Florida and elsewhere.

17.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §1391 because Healogics is headquartered in and transacts business in this District, and many of the practices and conduct which are the suspect of this complaint were designed, created, and implemented' from this district.

18.     This Court has supplemental jurisdiction over this case for the claims brought on behalf of the named states pursuant to 31 U.S.C. §3732(b) and/or 28 U.S.C. § 1367, inasmuch as

---

[3] This attachment lists each hospital and is organized first by Defendants which own and operate more than one facility.  The spreadsheet then lists those hospitals which are single unit hospitals by the state in which each facility is located.

recovery is sought on behalf of these states which arises from the same transactions and occurrences as the claims brought on behalf of the United States.

19.    The facts and circumstances alleged in this Amended Complaint have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

## III.    Factual Background

20.    Healogics created, designed, and implemented a nationwide scheme to generate unjustified and costly medical procedures to generate fraudulent invoices to Medicare, Medicaid and Tricare, among others.

21.    Healogics contracted with Defendant Hospitals throughout the United States to run the day-to-day operations of the Defendant Hospitals' wound care centers, and implemented a fraudulent scheme through, and with the consent and cooperation of, Defendant Hospitals.

22.    Healogics incentivized Defendant Hospitals to contract with them by agreeing to provide the hyperbaric oxygen tanks, employ the support staff, and conduct the necessary marketing that a wound care center requires.  Defendant Hospitals were informed by Healogics that Defendant Hospitals could expect certain profits from the wound care centers when the facilities are operated the "Healogics Way".   The anticipated profits included spin-off or ancillary revenue created by the wound care center operations for things like x-rays, lab work, bandages, etc. The basic operation works as follows:

23.    Defendant Hospitals bill insurance, including government programs like Medicaid, Medicare and other government sponsored insurance programs, for the technical

component of treatments provided in the wound care center. In some cases, Defendant Hospitals may also bill for the professional component for services provided.

24.    Prior to any patient interaction a document known as a superbill would be placed into the patient's chart. The superbill lists all procedures and corresponding CPT codes. At the end of the patient visit the attending nurse and/or the treating physician would check off the procedures that were allegedly, but were in many instances not, done.

25.    An administrative assistant or biller then enters the "facility" portion of the visit charges into Defendant Hospital billing system.   Defendant Hospitals then bill Medicare, Managed Medicare, Medicaid, Managed Medicaid, Tricare and others for the charges incurred.

26.    In order to submit claims for the physician's fee for procedures performed, the contracted physician would be responsible for filling out their own superbill with corresponding CPT codes of the procedure performed.   The phsyician would then submit those superbills to Medicare, Managed Medicare, Medicaid, Managed Medicaid, and other government sponsored insurance programs for the "professional" charges incurred through their private practices.

27.    Each month a Healogics employee, usually the Program Director, would prepare an invoice to the partner Defendant Hospital indicating how much Defendant Hospital owed Healogics for operating the wound care center that month. There are generally three components which made up the basis for the invoice; the number of hyperbaric oxygen or HBO segments, the number of wound care visits/procedures, and the number of hours of medical director time. The data for these components comes from Healogics' databases as well as daily and weekly reports generated by the Program Director.

28.    Healogics provides each Defendant Hospital a specific budget showing them how much money the wound care centers will make each month.   The budget is built on the faulty

premise that certain benchmarks created by Healogics are obtainable and appropriate in all of the centers.

29.    Healogics developed and relied upon these national benchmarks in order to audit, manage and maximize the billing for each of its wound care centers. Healogics' benchmarks were more than mere targets that each wound care center should strive towards; rather they were structured corporate mandates that blatantly disregarded whether or not patients being treated in the centers actually needed the more expensive treatments or ever actually received it.

30.    If contracted physicians were not meeting these budgets or benchmarks by performing or billing for higher revenue producing procedures, then Healogics, in conjunction with the Defendant Hospital, would pressure and harass the program directors and physicians until they either conform with the benchmarks or are forced out. Once forced out, noncompliant program directors and physicians are replaced with "team player" program directors and physicians who will go along with this scheme and perform or bill for higher revenue producing procedures whether they are medically necessary or not.

31.    The scheme was carried out by the Defendants with an "everyone wins" explanation wherein patients received otherwise expensive treatments for little to no cost, doctors were able to bill extensively and grow wealthy, Defendant Hospitals improved their bottom line and Healogics' revenue and corporate valuation exploded. The downside to this reasoning is that the insurers, notably the government insurance programs, were left holding the bag.

32.    A majority of the Defendants' wound care center patients were under some type of government insurance. Healogics' payor mix reflects a range of 50% to 90% of all patients

treated were Medicare, Managed Medicare, Medicaid and Managed Medicaid patients, depending on the location of the particular wound care center.

33.     In order to meet the budgets and benchmarks so that "everyone wins," Healogics educated, trained, directed and ensured that their employees and contracted panel physicians did things the "Healogics Way".

34.     Doing things the "Healogics Way" meant, among other things, blatantly up-coding debridement procedures, falsifying eligibility in order to bill for unnecessary but expensive hyperbaric oxygen treatments, and requiring all patients to undergo unnecessary testing called transcutaneous oxygen measurement or TCOM.

35.     Healogics accomplished the aforementioned scheme by seeking out employees, agents and contractors who would go along with their plot. Healogics' schemes were national in scope and are corroborated through the independent experiences of the three Relators herein.

36.     When employees like John Murtaugh and panel physicians like Drs. Cascio and Van Raalte refused to participate in Healogics' deceptive practices, they were singled out, publically pressured, punished by withholding necessary resources and eventually replaced with someone willing to do the Defendants' bidding to focus on profits rather than patients or following government policies and rules.

37.     The instant scheme could not have succeeded without the willing and active participation of the Defendant Hospitals. In fact, all of the Defendants and many of their employees have profited greatly off of their fraud perpetrated on the United States and various states and private insurers.

## A. Up-Coding of Debridements

38.     Wound care centers, such as those operated by Healogics, typically treat chronic wounds.  A chronic wound is defined as one that is unresponsive to initial therapy or persistent in the face of appropriate care and not defined by size, complexity or failure to heal within a limited time frame.[4]

39.     The most common types of chronic wounds of the lower extremity are described by their cause or etiology: 1) vascular (e.g. arterial, venous, or mixed ulcers); 2) pressure ulcers; and 3) neuropathic (e.g. diabetic ulcers).

40.     One of the primary procedures used in treating wounds is debridement. Debridement is defined as the removal of unhealthy tissue from a wound in order to promote healing.  There are currently two types of debridements which are reimbursable under CMS guidelines, selective and surgical/excisional.

41.     The main clarifying difference between a selective debridement and a surgical/excisional debridement is the type of tissue removed. Selective debridement does not involve removal of subcutaneous fat, muscle tissue or bone, while surgical debridements do.

42.     Healogics directed physicians employed in their wound care centers to up-code more minor selective debridements[5] to the higher revenue producing and more involved surgical or excisional debridement.[6]  The more expensive procedure was billed regardless of the type of procedure that was actually performed. In most cases, a selective debridement was performed but a surgical debridement was billed.

---

[4]   American Society of Plastic Surgeons.  May 2007.  http://www.plasticsurgery.org/Documents/medical-professionals/health-policy/evidence-practice/Evidence-based-Clinical-Practice-Guideline-Chronic-Wounds-of-the-Lower-Extremity.pdf.
[5] CPT codes 97597-97598
[6] CPT codes 11042 – 11047

43.     The nationwide benchmark for all wounds assessed by employees working in Healogics wound care centers was that 60% of all wounds required debridement and 80% of all debridements performed required a surgical/excisional debridement.    Extrapolating these benchmarks meant that 48%, or roughly half of all patients Defendants treated, allegedly received the more painful and more expensive surgical/excisional debridements.

44.     In addition to billing the government for surgical/excisional debridements when they were either unnecessary or not actually performed, Healogics also directed that these procedures be performed on a frequent, often weekly, basis for each patient. The inherent flaw in this approach is that where surgical debridements are clinically indicated, they are almost never utilized on a weekly recurring basis for the same wound.   If the same wound were surgically debrided each week, very little viable tissue would be left and the wound would not have time to heal.

45.     Healogics provided instruction to their wound care center physicians on when to classify a wound debridement as the higher paying surgical/excisional.   This was done despite those instructions being in direct contradiction with the Center for Medicare and Medicaid Services (CMS) wound care guidelines,   National Coverage Determinations (NCDs), Local Coverage Determinations (LCDs) as well as Healogics' own clinical practice guidelines.

46.     Healogics structured its contracts with Defendant Hospitals so that it was only paid when surgical debridements were conducted, thus incentivizing its employees and agents to always code any debridement as surgical/excisional.

47.     Healogics, in their zeal to maximize revenue and keep their Defendant Hospitals happy, systematically identified individual wound care center physicians and/or their program

directors who had lower rates of debridement than Healogics' national benchmark of 60%, and punitively classified them as being "non-aggressive".

48.     "Non-aggressive" did not describe the physician's clinical approach of treating wounds, rather it was a code word for physicians who were not team players and would not compromise their medical integrity in order to carry out Defendants' profit scheme.

49.     Healogics targeted these "non-aggressive" physicians for replacement by giving presentations to their partner Defendant Hospitals that showed the lost revenue which could be brought to Defendant Hospital if "non-aggressive" physicians would simply attain the benchmarks set by Healogics.  At these meetings, a strong suggestion was made to pressure the "non-aggressive" physicians or replace them with ones who would meet the lofty revenue goals by up-coding debridements.  The same treatment was directed at Program Directors whose centers were not meeting Healogics benchmarks and related profitability.

50.     Defendants' scheme was carried out by finding "team player" physicians who would do Defendants' bidding and eliminating and replacing those who refused.   Most physicians went along the scheme because they were able to make their affiliated hospitals extra revenue and personally profit as well.   Healogics was selective in hiring or contracting with treating physicians as they wanted only those doctors who would view treatment options strictly under the Healogics prism and not based on CMS or other regulatory criteria.

**B.  CMS Guidelines and Background on Debridements**

51.     Fraud in debridement coding is not a new or novel scheme.

52.     In May 2007, the Office of the Inspector General for the Department of Health and Human Services (OIG-HHS) released a report on Medicare Payments for Debridement

Services for 2004. The OIG-HHS had seen a dramatic increase in the number of Medicare claims submitted for the surgical debridement of wounds under CPT codes 11040–11044.

53.     In 2004, Medicare paid out $188 million for surgical debridement services. However, as much as 64% of surgical debridement services that year did not meet Medicare program requirements.

54.     CMS determined that this resulted in $64 million dollars of improper payments. A variety of problems were noted, including 47% of miscoded services were not actually surgical debridement.[7]

55.     The OIG found that CMS should either develop an NCD or instruct contractors to develop more uniform policy guidance that defines surgical debridement and appropriate coding and documentation practices.

56.     It was also recommended that CMS should instruct carriers to conduct additional medical reviews on surgical debridement services with a focus on common coding errors, higher cost services, and providers with aberrant billing patterns.

57.     CMS' Local Coverage Determinations (LCDs)[8] dictate the following in regards to Wound Debridement Services (L29128):

> Surgical/Excisional    Debridement    (CPT    codes    11042-11047)    Surgical
> debridement, also known as excisional debridement, occurs only if material has
> been excised and is typically reported for the treatment of a wound to clear and
> maintain the site free of devitalized tissue including necrosis, eschar, slough,
> infected tissue, abnormal granulation tissue etc., to the margins of viable tissue.
> *Surgical excision includes going slightly beyond the point of visible necrotic*
> *tissue until viable bleeding tissue is encountered in some cases. The use of a*

---

[7] Department of Health & Human Services, Office of the Inspector General; "Medicare Payments for Surgical Debridement Services in 2004;" May 2007; OEI-02-05-00390.
http://oig.hhs.gov/oei/reports/oei-02-05-00390.pdf.
[8] Medicare Policies and Guidelines, LCD Determination ID: 11000, Original Determination Effective date of February 2, 2009 with latest revision effective date of January 1, 2011

*sharp surgical instrument does not necessarily substantiate the performance of surgical excisional debridement. Unless the medical record shows that a surgical excision debridement has been performed, debridement should be coded with either selective or non-selective codes (97597, 97598, or 97602).*](emphasis added)

Surgical debridement codes (11042-11047), as performed by physicians and qualified non-physician practitioners licensed by the state to perform those services, are reported by depth of tissue removed and by surface area of the wound. These codes can be very effective but represent extensive debridement, *often painful to the patient,* and could require complex, surgical procedures and sometimes require the use of general anesthesia. Surgical debridement will be considered as "not medically necessary" when documentation indicates the wound is without infection, necrosis, or nonviable tissues and has pink to red granulated tissue. Documentation for surgical debridement procedures should include the indications for the procedure, the type of anesthesia if and when used, and the narrative of the procedure that describes the wounds, as well as the details of the debridement procedure itself. The CPT code selected should reflect the level of debrided tissue (e.g., skin, subcutaneous tissue, muscle and/or bone), not the extent, depth, or grade of the ulcer or wound. For example, CPT code 11042 defined as "Debridement; subcutaneous tissue" should be used if only necrotic subcutaneous tissue is debrided, even though the ulcer or wound might extend to the bone. In addition, if only fibrin is removed, this code would not be billed. *It would not be expected that an individual wound would be repeatedly debrided of skin and subcutaneous tissue because these tissues do not regrow very quickly.* (emphasis added)

58.     The same LCD dictates the following in regards to selective debridement:

Selective Debridement CPT codes 97597 and 97598 are used for the removal of specific, targeted areas of devitalized or necrotic tissue from a wound along the margin of viable tissue. Occasional bleeding and pain may occur. The routine application of a topical or local anesthetic does not elevate active wound care management to surgical debridement. Selective debridement includes:

- *Selective removal of necrotic tissue by sharp dissection including scissors, scalpel, and forceps.*

- Selective removal of necrotic tissue by high pressure water jet. Medicare coverage for wound care on a continuing basis for a given wound in a given patient is contingent upon evidence documented in the patient's medical record that the wound is improving in response to the wound care being

provided. It is neither reasonable nor medically necessary to continue a given type of wound care if evidence of wound improvement cannot be shown.

- Evidence of improvement includes, but is not limited to, measurable changes in at least some of the following:
  - Drainage (color, amount, consistency)
  - Inflammation
  - Swelling
  - Pain
  - Wound dimensions (diameter, depth, tunneling)
  - Granulation tissue
  - Necrotic tissue/slough

Such evidence must be documented with each visit. A wound that shows no improvement after 30 days requires a new approach, which may include a reassessment, by a qualified professional, of underlying infection, metabolic, nutritional, or vascular problems inhibiting wound healing, or a new plan of care or treatment method.   In rare instances, the goal of wound care provided in the outpatient setting may only be to prevent progression of the wound, which due to severe underlying debility or other factors such as inoperability, is not expected to improve.

59.   The 2014 Medicare participating provider national unadjusted fees for selective debridements are as follows:

| CPT Code | In office | In hospital | APC[9] |
|----------|-----------|-------------|--------|
| 97597 | $77.02 | $24.72 | $147.39 |
| 97598 | $25.43 | $11.82 | N/A |

60.   The 2014 Medicare participating provider national unadjusted fees for surgical/excisional debridements are as follows:

| CPT Code | In office | In hospital | APC |
|----------|-----------|-------------|-----|
| 11042 | $117.14 | $63.05 | $274.81 |
| 11043 | $232.49 | $161.20 | $274.81 |
| 11044 | $322.41 | $240.37 | $640.91 |

---

[9] Ambulatory Payment Classification

| 11045 | $42.99  | $28.30  | N/A |
|-------|---------|---------|-----|
| 11046 | $74.51  | $57.67  | N/A |
| 11047 | $127.17 | $103.17 | N/A |

61.     As is evident from the above reimbursement information, the professional fee reimbursement for surgical debridements are in excess of 50% more than the selective and the APC reimbursement is more than 86% greater for surgical versus selective.

**C. Dr. Van Raalte's Experience**

62.     Dr. Van Raalte began working as an independent contractor for Healogics on May 15, 2009, serving as a wound care physician in their Bettendorf, Iowa clinic and approximately one year later in their Moline, Illinois clinic.

63.     On the very first day he started working for Healogics, he received a letter explaining when to charge for a surgical/excisional debridement versus a selective debridement. In reviewing the document, he concluded that the letter was intended to dictate or influence his clinical approach so that higher revenue could be realized through the use of 11042-47 CPT codes in lieu of the lower paying 97597-98 CPT codes.  He concluded that Healogics was not instructing him to actually perform surgical debridements, merely to bill as those he had.

64.     Dr. Van Raalte would not allow Healogics to influence his professional opinion either through letters, such as this one, or through the constant pressure that was exerted on him by Healogics to bill for or perform more lucrative procedures whether medically necessary or not.

65.     On March 21, 2010, Dr. Van Raalte attended a medical staff meeting led by his program director, Tim Raymon and medical director, Gregory Bohn, M.D., which was devoted singularly to the issue of debridement coding. The primary focus of the meeting was the "non-

aggressive" debridement statistics for Healogics' Moline and Bettendorf clinics. Dr. Van Raalte averaged a much lower debridement rate at the time compared to Healogics' specified benchmark of 60% of all wounds assessed being debrided.

66.     The lower debridement rate caused Tim Raymon and Gregory Bohn to constantly question why Dr. Van Raalte was not conducting more debridement, and particularly surgical/excisional debridements, even though his patients were healing quicker and at lower cost.

67.     Tim Raymon continued his presentation by pointing out that the Bettendorf and Moline clinics, and more particularly Dr. Van Raalte, were not coding enough of the higher revenue producing surgical/excisional debridements, thus falling well short of the 80% benchmark the company expected.  They did not cite specific case examples where a surgical debridement should have been performed or where a surgical debridement was performed but the lower cost selective debridement was billed.

68.     Tim Raymon went over another slide titled "Room For Improvement?".  This slide utilized pie charts to examine the percentage of the higher paying surgical/excisional debridements being billed by the Moline and Bettendorf clinics. The message from Healogics was that the two clinics were not being "aggressive" enough in their use of the higher paying surgical/excisional debridement and that profits were being lost.  They also stressed that physicians not billing or performing sufficient surgical debridements were being closely monitored.

69.     Tim Raymon went over the financial considerations of debridements by presenting a slide that showed all in attendance how much less reimbursement was received by

the wound care center for selective debridements in 2011 compared to reimbursement rates for 2006.

70.     The chart clearly demonstrated that there was no financial incentive to perform a selective debridement as Medicare was not reimbursing as much as it once did for the procedure and definitely was not reimbursing at a rate comparable to surgical/excisional debridements.

71.     Healogics insisted that its' wound care centers make up this difference by coding most of their debridements as surgical/excisional.

72.     Even though he was under extreme pressure to meet the 80% surgical/excisional debridement benchmark demanded by Healogics, Dr. Van Raalte refused to perform and bill for surgical/excisional debridements that were not indicated by patient interaction or examination.

73.     On November 21, 2011, Dr. Van Raalte attended yet another medical staff meeting led by Tim Raymon and Gregory Bohn to review each physician's debridement rates. At this point in time Dr. Van Raalte's rates were 5.56% for surgical/excisional debridement and 11.81% for selective debridement. His healing rates were 90% exclusive of venous stasis ulcers which take longer to heal and were lower for all physicians providing service.

74.     Tim Raymon and Gregory Bohn once again went over the benchmarks that were to be met by the physicians in the wound care centers restating that 60% of all wounds assessed should be debrided and 80% of those should be the higher paying surgical/excisional and only 20% should be the lower paying non-excisional or selective.

75.     Tim Raymon and Gregory Bohn once again, chastised those physicians, such as Dr. Van Raalte, whose debridement rates were lower than Healogics demanded and explained the financial consequences on the wound care center for their behavior.

76.    Sometime in early 2012, Tim Raymon and Michael Patterson, vice president of operations for Defendant Trinity Hospital Moline, met with Dr. Van Raalte because they claimed he was not performing enough profitable procedures and was not meeting the Healogics benchmarks for surgical/excisional debridements.

77.    During the meeting, Dr. Van Raalte was provided with a chart showing how much more physician reimbursement could be made by billing or performing surgical/excisional debridements ($26.89 - $236.56) instead of selective debridements ($11.23 - $23.83).  This meeting was designed to get Dr. Van Raalte to increase his level of the higher paying surgical/excisional debridement in order to bill more for his hospital, himself and Healogics.

78.    Dr. Van Raalte refused to comply with their profit focused directives and as a result, his contract with the Healogics wound care centers was not renewed on June 15, 2012.

79.    Although other reasons were provided as to why his contract was not renewed, Dr. Van Raalte's contract was not renewed due to his refusal to up-code selective debridements to surgical/excisional debridements, perform medically unnecessary procedures to increase revenue and his refusal to place patients into expensive HBO treatments when their condition did not make them good candidates or qualify them for the treatment.

80.    In order to justify not renewing Van Raalte's contract, Healogics severely understaffed the clinic while he was on duty.  This tactic caused long patient waits, routinely two hours, and led to patient complaints against him even though there was no wait to see him once a patient had been screened by the duty nurse.

81.    Dr. Van Raalte was one of the only physicians in his wound care center who would counsel and discourage smoking by patients being treated for chronic wounds.  Smoking

deprives the skin and surrounding tissue of oxygenated blood.  As such, it is contraindicated for patients with chronic wounds and actually prevents healing.

82.     Healogics told Dr. Van Raalte that his contract was not renewed because there had been several patient complaints and his patient satisfaction scores were too low.  The nature of the complaints and purported low scores was actually caused by Dr. Van Raalte's anti-smoking advice to his patients and long wait times caused by Defendants' understaffing his facility.

83.     Healogics also encouraged the nursing staff, specifically Elizabeth Voss, Sara Wells and Charity Kyser, to file complaints against him.  The three nurses refused and ultimately left the wound care center.

84.     Dr. Van Raalte was allowed to work an additional four weeks in the wound care center after his contract was not renewed.

85.     Healogics began referring problematic wound care cases to Dr. Van Raalte at his private practice soon after his departure and have continued to do so over the last two years, the most recent being in mid-February 2014.

**D. Dr. Cascio's and John Murtaugh's Experience**

86.     In October 2012, Relator Dr. Michael Cascio and his private practice partner, Dr. Walter Conlan, requested a meeting with Healogics area vice president Suemei Addington.

87.     The purpose of the meeting was to discuss Healogics' recent purchase of the Nautilus Health Care Group which staffs wound care centers with physicians. Ms. Addington told both physicians that the goal of the acquisition was not to replace current physicians but to hire physicians in areas that were underserved.

88.     During the meeting Ms. Addington told both men that the two wound care centers Dr. Cascio was medical director over, South Seminole Hospital and Dr. Phillips Hospital, were not performing well financially. In questioning why she felt they were not performing financially, Ms. Addington responded that the physicians needed to do more surgical/excisional debridement and attempt to meet the national averages that Healogics accomplished in their other wound care centers.

89.     Ms. Addington also told both physicians that they needed to convert more patients to a hyperbaric oxygen treatment plan as their HBO conversion rate was well below national averages. At this meeting, and during numerous other occasions when speaking with Ms. Addington, Dr. Cascio told her that he did what was necessary for each individual patient and would not do procedures just to increase the bottom line for Defendants.

90.     Lisa Miller-Noble, the program director hired by Healogics to work in Dr. Cascio's centers resigned due to the extreme pressure of the job.

91.     On April 23, 2013, John Murtaugh was hired by Healogics as the Program Director of the Dr. Phillips Hospital Wound Care Center in Orlando Florida.

92.     During the first few weeks of employment with Healogics he was told by his area vice president Suemei Addington and regional director of clinical operations Nancy Helme that the Dr. Phillips Hospital wound care physicians were "non-aggressive" and that they were not coding the more expensive surgical/excisional debridement as often as they should be.

93.     Ms. Addington made it clear to John Murtaugh that part of his job was to get these physicians to be more "aggressive" and fall in line with Healogics' targets for debridement percentages.

94.     The tools and techniques used by Healogics to get under-performing physicians in line were relayed to John Murtaugh and included utilizing reports (daily, weekly, monthly and annual) to highlight and publicize trends, posting debridement rates within the center, conducting center leadership meetings, providing corporate directed "education" on coding debridements and meeting with Defendant Hospital partners to discuss and expose the weaknesses of the non-aggressive physicians.

95.     John Murtaugh was repeatedly told by Suemei Addington and Nancy Helme that a wound that has any depth into the subcutaneous tissue was to be automatically classified as a surgical/excisional debridement.  Mr. Murtaugh was told that his physician's refusal to code these procedures correctly was greatly damaging his center financially and jeopardizing his future with Healogics.

96.     In September 2013, Healogics held a company-sponsored educational meeting on debridement for contracted physicians at South Seminole Hospital in Longwood, Florida.

97.     In attendance were Healogics' area medical director Kathleen Minnick, who led the meeting, Dr. Cascio, Dr. Ricardo Ogando, Dr. Barry Cook and Dr. Antonio Crespo, physicians who worked in the Healogics' wound care centers.  Also in attendance were Sue Ann Prouse, clinical coordinator at the Healogics' South Seminole Wound Care Center, Cindy Johnson, Healogics' acting program director of the South Seminole Wound Care Center, Robin Hug, chief operations officer at South Seminole Hospital and Relator John Murtaugh.

98.     During the meeting, Kathleen Minnick continually made recommendations on coding the higher revenue producing surgical/excisional debridement that were in direct contradiction with the CMS LCD guidelines.  She told the physicians in attendance that "if a

wound bleeds during a debridement, then it is a surgical/excisional debridement and should be coded as such."

99.    Dr. Cascio and other physicians in attendance immediately expressed concern over her statement. Dr. Cascio actually picked up Kathleen Minnick's own iPad, accessed the internet and pulled up the CMS LCD guidelines reading them aloud so that all attendees could hear.

100.    Kathleen Minnick responded that "the LCD is wrong".   Dr. Cascio informed her that the LCD could not be wrong and that he respectfully disagreed with her.  Kathleen Minnick also made the statement that "you always take a little subcutaneous tissue out of the wound during a debridement, so that is why you can bill for a surgical/excisional debridement." Drs. Cascio and Ogando immediately voiced additional concern over her statements.

101.    While continuing to debate the physicians in attendance over the up-coding of a selective debridement to a surgical/excisional debridement, Kathleen Minnick made the statement that she "does not want to be greedy, so sometimes she will actually bill for a selective debridement."

102.    John Murtaugh and Dr. Cascio were shocked by her statement as it directly conflicted with their knowledge of how to properly code for procedures, namely that procedures are to be coded for what is actually done according to the guidelines and not whether the physician wants to be greedy or not.

103.    On August 27, 2013, John Murtaugh attended an annual business review meeting where Healogics' upper management gave a presentation regarding the Dr. Phillips and South Seminole Hospitals' wound care centers' healing rates, median days to heal, and outliers.

104.    Annual business review meetings are conducted at each of Healogics' centers in similar fashion. The primary focus of the meetings is to review financial results and create plans to get or stay on track.

105.    In attendance at the meeting were Healogics' senior vice president Michael Tanner, Suemei Addington, Nancy Helme, Cindy Johnson (acting program director), chief nursing officer for Dr. P. Phillips Hospital Kathy Black, senior financial manager at Dr. Phillips Hospital Stephen Graham, and chief operations officer at South Seminole Hospital Robin Hug.

106.    During the meeting, Michael Tanner and Suemei Addington informed the financial managers from the two hospitals that their wound care center physicians, specifically Dr. Cascio, along with other contracted physicians like Dr. Antonio Crespo, were being "non-aggressive" in their debridement.

107.    Healogics upper management presented slides comparing the Dr. Phillips and South Seminole Hospital wound care physicians' rates of surgical/excisional debridement with Healogics national averages demonstrating how much money was being lost due to the fact that the physicians were not up-coding to Healogics' national averages.  In the case of Dr. Phillips Hospital this amounted to $156,644 annually and in the case of South Seminole, $189,014 annually.

108.    During the meeting, Michael Tanner and Suemei Addington continually stressed to the hospital's financial managers that the benchmark was 60% of all wounds assessed should be debrided and that 80% of those wounds should be the higher paying surgical/excisional debridement.

109.    The conversation did not include any discussion on the medical necessity or lack thereof for such wound assessments.  There were no case examples cited where Dr. Cascio

miscoded or down-coded a debridement. Particularly disturbing about these meetings is the complete absence of any discussion of healing rates or efficacy. Dr. Cascio's healing rates and efficacy were well above the national averages for Healogics' wound centers.

110. In 2012, both Wound Care Centers that Dr. Cascio was medical director of received the Center of Distinction award. The Center of Distinction designation by Healogics was only given to 1 in 6 wound care centers nationwide. The award is given to those centers that meet or exceed Healogics' national averages in the following categories: patient satisfaction is greater than or equal to 92%; healing rate is greater than or equal to 91%; outlier rate, an outlier being a wound that does not hit certain healing benchmarks, less than or equal to 19%; and median days to heal less than or equal to 30 days.

111. Sometime in 2013, Dr. Cascio was informed by Nancy Celleri, RN, that his partner Dr. Walter Conlan had performed a selective, non-excisional debridement, CPT 97597, but had circled a higher paying CPT code of 11042 on the billing sheet.

112. When Nurse Celleri confronted Dr. Conlan at the time he told her that, "this is what they want me to do so I'm doing it."

113. Nurse Celleri also reported this information to Michelle Foster, the program director at South Seminole Wound Center and then to Clinical Coordinator Sue Ann Prouse. As a result of being confronted, Dr. Conlan purportedly went back and adjusted the billing and dictation to reflect the lower paying debridement that he had actually performed.

114. Dr. Conlan's rate of higher paying surgical excisional debridement has tripled in the face of constant pressure from Healogics to perform more profitable procedures.

115. Due to his refusal to participate in the scheme to defraud the government and private insurers, Dr. Cascio was removed as medical director on May 11, 2014.

116.    He was effectively terminated from Healogics effective June 30, 2014.

117.    On March 20, 2014, John Murtaugh had a conversation with Dr. Jefferson Mennuti in the physician's office of the Florida Hospital Fish Memorial Wound Care Center. A chart listing the debridement rates for each contracted physician was prominently displayed in the office.

118.    John Murtaugh noticed that the selective debridement rate average was 2.5% while the rate for surgical/excisional debridement was approximately 95%. The public posting of each physician's debridement rates is further proof of the type of pressure Healogics places on its contracted physicians to conform to their corporate, mandated quotas.

**E.   Unnecessary Use of Hyperbaric Oxygen Treatments**

119.    Hyperbaric Oxygen (HBO) therapy involves the inhalation of 100% oxygen at increased atmospheric pressures.   HBO therapy can be used to treat a variety of conditions including air or gas embolisms, carbon monoxide poisoning, decompression sickness (bends), selected diabetic wounds, intracranial abscesses, necrotizing soft tissue infection, osteoradionecrosis, osteomyelitis (chronic refractory), and thermal burns.

120.    The theory behind treating wounds with HBO is that wounds have a reduced oxygen supply that impairs healing. It can be a lifesaving or limb sparing procedure in certain circumstances, but there are a myriad of complications that are associated with it and it is not indicated for all wound patients.

121.    Among the potentially severe and life-threatening complications which can occur are ruptured ear drums, oxygen toxicity, chest pain, seizures, panic attacks, collapsed lungs and myopia.

122.     Patients undergoing HBO therapy enter a chamber where oxygen is forced through the lungs to the bloodstream, tissues and cells. The atmospheric pressure is typically between 2 to 2.5 atmospheric absolute (ATA) or the equivalent to being 38 to 48 feet below sea level. A 90-minute treatment in this hyperbaric environment induces "hyperoxygenation" with oxygen levels over 10 times the normal amount in the bloodstream.

123.     Various government insurance programs like Medicare provide significant reimbursement for HBO therapy when it is clinically indicated and meets CMS guidelines.

124.     Disregarding all of the potential harm that can occur to a patient and regardless of the medical necessity, Healogics set benchmarks for the amount of HBO therapy that was to be conducted in each of their wound care centers. They actively targeted each and every patient for conversion to HBO therapy.

125.     Healogics strived to meet these HBO benchmarks, and thereby increase their revenue and profits.  In order to do so, the Defendants had their employees or contractors manipulate patients' actual diagnoses or wound classifications in order to create false support for providing the expensive therapy.

126.     Healogics universally approached and described wound classification as "an area of opportunity." They educated and instructed their employees to be creative in classifying wounds so that surgical debridements would seem appropriate and that the patients would qualify for HBO therapy.

127.     One of the most widely used diabetic wound classification systems is the Meggitt-Wagner system developed in the 1970s. Meggitt-Wagner staging is used in assessing diabetic foot wounds and provides a guideline for measuring the depth of the ulcer and the severity of the wound. It does not assess the vascular status of the foot.

128.   Dr. Benjamin Van Raalte, with seven years of surgical residency in wound care, plastic surgery and general surgery, and twenty-five years of practical wound care experience, Dr. Michael Cascio, with seven years of practical experience in wound care treatment and John Murtaugh, with over seven years combined experience as the director of a wound care center and sales representative for wound care products and devices, all have witnessed Healogics pressuring its wound care center employees and contracted physicians to improperly classify wounds as diabetic ulcers that should be classified as venous leg ulcers or pressure ulcers. Defendants did this in order to qualify patients for HBO therapy.

129.   CMS NCD guidelines allow for HBO therapy for a wound classified as a Wagner Grade 3 while a Wagner Grade 1 or 2 wound would not qualify for the expensive therapy. Relators also witnessed Healogics pressure staff and panel physicians to classify Wagner Grade 1 or 2 wounds, as Wagner Grade 3 wounds, which would then qualify the patient for the expensive and lucrative HBO therapy.

130.   During Dr. Van Raalte's employment with Healogics he observed Healogics' employees obtain wound cultures by running swabs across the ulcer surface. This is an improper technique since the swab will pick up bacteria from the superficial layers of the skin where they normally reside which can lead to an inaccurate isolation of the wrong bacteria if infection is present in the bone.

131.   These improper and needless swabs were only done so that wounds could be upgraded to a Wagner Grade 3 which would then qualify the patient for the profitable HBO therapy.

132.   Dr. Van Raalte challenged the surface cultures as being unnecessary and inaccurate and discussed this with the hospital's infectious disease expert at the time, Dr. Mirza

Baig, who agreed that this was an improper technique to obtain a culture and that it had no value whatsoever in determining a patient's course of treatment and, in fact, could cause harm to the patient who might not receive the proper treatment due to an improper culture being performed.

133.    The Infectious Disease Society of America (IDSA) has developed and validated clinical criteria for recognizing and classifying diabetic foot infections.  If infection is suspected, a deep tissue swabbing or soft tissue cultures should be taken at the site where the wound has been cleansed and debrided or if osteomyelitis is suspected, a piece of bone should be sent for culture and histology.[10]  IDSA also recommends using diagnostic studies, such as x-rays or magnetic resonance imaging (MRI), to evaluate patients with suspected osteomyelitis or gas gangrene.  It should be noted that IDSA does not support the use of HBO treatments in patients with osteomyelitis.[11]

134.    After challenging these improper cultures, Dr. Van Raalte was labeled a troublemaker by Tim Raymon and Gregory Bohn.  Stunningly, Tim Raymon and Gregory Bohn continued the practice with total disregard to how it might affect patient healing and recovery.

135.    Dr. Van Raalte estimates that 50% of all diabetic wounds that were treated during his employment with Healogics were upgraded to Wagner 3 when they should have properly been classified as Wagner 2 or lower.

**F.  Healogics iHeal Software**

136.    Healogics created a computer system which artificially classified wounds on diabetic patients as diabetic ulcers even when they were not.

---

[10]  IDSA Guideline for Diabetic Foot Infections; "2012 Infectious Diseases Society of America Clinical Practice Guideline for the Diagnosis and Treatment of Diabetic Foot Infections." CID 2012:54 (15 June) • pg.136. www.idsociety.org/uploadedFiles/IDSA/Guidelines-Patient_Care/PDF_Library/2012%20Diabetic%20Foot%20Infections%20Guideline.pdf

[11]  Id.

137.    iHeal, an electronic medical record system and database that was developed by Healogics, is used in all of the Healogics' wound care centers. This in-house, proprietary software artificially limits a physician's discretion in treating wounds and automatically classifies all wounds on a diabetic patient as diabetic ulcers regardless of their true nature or location and will not allow the physician to override that classification.

138.    Whenever a physician enters information into iHeal about a patient who has been diagnosed with diabetes, the software thereafter requires the physician to grade the wound using the Meggitt-Wagner Grading Scale which is specific to diabetic ulcers.

139.    Physicians are not given the choice of selecting partial thickness or full thickness to describe the wound depth of venous ulcers that happen to be on a diabetic patient, nor are they given the option of selecting Stage 1 – 4 for pressure ulcers.

140.    Not all wounds on diabetic patients are diabetic wounds but iHeal does not allow physicians to take into consideration the primary etiology of the wound if the patient has diabetes.

141.    Healogics designed iHeal in this fashion in order to classify wounds that would qualify for expensive HBO treatment regardless of the clinical judgment of the physicians working in the wound care centers.

### G. Osteomyelitis

142.    Osteomyelitis is an infection of the bone. Chronic refractory osteomyelitis is defined as acute or chronic osteomyelitis that is not cured after appropriate interventions. Per CMS NCD guidelines, HBO therapy is not indicated for osteomyelitis but is indicated for chronic refractory osteomyelitis.

143.   Drs. Cascio and Van Raalte, as well as John Murtaugh, have first-hand knowledge of Healogics purposefully misclassifying osteomyelitis as chronic refractory osteomyelitis in order to qualify patients for HBO therapy.

144.   In September 2013, Dr. Cascio and John Murtaugh were at a meeting where Healogics' area medical director, Dr. Kathleen Minnick, instructed all of the physicians and clinical coordinators in attendance that she only waited one week before classifying osteomyelitis as chronic refractory osteomyelitis and that she recommended all of the employees in attendance do the same.

145.   All of the physicians at the meeting vehemently disagreed with her instruction as all agreed that one week was not long enough to assess whether or not antibiotic therapy had failed. Healogics provided this instruction to its employees for the express purpose of qualifying more patients for unnecessary HBO therapy and thereby meeting their corporate imposed revenue benchmarks. Healogics went as far as having physicians working in their facilities sign contracts stating a minimum of 10% of all patients seen would receive HBO therapy.

**H. CMS Coverage of Hyperbaric Oxygen Treatments**

146.   CMS' LCD for Florida[12], titled Policies and Guidelines for Hyperbaric Oxygen Therapy (HBO Therapy) (L28887), identify HBO therapy as a medical treatment in which the patient is entirely enclosed in a pressure chamber breathing 100% oxygen (O2) at greater than one atmosphere (atm) pressure.

147.   The delivery system for HBO uses either a single person or multiple person chamber. In either setting, the time the patient spends in the chamber under hyperbaric conditions is decided by the physician and generally ranges from one to two hours. In order to

---

[12] The Florida LCD is consistent with the National Coverage Determinations and is used here for ease of reference.

receive Medicare reimbursement for HBO therapy, services must be rendered under the direct supervision of the physician.

148. HBO therapy is covered by Medicare for the following conditions that would generally be seen in a wound care center:

Chronic refractory osteomyelitis persists or recurs following appropriate interventions. These interventions include the use of antibiotics, aspiration of the abscess, immobilization of the affected extremity, and surgery. HBO therapy is an adjunctive therapy used with the appropriate antibiotics. Antibiotics are chosen on the basis of bone culture and sensitivity studies. HBO therapy can elevate the oxygen tensions found in infected bone to normal or above normal levels. This mechanism enhances healing and the body's antimicrobial defenses. It is believed that HBO therapy augments the efficacy of certain antibiotics (gentamicin, tobramycin, and amikacin). Finally, the body's osteoclast function of removing necrotic bone is dependent on a proper oxygen tension environment. HBO therapy provides this environment. HBO treatments are delivered at a pressure of 2.0 to 2.5 atm abs for duration of 90-120 minutes. It is not unusual to receive daily treatments following major debridement surgery. The required numbers of treatments vary on an individual basis. Medicare can cover the use of HBO therapy for chronic refractory osteomyelitis that has been demonstrated to be unresponsive to conventional medical and surgical management.

HBO's use in the treatment of osteoradionecrosis and soft tissue radionecrosis is one part of an overall plan of care. Also included in this plan of care is debridement or resection of nonviable tissue in conjunction with antibiotic therapy. Soft tissue flap reconstruction and bone grafting may also be indicated. HBO treatment can be indicated both preoperatively and postoperatively. HBO therapy must be utilized as an adjunct to conventional therapy. The patients who suffer from soft tissue damage or bone necrosis present with disabling, progressive, painful tissue breakdown. They may present with wound dehiscence, infection, tissue loss and graft or flap loss. The goal of HBO treatment is to increase the oxygen tension in both hypoxic bone and tissue to stimulate growth in functioning capillaries, fibroblastic proliferation and collagen synthesis. The recommended daily treatments last 90-120 minutes at 2.0 to 2.5 atm abs. The duration of HBO therapy is highly individualized.

Treatment of diabetic wounds of the *lower extremities* in patients who meet the following criteria: Patient has type I or type II diabetes and has a lower extremity wound that is due to diabetes. Patient has a wound classified as Wagner grade III or higher (Grade 3 - Osteitis, abscess, or osteomyelitis, Grade 4 - Gangrene of the forefoot, Grade 5 - Gangrene of the entire foot); *and a patient has failed an adequate course of standard wound therapy.*

149.   Per the aforementioned guidelines, the use of HBO therapy "will be covered as adjunctive therapy only after there are no measurable signs of healing for at least 30 days of treatment with standard wound therapy and must be used in addition to standard wound care."

150.   The 2014 Medicare participating provider allowable fee for Hyperbaric Oxygen treatment is as follows:

CPT Code – 99183 – Professional fee for physician or other qualified health care professional attendance and supervision of HBO, per session:  Reimbursement $214.94.

HCPC Code – C1300 – Facility fee for HBO therapy, hyperbaric oxygen under pressure, full body chamber, per 30 minute interval/segment:  Reimbursement $110.93 (A segment is defined as a 30-minute interval or session).  For example, a two-hour HBO treatment (4 segments of 30 minutes each or C1300 x 4) would total $443.72 paid to the facility.  This would be in addition to the physician's professional fee described in CPT code 99183 above.

151.   An HHS/OIG report published in October 2000 on hyperbaric oxygen therapy evaluated the extent and appropriateness of the therapy reviewing Medicare claims data between 1995 and 1998. In addition to this report, CMS polices and published research studies conclude as follows:

1. Many hyperbaric practices are started with little information on proper utilization or reimbursement policies. According to interviews with hyperbaric physicians, many hyperbaric units are not started by physicians. They are started by facilities which may have little knowledge of proper utilization and standards of care.

2. Hyperbaric therapy is generally reserved as a last resort, when other treatment options are exhausted. The population targeted is generally elderly and very ill. The average age of a hyperbaric Medicare patient is 70. At least 45 percent are diabetic and almost 40 percent have some form of heart disease. It also appears that about 18 percent are deceased within two years of treatment.

3. Diagnosis codes are sometimes used inappropriately to obtain reimbursement for uncovered indications.   Although the guidelines specifically describe fourteen indications for which hyperbaric treatment is reimbursable by Medicare, some providers have taken great latitude in how they interpret those conditions, while others appear to deliberately use inaccurate ICD-9 codes to bypass carrier and intermediary edits. The HHS/OIG reviewers found 13 percent of beneficiaries had

diagnoses listed on their claims that misrepresented their true medical condition suggesting that diagnosis codes are, at times, selected for the purpose of bypassing the carrier and intermediary edits used to flag potentially inappropriate treatments per OIG.

4.  The report of 2000, when hyperbaric treatment was not widely available, found that $14.2 Million (of the $49.9 million allowed charges for outpatient hospitals and physicians) was paid in error for hyperbaric treatments. Nearly 32 percent of beneficiaries received treatments for either non-covered conditions (22.4 percent, $10.5 million) or documentation did not adequately support HBO2 treatments (9.2 percent, $3.7 million). It also found that an additional $4.9 million was paid for treatments deemed to be excessive and eleven percent of beneficiaries were treated for appropriate indications, but received more treatments than were considered medically necessary by physician reviewers. The excessive treatments represent $4.9 million paid for potentially ineffective procedures. It was also found that the lack of testing and treatment monitoring raised quality of care concerns. Of the 68 percent of beneficiaries treated for covered conditions, 37 percent received questionable quality care with respect to either lack of appropriate testing prior to initiation of treatment or insufficient progress documented to justify continuation of therapy. The treatments with suspect quality accounted for as much as $11.1 million in payments.

152.   Without question, HBO therapy is the golden goose of wound care centers providing huge revenue to hospitals and companies like Defendants. Along those lines, Drs. Van Raalte and Cascio, and John Murtaugh, witnessed during their employment with, or while working on behalf of Healogics, a constant drive to increase the utilization of HBO therapy by setting arbitrary benchmarks that were to be met by all employees for the purpose of increasing revenue regardless of the medical necessity of the therapy.

153.   In a meeting with Tim Raymon, and vice president of operations Michael Patterson, that was called primarily because Dr. Van Raalte was not ordering as much HBO therapy as Healogics wanted, Tim Raymon made the statement that "if I don't produce a profit for them [Healogics], I'm out of here".

154.   Tim Raymon routinely reviewed patient charts and conspired with Healogics' medical director, Gregory Bohn, to override physician diagnoses, including Dr. Van Raalte's, by

upgrading wounds that were properly classified as a Wagner Grade 1 or 2 to Wagner Grade 3, in order to qualify the patient for the expensive HBO therapy per the aforementioned CMS LCD guidelines.

155.   Dr. Van Raalte concluded that this was done strictly to qualify patients for the revenue producing, but potentially dangerous, HBO therapy thereby enriching Healogics. He also estimates that another 10% of non-diabetic HBO patients had no factors that qualified them for the therapy based on CMS LCD guidelines.

156.   Dr. Van Raalte has first-hand knowledge of the following Medicare patients receiving HBO therapy who were not qualified per CMS LCD guidelines and for which Medicare was billed:

**Patient 1 -**   April 2011. Patient suffering from osteomyelitis which was not indicated for HBO therapy but was ordered by Healogics' Medical Director Gregory Bohn.

**Patient 2 -**   May 2011. Patient had re-vascularization of the foot which was not appropriate for HBO therapy. Indications were changed to qualify for HBO.

**Patient 3 -**   June 2011. Patient seen by Dr. Van Raalte for ischemic toe and forefoot due to vasculitis. Not an HBO candidate but criteria changed after he saw patient so that she could be placed into HBO therapy. Patient still ended up with amputation.

**Patient 4 -**   June 2011. Patient was treated with HBO therapy for a radiation wound of the sacrum while standard of care was a wound flap. HBO not indicated for this patient.

**Patient 5 -**   October 2011. Patient had a Wagner Grade 2 diabetic ulcer but got HBO therapy after upgrading of wound.

**Patient 6 -**   Patient had a seroma after breast biopsy. HBO not indicated as her seroma classified as a radiation wound but which needed no treatment. Received 45 segments of HBO therapy even though no wound and no biopsy.

**Patient 7 -**   October 2011. Patient had tip of toe swabbed in order for wound care center to get a positive culture which would then allow Healogics to upgrade Wagner Grade 2

to a Wagner Grade 3. Patient then given HBO therapy that they did not qualify for.

**Patient 8 -** October 2011. Patient received vascular stents for toes. Not diabetic and suffering from end stage vascular disease due to age. Needed amputation but was given HBO therapy instead.

**Patient 9 -** November 2011. Patient had a venous wound that started as a blister on mid-calf. Blister was a superficial wound, not deep or infected. HBO therapy ordered after physician incorrectly classified as ischemic in order to qualify patient for HBO therapy.

**Patient 10 -** December 2011. Patient had Wagner Grade 2 toes 1 cm ulcer. Dr. Van Raalte upon observing patient cancelled HBO therapy ordered by another physician due to the fact that it was not indicated, would serve no benefit and could be detrimental to the patient due to pain and dementia. Within two hours Healogics' Medical Director Bohn ordered HBO therapy for patient.

**Patient 11 -** December 2011. Patient had a Wagner Grade 2 wound that was classified as a Wagner Grade 3 in order to place patient into HBO therapy.

**Patient 12 -** March 2012. Patient had two 5mm wound that was a Wagner Grade 2 but that was upgraded to a Wagner Grade 3 to qualify patient for HBO therapy.

157.   The above patient cases are but an example of the fraudulent behavior of Healogics.

**I.   John Murtaugh' S Experience with HBO**

158.   Early during his employment with Healogics, John Murtaugh learned that each wound care center had a benchmark regarding the amount of patients who should receive HBO therapy with no concern or regard for the medical necessity of the procedure.

159.   Sometime in late-May, 2013, John Murtaugh was provided a copy of a document titled "Leesburg Regional Medical Center Wound Care and Hyperbaric Center 2013 Annual Business Review" by Suemei Addington.

160.   Ms. Addington told him that he should model the annual business review for his clinic after the Leesburg presentation.  In discussions with her, and in reviewing the document, he learned that Healogics expected that every clinic nationwide should have a minimum 10% HBO conversion rate which, in laymen's terms, meant that a minimum of 10% of all patients who came to the wound care centers for treatment should be given the HBO therapy.

161.   In mid-August, 2013, John Murtaugh prepared an annual business review titled "The Comprehensive Wound Care Center at Dr. Phillips Hospital, Q3 2013 Annual Business Review".  This was to be presented to financial managers of Defendant Dr. P. Phillips Hospital on August 27, 2013 by Michael Tanner, Suemei Addington and John Murtaugh.

162.   John Murtaugh compiled the patient data in the presentation while Maureen Fera, Healogics' employee who worked in reimbursement, compiled all of the financial data. When putting the presentation together, John Murtaugh used the Healogics company-wide standard language for the 2013 financial initiatives and goals section further evidencing the minimum 10% HBO therapy benchmark that the Healogics mandated for all of their wound care centers.

163.   During the August 27, 2013 presentation, John Murtaugh repeatedly witnessed Michael Tanner and Suemei Addington, criticizing Dr. Michael Cascio and Dr. Antonio Crespo and other contracted panel physicians to the hospital financial managers for not meeting the 10% HBO therapy benchmark that Healogics mandated for each of their centers and pointing out how much revenue was lost because they were not meeting those arbitrary benchmarks.

164.   Soon after the August 27, 2013 presentation, Dr. Cascio met with South Seminole Hospital's chief operating officer Robin Hug to discuss Healogics' complaints that he and the other physicians working in the wound care center were not meeting the benchmarks set by Healogics.

165.     In the past, Dr. Cascio had met with Ms. Hug and Kathy Black, the chief nursing officer for Dr. Phillips Hospital, at different times to discuss Healogics' complaints.  Dr. Cascio always felt that they were in his corner and supportive of him not meeting Healogics' arbitrarily set benchmarks.

166.     Dr. Cascio concluded that due to financial considerations, specifically the revenue that Healogics claimed was being lost, Robin Hug and Kathy Black had started to side with Healogics.

167.     After enduring intense pressure from Healogics during the entire time of his employment to meet a variety of benchmarks that had nothing to do with patient care, John Murtaugh submitted his two-week notice in October 2013 and ultimately began employment with another company in the medical care field.

168.     On February 4, 2014, in his new position, John Murtaugh had lunch with Dr. Jefferson Menutti, DPM, who works at the Florida Hospital Fish Memorial Wound Care Center, Orange City, Florida, which is operated by Healogics.

169.     Dr. Menutti informed John Murtaugh that Pam Harkrider, RN, the Healogics Program Director over the center, had made him sign a contract that called for him to obtain a minimum 10% HBO therapy conversion rate, regardless of medical necessity.

170.     Dr. Menutti stated that "Healogics is evil" and that "Healogics is all about money." Dr. Menutti further told John Murtaugh that Pam Harkrider was constantly "badgering" him regarding his HBO conversion rate and was always coming to him trying to get him to order HBO therapy for Wagner Grade 1 wounds that did not qualify for the expensive therapy per CMS LCD guidelines.

## J.  Overutilization of Transcutaneous Oxygen Measurement (TCOM) Testing

171.    Transcutaneous Oxygen Measurement or TCOM, also known as TpO2 testing, is where oxygen tension measurements are taken transcutaneously (through unbroken skin) using an oximetry device (sensor pad attached to the skin) to measure oxygen saturation in capillaries at various levels along the extremity.

172.    On July 15-16, 2013, John Murtaugh attended Healogics' quarterly meeting, known internally as a DASH meeting, in Lakeland, Florida.  This DASH meeting was led by Michael Tanner and Suemei Addington.

173.    During this meeting Suemei Addington announced a new corporate-wide initiative that "every patient coming into the wound care centers would receive a TCOM test."

174.    While there is increased revenue associated with the widespread unnecessary testing, Healogics' true objective was to use the TCOM tests to identify and justify the more expensive HBO therapies.

175.    This new policy sat in direct conflict with CMS LCD guidelines. John Murtaugh witnessed several clinical coordinators question this proclamation at the meeting.  The TCOM test is time consuming, expensive and is not always indicated depending on the patient's wound.

176.    Jane Naylor, RN, clinical coordinator over Healogics' Manatee Wound Care Center, asked Suemei Addington, "[w]hat about a 17 year old with a wound on his leg? Do we do a TCOM on him?" to which Suemei Addington replied "[y]es, how else can we determine perfusion in the wound?"

177.    Dr. Cascio, upon hearing that Ms. Addington had made this pronouncement, knew a TCOM was not necessary to determine perfusion in the wound as there were several other ways to assess perfusion, such as a hand held Doppler or an Ankle-brachial Index (ABI),

but which Healogics could not bill for. Dr. Cascio also knew that Healogics' own published clinical practice guidelines did not mandate a TCOM to determine perfusion.

178.   On July 17, 2013, John Murtaugh discussed the new initiative with Dr. Cascio. Dr. Cascio concluded, and John Murtaugh agreed, that performing a TCOM on every new patient was an overutilization of testing, was only indicated in a small handful of patients, and was in direct conflict with Healogics' own Clinical Practice Guidelines (CPG) as well as CMS' LCD.  Dr. Cascio refused to allow the two clinics he supervised to comply with the Healogics mandate.

179.   Over the course of the weeks following the Healogics mandate that a TCOM test be performed on every new patient, John Murtaugh was continually questioned by Suemei Addington and Nancy Helme on why the new mandate was not being followed at South Seminole and Dr. Phillips Hospitals.

180.   At a meeting at South Lake Hospital Wound Care Center between John Murtaugh, Suemei Addington, Nancy Helme and Sue Ann Prouse, John Murtaugh explained that after discussing the mandate with Dr. Cascio, and reviewing CMS LCD guidelines as well as internal clinical practice guidelines, it was determined that a TCOM test was not indicated for every patient. Suemei Addington and Nancy Helme became upset and continued to push John Murtaugh and Dr. Cascio to implement the TCOM protocol.

181.   In late April/early May, 2014, John Murtaugh had a conversation with Michelle "Micah" DiProspero, a former HBO Technician for Healogics. Michelle DiProspero told him that at a Healogics facility she previously worked at any TCOM tests that did not support HBO therapy were discarded by Healogics.

182.   Dr. Cascio has first-hand knowledge of Healogics' employees performing TCOMs who do not have the proper training and certification, but who conduct the testing in order to follow the mandate that has been set forth by the Healogics. As the guidelines state:

> *The accuracy of non-invasive vascular diagnostic studies depends on the knowledge, skill and experience of the technologist and the physician performing the interpretation of the study.*

183.   Healogics did not have enough sufficiently trained and certified personnel in its employ to comply with the mandate that "every patient coming into the wound care centers would receive a TCOM test" therefore the testing that has been, and continues being conducted, by unqualified and uncertified personnel are not reimbursable.

184.   This corporate mandate is in direct conflict with the aforementioned CMS guidelines and was set forth merely to increase the Defendants' profits with blatant disregard to patient care and medical necessity.

185.   In addition to constantly harassing John Murtaugh and Dr. Cascio to implement the TCOM mandate, Ms. Addington, Ms. Helme and other representatives of Healogics spoke with administrators of South Seminole and Dr. Phillips Hospitals comparing Dr. Cascio's clinics to twelve other wound care centers in their region and showing how his clinics were not producing the revenue that Healogics' other centers were producing.

186.   In late August or early September of 2013, soon after a meeting Dr. Cascio had with Cindy Johnson, Healogics' interim program director at South Seminole Hospital, to discuss normal clinic agenda items he was informed that Healogics had started a compliance investigation.

187.   The investigation was based on the fact that he had told Johnson that to up-code selective debridement to the higher revenue producing surgical/excisional debridement would be

fraudulent and that he would not allow the wound care centers where he was medical director to do so.

188.   Barry Grosse, Healogics' compliance director, conducted the investigation and interviewed both Dr. Cascio and John Murtaugh, among others. During the interviews Dr. Cascio and John Murtaugh informed Mr. Grosse that Healogics was pressuring physicians to up-code selective debridement to the higher revenue producing surgical/excisional debridement, to perform more surgical/excisional debridement regardless of the medical necessity of the procedure and to do unnecessary testing, namely TCOM testing, that was mandated by Healogics.

189.   At the conclusion of the interviews, Mr. Grosse told Dr. Cascio and John Murtaugh that it was his conclusion that no fraud had actually taken place since their center had not billed for any of the procedures. John Murtaugh explained to Mr. Grosse that no fraud had taken place at their center because Dr. Cascio had refused to comply with Healogics' mandate that every new patient should receive a TCOM and that Dr. Cascio refused to allow physicians in the wound care centers to up code selective debridement to surgical/excisional debridement just to produce more revenue for Healogics.

190.   Mr. Grosse told John Murtaugh that he should contact him if any new information came up but that otherwise the matter was closed. Neither Dr. Cascio nor John Murtaugh ever heard from Mr. Grosse again regarding the information they provided to him.

191.   Soon after his interview with Grosse, John Murtaugh had a discussion with Jim Hirkel, Healogics' program director of their Bartow Wound Care Center regarding the TCOM mandate. Jim Hirkel told him that he had implemented the mandate at his facility and was presently conducting a TCOM test on every new patient.

192.    John Murtaugh told Jim Hirkel that he should read the CMS LCD and Healogics' own clinical practice guidelines as the mandate was in direct confliction with both.

193.    Soon after his discussion with Jim Hirkel, John Murtaugh informed Mr. Grosse that he had become aware that the Bartow Wound Care Center was performing TCOM testing on every new patient but that Mr. Grosse seemed disinterested in the information he was providing.

194.    In a meeting John Murtaugh had with Kathy Black, director of nursing for Dr. P. Phillips Hospital, several weeks after providing the information to Grosse about the overutilization of TCOM testing at Bartow Wound Care Center, Ms. Black informed John Murtaugh that Healogics had contacted her and told her that their compliance investigation was complete and no wrong doing had been discovered.

## K. CMS Guidelines (Transcutaneous Oxygen Tension Measurements)

195.    Medicare Guidelines[13] for TCOM testing, state that:

*Transcutaneous oxygen tension measurements (Tp02) are to be utilized in conditions for which hyperbaric oxygen therapy (HBO) is being considered, as well as for monitoring the course of HBO therapy. The following conditions are considered medically indicated uses for Tp02 testing prior to, and during the course of HBO therapy:*

- *Acute traumatic peripheral ischemia*
- *Crush injuries and suturing of severed limbs*
- *Progressive necrotizing infections (necrotizing fasciitis)*
- *Acute peripheral arterial insufficiency*
- *Preparation and preservation of compromised skin grafts (not for primary management of wounds)*
- *Soft tissue radionecrosis (death of soft tissue from radiation treatment) as an adjunct to conventional treatment*
- *Tp02 used to determine a line of demarcation between viable and non-viable tissue when surgery or amputation is anticipated*

196.    In regard to utilization, Medicare guidelines also state:

---

[13] LCD Determination ID: 93922, original determination effective date of February 2, 2009, and latest revision effective date of January 31, 2012.

*Customarily, transcutaneous oxygen tension measurements (TpO2) are acceptable for evaluating healing potential in non-healing or difficult-to-heal wounds at a frequency of no more than twice in any 60-day period.*

197.    Medicare guidelines also clearly state that there are limitations on when TCOM

testing can be used:

*Non-invasive vascular testing studies are medically necessary only if the outcome will potentially impact the clinical management of the patient. For example, if a patient is (or is not) proceeding on to other diagnostic and/or therapeutic procedures regardless of the outcome of non-invasive studies, and non-invasive vascular procedures will not provide any unique diagnostic information that would impact patient management, then the non-invasive procedures are not medically necessary. If it is obvious from the findings of the history and physical examination that the patient is going to proceed to angiography, then non-invasive vascular studies are not medically necessary. It is also expected that the studies are not redundant of other diagnostic procedures that must be performed.*

198.    The Medicare guidelines referenced above mandate that certain training and

experience must be attained in order to conduct TCOM testing as follows:

*The accuracy of non-invasive vascular diagnostic studies depends on the knowledge, skill and experience of the technologist and the physician performing the interpretation of the study. Consequently, the technologist and the physician must maintain proof of training and experience. All non-invasive vascular diagnostic studies must be: (1) performed by a qualified physician, or (2) performed under the general supervision of a qualified physician by a technologist who has demonstrated minimum entry level competency by being credentialed in vascular technology, and/or (3) performed in a laboratory accredited in vascular technology. Examples of certification in vascular technology for non-physician personnel include:*

-       *Registered Vascular Technologist (RVT) credential*
-       *Registered Vascular Specialist (RVS) credential*

*These credentials must be provided by nationally recognized credentialing organizations such as:*

-       *The American Registry of Diagnostic Medical Sonographers (ARDMS) which provides RDMS and RVT credentials*

-    *The Cardiovascular Credentialing International (CCI) which provides RVS credential*

*Appropriate nationally recognized laboratory accreditation bodies include:*

-    *Intersocietal Commission for the Accreditation of Vascular Laboratories (ICAVL)*
-    *American College of Radiology (ACR)*

*Additionally, the transcutaneous oxygen tension measurements (Tp02) may be performed by personnel credentialed as a certified hyperbaric registered nurse (CHRN) or certified hyperbaric technologist (CHT) by the National Board of Diving and Hyperbaric Medical Technology (NBDHMT).*

*General Supervision means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually performs the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.*

199.    The 2014 Medicare participating provider allowable fee for transcutaneous oxygen tension measurements (TCOM) testing is as follows:

CPT Code - 93922 - *Limited* bilateral noninvasive physiologic studies of upper or lower extremity arteries, 1-2 levels.

| CPT Code - 93922 | Reimbursement |
|---|---|
| Physician's Component | $12.18 |
| Technical Component | $77.02 |
| Global | $89.20 |

CPT Code - 93923- *Complete* bilateral noninvasive physiologic studies of upper or lower extremity arteries, 3 or more levels.

| CPT Code - 93923 | Reimbursement |
|---|---|
| Physician's Component | $22.57 |
| Technical Component | $117.50 |
| Global | $140.07 |

200.    Based on the mandate of July 2013, 95% of all TCOM tests that are currently being performed in Defendants' wound care centers are not and cannot be clinically supported, are unnecessary and are causing Medicare, Medicaid, Tricare and private insurers to be fraudulently billed.

201.    Dr. Cascio, during his employment with Healogics, has seen an average of 1,400 patients per year come through his wound care centers.  By following clinical guidelines, approximately 5% of those patients had TCOM tests appropriately performed on them compared to the 100% figure required by the Healogics as of July 16, 2013.

202.    Had Dr. Cascio implemented the corporate directive, it would have resulted in the submission of approximately 1,330 false claims per year just from the two clinics where he is the Medical Director.  Relators are aware that Healogics was successful in implementing its 100% TCOM directive in numerous centers across the country resulting in tens of thousands of false claims for unnecessary TCOM testing ranging in expense from $89.20 to $140.07 per test.

## IV.    Allegations Common to All Defendant Hospitals

203.    Defendant Hospitals contracted with Healogics to run the day-to-day operations of their wound care centers.

204.    Pursuant to these contracts, Defendant Hospitals billed government insurance programs like Medicaid, Medicare and Tricare, for the technical component of treatments provided in the wound care center.  In some cases, Defendant Hospitals also billed for the professional component for services provided.

205.    Each month Defendant Hospital would receive and pay an invoice from Healogics indicating how much Defendant Hospital owed Healogics for operating the wound care center that month.

## V.   The False Claims Acts

206.   The federal False Claim Act (FCA) as amended, provides in pertinent part that:

[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1)

207.   The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

208.   No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

209.   In addition to the FCA, Relators bring these claims under the state False Claims Acts or their equivalents (the state FCAs) for each state the Defendants conduct business in, including the California False Claims Act, Cal. Gov. Code §§12650, et seq.; Colorado Medicaid False Claims Act, Col. Rev. Stat. 25.5-4-304, et. seq.; Connecticut False Claims Act For Medical Assistance Programs, Conn. Gen. Stat. Sec. 17b-301a, et. seq.; Delaware False Claims and Reporting Act, 6 Del. C. §§1201; the District of Columbia False Claims Act, D.C. Code §§2-30814, et seq.; the Florida False Claims Act, Fla. Stat. §68.081 et seq.; Georgia State False Medicaid Claims Act. Ga. Code §49-4-168, et seq.; the Hawaii False Claims Act, False Claims to the State, HRS §§661-21, et seq.; the Illinois False Claims Act, 740 ILCS 175, et seq.; the Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. §5-11-5.5. et

seq.; Iowa False Claims Act, Iowa Code Ch. 685 et. seq.; the Louisiana Medical Assistance Programs Integrity Law, La, R.S. §§46:437, et seq.: Maryland False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 et. seq.; Massachusetts False Claims Act ALM GL ch12 §§5A, et seq.; the Michigan Medicaid False Claims Act, MCLS §§400.601, et seq.; Minnesota False Claims Act, Minn. Stat. §15C.01 et. seq.; the Montana False Claims Act, Mont Code §§17-8-401, et seq.; the Nevada False Claims Act, Submission of False Claims to State or Local government, Nev. Rev. Stat. Ann. §§357.010 et seq., the New Mexico False Claims Act, N.M. Stat Ann. §§27-14-1 et seq.; New Mexico Fraud Against Taxpayers Act, N.M. Stat. §§44-9-1 et seq.; New Jersey False Claims Act, N.J. Stat. §§2A:32C-1.the New York False Claims Act, NY CLS St Fin, §§187 et seq.; North Carolina False Claims Act, NCGSA § 1-607 et. seq.; Oklahoma Medicaid False Claims Act, 63 Okla. Stat. §§5053, et seq.; Rhode Island State False Claims Act. R.I. Gen. Laws §§9-1.1-1, et seq.; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-181, et seq.;: the Tennessee False Claim Act, Tenn. Code Ann. §4~18-101, et seq.; the Texas Medicaid Fraud Prevention Act, Tex. Hum, Res. Code, §36.001, et seq.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1, et seq.; Washington State Medicaid Fraud False Claims Act, RCWA § 74.66.005 et. seq. and the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §§20.931, et seq.

210.   The state FCAs are largely modeled on the federal FCA with similar provisions and interpretations, but will be differentiated as necessary in individual counts herein.

**A. Cost Reporting and Claims Processing Procedures Under The Medicare Program**

211.   In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 et seq., known as the Medicare Program, as part of Title XVIII of the Social

Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426-1.

212.   Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.   CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund.   42 U.S.C. § 1395(u).  In this capacity, the fiscal intermediaries act on behalf of CMS.  42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

213.   There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them. 42 U.S.C. §§ 1395j-1395w-5.

214.   Reimbursement of the facility charges is covered under the Hospital Outpatient Prospective Payment System or OPPS. The allegations herein involve Part B and OPPS for services billed by the Defendants or its agents to Medicare.

215.   The Balanced Budget Act of 1997 granted authority to the Centers of Medicare and Medicaid Services (CMS) to establish a prospective payment system for hospital outpatient services.

216.   On August 1, 2000, CMS began using what is known as the Outpatient Prospective Payment System (OPPS), which was authorized by Section 1833(t) of the Social Security Act (the Act) as amended by Section 4533 of the Balanced Budget Act of 1997.

217.   The OPPS was designed to better predict and manage program expenditures by assigning fixed payment amounts to groups of services similarly to the inpatient prospective payment system (Diagnosis-Related Groups).

218.   The OPPS system is applicable only to hospitals and groups all hospital outpatient services into Ambulatory Payment Classifications (APCs).  The payment amounts for each APC are established by CMS and are based on upon the estimated costs associated with the services assigned within the APC.

219.   The costs are calculated using national, aggregate data from hospitals' claims and cost reports.  Medicare payment for outpatient services provided in hospitals is based on set rates under Medicare Part B when paying for services such as X rays, emergency department visits, and partial hospitalization services in hospital outpatient departments.

220.   Payments made under OPPS cover facility resources including equipment, supplies, and hospital staff but do not include services of physicians or non-physician practitioners covered under the Medicare Fee Schedule.

221.   Hospitals may only bill for the outpatient services that are provided at the hospital's expense.  CMS requires hospitals billing outpatient services to use HCPCS codes submitted on the CMS 1450 form (UB04).  When the claim is received the claims administrator is responsible for applying the appropriate APC payment rates to the HCPCS codes.

**B.   Conditions of Participation and Conditions of Payment**

222.    To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc.  The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

**C.   Medical Necessity and Appropriateness Requirements**

223.    One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information.  42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

224.    Various claims forms, including but not limited to the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.  42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406.  Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  Id.  See also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

225.    The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

**D.   Obligation to Refund Overpayments**

226.    As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they

become aware in their claims for Medicare reimbursement (including in their cost reports). 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31. In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony. Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

227.    Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS. 42 U.S.C. § 1395u(l)(3). In such cases, the overpayment is subject to recoupment. 42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395l(j).

### E. Other Federally-Funded Health Care Programs

228.    Although false claims to Medicare are the primary FCA violations at issue in this case, there were medically unnecessary upcoded/overbilled procedures for two other federally-funded health care benefit programs – Medicare, and Tricare/CHAMPUS. Accordingly, those other two programs are briefly discussed as well.

### (1) Medicaid

229.    The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level while state agencies serve as the administrator or counterpart. Reimbursement of physician charges is governed by Part B of Medicare. Reimbursement of the facility charges is covered under the Hospital Outpatient Prospective Payment System. As with the Medicare Program, hospitals and physicians may, through the

submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

### (2) Tricare, Formerly Known as CHAMPUS

230.    A federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although Tricare is administered by the Secretary of Defense, the regulatory authority establishing the Tricare program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, et seq.).   Like Medicare and Medicaid, Tricare will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).   And, like the Medicare Program and the Medicaid Program, Tricare prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records.  32 C.F.R. §§ 199.9(b)(3)-(b)(5).

### Count I
### Violation Of The Federal False Claims Act
### (31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))

231.    Plaintiffs allege and incorporate by reference paragraphs 1–230 of this Amended Complaint as though fully set forth herein.

232.    Through the acts described above, Defendants and their agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented,

and are still presenting or causing to be presented, to the United States government and state governments participating in the Medicare and Medicaid, and other government sponsored insurance programs, false and fraudulent claims, records, and statements in order to obtain reimbursement for healthcare services that were falsely billed and/or not medically necessary, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. §3729 (a)(1)(A).

233.    As a result of Defendants' actions, as set forth above, the United States of America and the state governments participating in Medicare, Medicaid and other government sponsored insurance programs have been, and may continue to be, severely damaged.  By virtue of Defendants' conduct, the United States and listed States suffered damages and therefore are entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

**Count II**
**Violation Of The Federal False Claims Act**
**(31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))**

234.    Plaintiffs allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

235.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

236.    As a result of Defendants' actions, as set forth above, the United States of America and the state governments participating in the Medicare and Medicaid, and other

government sponsored insurance programs have been, and may continue to be, severely damaged. By virtue of Defendants' conduct, the United States and listed States suffered damages and therefore are entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

**Count III**
**Violation Of The Federal False Claims Act**
**(31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G))**

237.   Plaintiffs allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

238.   Through the acts described above and otherwise, Defendants and their agents and employees knowingly made, used, or caused to be made or used, false records and statements material to obligations to pay or transmit money to the government, or knowingly concealed, improperly avoided or decrease their obligation to pay money to the United States government that they improperly or fraudulently received.

239.   Defendants also failed to disclose to the government material facts that would have resulted in substantial repayments by them to the federal and state governments in violation of 31 U.S.C. § 3729(a)(1)(G).

240.   Defendants, at all relevant times to this action, had an ongoing legal obligation to report and disclose overpayments to the government pursuant to 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C, 42 C.F.R. §§ 489.40, 489.31, 42 U.S.C. § 1320a-7b(a)(3), 42 U.S.C. § 1395u; and 42 C.F.R. § 489.20(g), and failed to do so.

241.   As a result of Defendants' actions, as set forth above, the United States of America and the state governments participating in the Medicare and Medicaid, and other

government sponsored insurance programs have been, and may continue to be, severely damaged. By virtue of Defendants' conduct, the United States and listed States suffered damages and therefore are entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## Count IV
### Violation Of The False Claims Act,
### 31 U.S.C. § 3729(a)(3) (2006), and 31 U.S.C. § 3729(a)(1)(C) (2012)
### Conspiracy to Submit False Claims

242.    Plaintiffs allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

243.    Defendant Healogics entered into agreements with each of the Defendant Hospitals and conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States, acting through its programs, Medicare, Medicaid, and other government sponsored insurance programs, for money to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3) (2006) and 31 U.S.C. § 3729(a)(1)(C) (2012).

244.    As part of the schemes and agreements to obtain reimbursement from the United States in violation of federal laws, Defendants conspired to file or cause to be filed billings for payment for unnecessary services, services not rendered, and/or upcoded services, and to cause the United States to pay claims for health care services based on false claims, false statements, and false records that the services were provided in compliance with all laws regarding the provision of health care services when they were not so provided.

245.    By virtue of Defendants' conspiracy to defraud the United States and the state governments, the United States and listed States suffered damages and therefore are entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than

$5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## VI.    Prayer for Relief

WHEREFORE, Relators, on behalf of the United States, demand judgment against Defendant Healogics and Defendant Hospitals as to Counts I-IV of the Amended Complaint, as follows:

A. That Defendants cease and desist from violating 31 U.S.C. §3729 *et. seq.* and the equivalent provisions of the state statutes set forth above.

B. That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each false claim, together with the costs of this action, with interest, including the cost to the United States government for its expenses related to this action.

C. That this Court enters judgment against Defendants for the maximum amount of actual damages under 31 U.S.C. §3729 *et. seq.*

D. That Relators be awarded all costs incurred, including their attorneys' fees.

E. That in the event the United States government subsequently intervenes in this action, Relators be awarded 25% of any proceeds of the claim, and that in the event the United States government does not intervene in this action, Relators be awarded 30% of any proceeds.

F. That the United States and Relators receive all relief, both in law and in equity, to which they are entitled.

### Count V
### California False Claims Act

246.    Plaintiffs allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

247.    This is a qui tam action brought by Plaintiffs on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 et seq.

248.   Cal. Gov't Code § 12651(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

(4) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

249.   Defendant Healogics and Defendant California Hospitals violated Cal. Gov't Code § 12651(a)(1), (2) ,(3)  and (4) by the aforementioned conduct and failed to disclose the falsity of their claims, or return amounts paid upon said false claims within reasonable time after discovery of the false claim.

250.   The State of California, by and through the California Medicaid program (Medi-Cal) and other state healthcare programs, and unaware of Defendant Healogics and Defendant California Hospitals' conduct, paid the claims submitted by Defendants and third party payers in connection therewith.

251.   Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendant Healogics' and Defendant California Hospitals' conduct.  Compliance with applicable California statutes and regulations was also an express condition of payment of claims submitted to the State of California.

252.    Had the State of California known that false representations and false records were made regarding the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant California Hospitals and third party payers in connection with that conduct.

253.    As a result of Defendant Healogics' and Defendant California Hospitals' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

254.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Cal. Gov't Code §12652(c) on behalf of themselves and the State of California.

255.    This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Plaintiffs respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant California Hospitals:

To the State of California:

(1) Three times the amount of actual damages which the State of California has sustained as a result of the Defendant Healogics' and Defendant California Hospitals' conduct;

(2) A civil penalty of no less than $5,500 and up to $11,000 for each false claim which Defendant Healogics' and Defendant California Hospitals' presented or caused to be presented to the State of California;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Plaintiffs:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**Count VI**
**Colorado False Medicaid Claims Act**

256.     Plaintiffs allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

257.     This is a qui tam action brought by Plaintiffs on behalf of the State of Colorado to recover treble damages and civil penalties under CRSA § 25.5-4-305.

258.     The Colorado False Medicaid Claims Act provides liability for any person who:

(a) Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act";

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

259.     Defendant Healogics and Defendant Colorado Hospitals violated CRSA § 25.5-4-305(a), (b), (f), and (g) by the aforementioned conduct and failed to disclose the falsity of their

claims, or return amounts paid upon said false claims within reasonable time after discovery of the false claim.

260.   The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendant Healogics and Defendant Colorado Hospitals' conduct, paid the claims submitted by Defendants and third party payers in connection therewith.

261.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendant Healogics' and Defendant Colorado Hospitals' conduct.  Compliance with applicable Colorado statutes and regulations was also an express condition of payment of claims submitted to the State of Colorado.

262.   Had the State of Colorado known that false representations and false records were made regarding the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Colorado Hospitals and third party payers in connection with that conduct.

263.   As a result of Defendant Healogics' and Defendant Colorado Hospitals' violations of the Colorado Medicaid False Claims Act, the State of Colorado has been damaged in an amount in excess of one million dollars exclusive of interest.

264.   Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who has brought this action on behalf of themselves and the State of Colorado.

265.    This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Plaintiffs respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Colorado Hospitals:

To the State of Colorado:

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of the Defendant Healogics' and Defendant Colorado Hospitals' conduct;

(2) A civil penalty of up to $10,000 for each false claim which Defendant Healogics and Defendant Colorado Hospitals presented or caused to be presented to the State of Colorado;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Plaintiffs:

(1) The maximum amount allowed pursuant to the Colorado Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**Count VII**
**Connecticut False Claims Acts For Medical Assistance Programs**

266.    Plaintiffs allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

267.    This is a qui tam action brought by Plaintiffs on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. Sec. 17b-301a, et. seq.

268.    Conn. Gen. Stat. Sec. 17b-301b provides liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under a medical assistance program administered by the Department of Social Services".

269.    In addition, subsection 3 prohibits a conspiracy to commit a violation of this section.

270.    Defendant Healogics and Defendant Connecticut Hospitals violated the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. Sec. 17b-301a, et. seq by virtue of the aforementioned conduct.

271.    The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendant Healogics and Defendant Connecticut Hospitals' conduct, paid the claims submitted by Defendants and third party payers in connection therewith.

272.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendant Healogics' and Defendant Connecticut Hospitals' conduct.  Compliance with applicable Connecticut statutes and regulations was also an express condition of payment of claims submitted to the State of Connecticut.

273.    Had the State of Connecticut known that false representations and false records were made regarding the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Connecticut Hospitals and third party payers in connection with that conduct.

274.    As a result of Defendant Healogics' and Defendant Connecticut Hospitals' violations of the Connecticut False Claims Act For Medical Assistance Programs, Conn. Gen. Stat. Sec. 17b-301a, et. seq., the State of Connecticut has been damaged in an amount in excess of one million dollars, exclusive of interest.

275.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who has brought this action on behalf of themselves and the State of Connecticut.

276.    This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Plaintiffs respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Connecticut Hospitals:

To the State of Connecticut:

(1) Three times the amount of actual damages which the State of Connecticut has sustained as a result of the Defendant Healogics' and Defendant Connecticut Hospitals' conduct;

(2) A civil penalty of up to $11,000 for each false claim which Defendant Healogics and Defendant Connecticut Hospitals presented or caused to be presented to the State of Connecticut;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Plaintiffs:

(1) The maximum amount allowed pursuant to the Connecticut False Claims Act for Medical Assistance Programs, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**Count VIII**
**Delaware False Claims And Reporting Act**

277.    Plaintiffs allege and incorporate by reference paragraphs 1–230 of this Amended Complaint as though fully set forth herein.

278.    This is a qui tam action brought by Relators on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Title 6, Chapter 12 of the Delaware Code.  6 Del. C. § 1201(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the government a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved; or

(3) conspires to defraud the government by getting a false or fraudulent claim allowed or paid.

279.    Defendant Healogics and Defendant Delaware Hospitals violated 6 Del. C. § 1201(a)(1), (2) and (3) by conspiring to knowingly causing false claims to be made, used and

presented to the State of Delaware, by knowingly making, using, or causing to made or used false records to get said false claims paid.

280.   The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of the Defendants' conduct, paid the claims submitted by Defendant Healogics and Defendant Delaware Hospitals and third party payers in connection therewith.

281.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendant Healogics' and Defendant Delaware Hospitals' conduct.  Compliance with applicable Delaware statutes and regulations was also an express condition of payment of claims submitted to the State of Delaware.

282.   Had the State of Delaware known that false representations and false records were made regarding the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Delaware Hospitals and third party payers in connection with that conduct.

283.   As a result of Defendant Healogics' and Defendant Delaware Hospitals' violations of 6 Del. C. § 1201(a), the State of Delaware has been damaged in an amount far in excess of one million dollars, exclusive of interest.

284.   Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of themselves and the State of Delaware.

285.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Delaware Hospitals:

To the state of Delaware:

(1) Three times the amount of actual damages which the state of Delaware has sustained as a result of Defendant Healogics' and Defendant Delaware Hospitals' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics and Defendant Delaware Hospitals caused to be presented to the state of Delaware;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count IX
## Florida False Claims Act

286.    Plaintiffs allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

287.    This is a qui tam action brought by Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 et seq.  Fla. Stat. § 68.082(2) provides liability for any person who:

    (a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

    (b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

    (c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

288.    Defendant Healogics and Defendant Florida Hospitals conspired to, and did in fact violate Fla. Stat. § 68.082(2)(a), (b) and (c) by knowingly causing false claims to be made, used and presented to the state of Florida, by its deliberate and systematic violation of federal and state laws, and by knowingly making using or causing to me made or used false records or statements to get said false claims paid.

289.    The state of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Florida Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Florida Hospitals and third party payers in connection therewith.

290.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendant Healogics' and Defendant Florida Hospitals' conduct.  Compliance with applicable Florida statutes and regulations was also an express condition of payment of claims submitted to the state of Florida.

291. Had the state of Florida known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Florida Hospitals and third party payers in connection with that conduct.

292. As a result of Defendant Healogics' and Defendant Florida Hospitals' violations of Fla. Stat. § 68.082(2), the state of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

293. Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of themselves and the state of Florida.

294. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Florida in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Florida Hospitals:

To the state of Florida:

(1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant Healogics' and Defendant Florida Hospitals' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics and Defendant Florida Hospitals caused to be presented to the State of Florida

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action,

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count X
## Georgia False Medicaid Claims Act

295.    Plaintiffs allege and incorporate by reference paragraphs 1–230 of this Amended Complaint as though fully set forth herein.

296.    This is a qui tam action brought by Relators on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 (2008) et seq.

297.    O.C.G.A. § 49-4-168.1(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3) conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

298.    Defendant Healogics and Defendant Georgia Hospitals violated O.C.G.A. § 49-4-168.1(a)(1), (2) and (3) by engaging in the conduct described herein and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws.  Further, Defendant Healogics and Defendant Georgia Hospitals knowingly made, used, or caused to be made or used false records or statements in

order to get said false claims paid by the state of Georgia. The Defendants acted together in a conspiracy to defraud the Georgia Medicaid program.

299.   The state of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Georgia Hospitals' conduct, paid the claims submitted by Defendant and third party payers in connection therewith.

300.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Georgia in connection with Defendant Healogics' and Defendant Georgia Hospitals' conduct.

301.   Had the state of Georgia known that false representations were made, or false records used, in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Georgia Hospitals and third party payers in connection with that conduct.

302.   As a result of Defendant Healogics' and Defendant Georgia Hospitals' violations of O.C.G.A. § 49-4-168, the state of Georgia has been damaged in excess of one million dollars exclusive of interest.

303.   Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to O.C.G.A. § 49-4-168 on behalf of themselves and the state of Georgia.

304.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Georgia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Georgia Hospitals:

To the state of Georgia:

    (1) Three times the amount of actual damages which the state of Georgia has sustained as a result of Defendant Healogics' and Defendant Georgia Hospitals' conduct;

    (2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim Defendant Healogics and Defendant Georgia Hospitals caused to be presented to the state of Georgia;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

    (5) Such further relief as this Court deems equitable and just.

To Relators:

    (1) The maximum amount allowed pursuant to O.C.G.A. § 49-4-168 and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## Count XI
## Hawaii False Claims Act

305.    Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

306.    This is a qui tam action brought by Relators on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. §661-21 et seq.

307.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

(8) is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

308.   Defendant Healogics and Defendant Hawaii Hospitals conspired to, and did in fact, violate Haw. Rev. Stat. §661-21(a)(1),(2),(3), and (8) by knowingly causing false claims to be made, used and presented to the State of Hawaii by its deliberate and systematic violation of federal and state laws, and by knowingly making, using, or causing to be made or used, false records or statements to get said false claims paid by the state and failed to disclose the falsity of their claims, or return amounts paid upon said false claims within reasonable time after discovery of the false claim.

309.   The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Hawaii Hospitals' conduct, paid the claims submitted by Defendant and third party payers in connection therewith.

310.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendant Healogics' and Defendant Hawaii Hospitals' conduct.

311.   Had the State of Hawaii known that false representations were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Hawaii Hospitals and third party payers in connection with that conduct.

312.   As a result of Defendant Healogics' and Defendant Hawaii Hospitals' violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

313.   Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of themselves and the State of Hawaii.

314.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Hawaii Hospitals:

To the State of Hawaii:

(1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendant Healogics' and Defendant Hawaii Hospitals' illegal conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics and Defendant Hawaii Hospitals caused to be presented to the State of Hawaii;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. §661-27 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XII
## Illinois Whistleblower Reward and Protection Act

315.    Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

316.    This is a qui tam action brought by Relators on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 et seq.

317.    740 ILCS 175/3(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

318.    Defendant Healogics and Defendant Illinois Hospitals conspired to, and did in fact, violate 740 ILCS 175/3(a) by knowingly causing false claims and false records to be made, used and presented to the state of Illinois.

319.    The state of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Illinois Hospitals' conduct, paid the claims submitted by Defendants and third party payers in connection therewith.

320.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Illinois in connection with Defendant Healogics' and Defendant Illinois Hospitals' conduct.

321.    Had the state of Illinois known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Illinois Hospitals and third party payers in connection with that conduct.

322.    As a result of Defendant Healogics' and Defendant Illinois Hospitals' violations of 740 ILCS 175/3(a), the state of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

323.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the state of Illinois.

324.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Illinois in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Illinois Hospitals:

To the state of Illinois:

(1) Three times the amount of actual damages which the state of Illinois has sustained as a result of Defendant Healogics' and Defendant Illinois Hospitals' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics and Defendant Illinois Hospitals

caused to be presented to the state of Illinois;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XIII
### Indiana False Claims And Whistleblower Protection Act

325.    Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

326.    This is a qui tam action brought by Relators on behalf of the state of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5 *et seq.*

327.    Sec. 2.(b) of the Act provides liability for any person who knowingly or intentionally:

(1) presents a false claim to the state for payment or approval;

(2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

(6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7) conspires with another person to perform an act described in subdivisions

(1) through (6); or

(8) causes or induces another person to perform an act described in subdivisions (1) through (6).

328.    Defendant Healogics and Defendant Indiana Hospitals conspired to, and did in fact, violate Indiana Code 5-11-5.5 et seq. by knowingly causing false claims and false records to be made, used and presented to the state of Indiana and failed to disclose the falsity of their claims, or return amounts paid upon said false claims within reasonable time after discovery of the false claim.

329.    The state of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Indiana Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Indiana Hospitals and third party payers in connection therewith.

330.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Indiana in connection with Defendant Healogics' and Defendant Indiana Hospitals' conduct.

331.    Had the state of Indiana known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics' and Defendant Indiana Hospitals' and third party payers in connection with that conduct.

332.    As a result of Defendant Healogics' and Defendant Indiana Hospitals' violations of Indiana Code 5-11-5.5 et seq., the state of Indiana has been damaged in excess of one million dollars, exclusive of interest.

333.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Indiana Code 5-11-5.5 et seq. on behalf of themselves and the state of Indiana.

334.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Indiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Indiana Hospitals:

To the state of Indiana:

(1) Three times the amount of actual damages which the state of Indiana has sustained as a result of Defendant Healogics' and Defendant Indiana Hospitals' conduct;

(2) A civil penalty of not less than $5,000 for each false claim which Defendant Healogics and Defendant Indiana Hospitals caused to be presented to the state of Indiana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to Indiana Code 5-11-5.5 et seq. and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XIV
## Iowa False Claims Act

335.     Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

336.     This is a qui tam action brought by Relators on behalf of the state of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, ICA §685.1 et. seq.

337.     The Iowa False Claims Act provides liability for any person who:

> a. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

> b. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

> c. Conspires to commit a violation of paragraph "a", "b", "d", "e", "f", or "g".

338.     Defendant Healogics and Defendant Iowa Hospitals conspired to, and did in fact, violate the Iowa False Claims Act, ICA §685.1 et. seq. by knowingly causing false claims and false records to be made, used and presented to the state of Iowa.

339.     The state of Iowa, by and through the Iowa Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Iowa Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Iowa Hospitals and third party payers in connection therewith.

340.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Indiana in connection with Defendant Healogics' and Defendant Iowa Hospitals' conduct.

341.    Had the state of Iowa known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics' and Defendant Iowa Hospitals' and third party payers in connection with that conduct.

342.    As a result of Defendant Healogics' and Defendant Iowa Hospitals' violations of the Iowa False Claims Act, ICA §685.1 et. seq. the state of Iowa has been damaged in excess of one million dollars, exclusive of interest.

343.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to the Iowa False Claims Act, ICA §685.1 et. seq. on behalf of themselves and the state of Iowa.

344.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Iowa in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Iowa Hospitals:

To the state of Iowa:

    (1) Three times the amount of actual damages which the state of Iowa has sustained as a result of Defendant Healogics' and Defendant Iowa Hospitals' conduct;

    (2) A civil penalty of not less than $5,500 or more than $11,000 for each false claim which Defendant Healogics and Defendant Iowa Hospitals caused to be presented to the state of Iowa;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

    (5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to the Iowa False Claims Act, ICA §685.1 et. seq. and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XV
## Louisiana Medical Assistance Programs Integrity Law (MAPIL)

345.    Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

346.    This is a qui tam action brought by Relators on behalf of the state of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 et seq.

347.    La. Rev. Stat. Ann. § 438.3 provides:

A. No person shall knowingly present or cause to be presented a false or fraudulent claim.

B. No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

C. No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

D. No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

E. (1) No person shall knowingly submit a claim for goods, services, or supplies which were medically unnecessary or which were of substandard quality or quantity.

348.    Through the conduct alleged herein, Defendant Healogics and Defendant Louisiana Hospitals conspired to and did in fact, violate La. Rev. Stat. Ann. §438.3 by knowingly causing false claims and false records to be made, used and presented to the state of Louisiana, for the purposes of obtaining payment and concealing an obligation to pay money back to the medical assistance programs.   In addition, Defendant Healogics and Defendant Louisiana Hospitals did knowingly submit claims for services which were medically unnecessary.

349.    The state of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Louisiana Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Louisiana Hospitals and third party payers in connection therewith.

350.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Louisiana in connection with Defendant Healogics' and Defendant Louisiana Hospitals' conduct

351.    Had the state of Louisiana known that false representations and false records were made with respect to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Louisiana Hospitals and third party payers in connection with that conduct.

352.    As a result of Defendant Healogics' and Defendant Louisiana Hospitals' violations of La. Rev. Stat. Ann. § 438.3 the state of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

353.     Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. §439.1(A) on behalf of themselves and the state of Louisiana.

354.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Louisiana Hospitals:

To the state of Louisiana:

(1) Three times the amount of actual damages which the state of Louisiana has sustained as a result of Defendant Healogics' and Defendant Louisiana Hospitals' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics and Defendant Louisiana Hospitals caused to be presented to the state of Louisiana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XVI
## Maryland False Health Claims Act

355.    Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

356.    This is a qui tam action brought by Relators on behalf of the state of Maryland to recover treble damages and civil penalties under the Maryland False Health Claims Act, Md. Code Health-Gen § 2-602 et seq.

357.    The Maryland False Health Claims Act provides that a person may not:

(1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspire to commit a violation under this subtitle;

358.    Defendant Healogics and Defendant Maryland Hospitals conspired to, and did in fact, violate §2-602 by knowingly causing false claims and false records to be made, used and presented to the state of Maryland by its deliberate and systematic violation of federal and state laws as alleged herein.

359.    The state of Maryland, by and through the Maryland Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Maryland Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Maryland Hospitals and third party payers in connection therewith.

360.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Maryland in connection with Defendant Healogics' and Defendant Maryland Hospitals' conduct.

361.   Had the state of Maryland known that false representations were made or false records relied upon with respect to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Maryland Hospitals and third party payers in connection with that conduct.

362.   As a result of Defendant Healogics' and Defendant Maryland Hospitals' violations of the Maryland False Health Claims Act, the state of Maryland has been damaged in excess of one million dollars, exclusive of interest.

363.   Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who has brought this action pursuant to the Maryland False Health Claims Act on behalf of themselves and the state of Maryland.

364.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Maryland in the operation of its Medicaid program and other state health programs.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Maryland Hospitals:

To the state of Maryland:

(1) Three times the amount of actual damages which the state of Maryland has sustained as a result of Defendant Healogics' and Defendant Maryland Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics and Defendant Maryland Hospitals caused to be presented to the state of Maryland;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to the Maryland False Health Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XVII
## Michigan Medicaid False Claims Act

365.     Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended

Complaint as though fully set forth herein.

366.     This is a qui tam action brought by Relators on behalf of the state of Michigan to

recover treble damages and civil penalties under the Michigan Medicaid False Claims Act. MI

ST Ch. 400.603 et seq.

367.     Section 3 of Chapter 400.603 provides liability in pertinent part as follows:

(1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits;

(2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit...

368.     Defendant Healogics and Defendant Michigan Hospitals conspired to, and did in

fact, violate, MI ST Ch. 400.603 et seq. by knowingly causing false claims and false records to

be made, used and presented to the state of Michigan as alleged herein.

369.     The state of Michigan, by and through the Michigan Medicaid program and other

state healthcare programs, and unaware of Defendant Healogics' and Defendant Michigan

Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Michigan Hospitals and third party payers in connection therewith.

370.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Michigan in connection with Defendant Healogics' and Defendant Michigan Hospitals' conduct.

371.    Had the state of Michigan known that false representations were made or false records created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Michigan Hospitals and third party payers in connection with that conduct.

372.    As a result of Defendant Healogics' and Defendant Michigan Hospitals' violations of MI ST Ch. 400.603 et seq. the state of Michigan has been damaged in an amount in excess of one million dollars, exclusive of interest.

373.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to MI ST Ch. 400.603 et seq. on behalf of themselves and the state of Michigan.

374.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Michigan in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Michigan Hospitals:

    To the state of Michigan:

        (1) Three times the amount of actual damages which the state of Michigan has sustained as a result of Defendant Healogics' and Defendant Michigan

Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics and Defendant Michigan Hospitals caused to be presented to the state of Michigan;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to MI ST Ch. 400.603 et. seq. and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XVIII
## Minnesota False Claims Act

375.     Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

376.     This is a qui tam action brought by Relators on behalf of the state of Minnesota for treble damages and penalties under the Minnesota False Claims Act, Minn. Stat. §15.C01 et seq.

377.     The Minnesota False Claims Act §15C.02 provides liability for any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7);

378.     Defendant Healogics and Defendant Minnesota Hospitals conspired to, and did in fact, violate the Minnesota False Claims Act by knowingly causing false claims and false records to be made, used and presented to the state of Minnesota vis-à-vis the allegations herein.

379.     The state of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Minnesota Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Minnesota Hospitals and third party payers in connection therewith.

380.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Minnesota in connection with Defendant Healogics' and Defendant Minnesota Hospitals' conduct.

381.     Had the state of Minnesota known that false representations were made and false records created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Minnesota Hospitals and third party payers in connection with that conduct.

382.     As a result of Defendant Healogics' and Defendant Minnesota Hospitals' violations of the Minnesota False Claims Act, the state of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

383.     Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to the Minnesota False Claims Act on behalf of themselves and the state of Minnesota.

384.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Minnesota Hospitals:

To the state of Minnesota:

(1) Three times the amount of actual damages which the state of Minnesota has sustained as a result of Defendant Healogics' and Defendant Minnesota Hospitals' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics and Defendant Minnesota Hospitals caused to be presented to the state of Minnesota;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to the Minnesota False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### Count XIX
### Montana False Claims Act
### Mont. Code Ann. § 17-8-403(1)(A)-(B)

385.   Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

386. This is a claim for treble damages and penalties under the Montana False Claims Act.

387. By virtue of the acts described above, Defendant Healogics and Defendant Montana Hospitals knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana state government to approve and pay such false and fraudulent claims.

388. Each claim submitted as a result of Defendant Healogics' and Defendant Montana Hospitals' illegal conduct represents a false or fraudulent record or statement. As such, each claim for reimbursement for wound treatment submitted to Montana represents a false or fraudulent claim for payment.

389. Relators cannot at this time identify all of the false claims for payment that were caused by Defendant Healogics' and Defendant Montana Hospitals' conduct. The false claims were presented by separate entities, across the United States, over many years. Relators have no control over or dealings with such entities and have no access to the records in the Defendants' possession.

390. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Montana in connection with Defendant Healogics' and Defendant Montana Hospitals' conduct.

391. Had the state of Montana known that false representations were made or false records created with respect to the above conduct, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

392.     The Montana state government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant Healogics and Defendant Montana Hospitals, paid and continues to pay the claims that would not be paid but for Defendants' conduct.

393.     By reason of the Defendants' acts, the state of Montana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

394.     The state of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant Healogics and Defendant Montana Hospitals.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Montana Hospitals:

To the state of Montana:

(1) Three times the amount of actual damages which the state of Montana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the state of Montana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to Montana Code Ann. § 17-8-403(1)(A)-(B) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XX
## Nevada False Claims Act

395.   Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

396.   This is a qui tam action brought by Relators on behalf of the state of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010, et. seq.

397.   N.R.S. § 357.040(1) provides liability for any person who:

(a) knowingly presents or causes to be presented a false claim for payment or approval;

(b) knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

(c) conspires to defraud by obtaining allowance or payment of a false claim;

(h) is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

398.   By virtue of the conduct alleged herein, Defendant Healogics and Defendant Nevada Hospitals conspired to, and did in fact, violate N.R.S. § 357.040(1) by knowingly causing false claims and false records to be made, used and presented to the state of Nevada.

399.   The state of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Nevada Hospitals' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

400.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Nevada in connection with Defendant Healogics' and Defendant Nevada Hospitals' conduct.

401.    Had the state of Nevada known that false representations were made and false records created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Nevada Hospitals and third party payers in connection with that conduct.

402.    As a result of Defendant Healogics' and Defendant Nevada Hospitals' violations of N.R.S. § 357.040(1) the state of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

403.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of themselves and the state of Nevada.

404.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Nevada in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Nevada Hospitals:

To the state of Nevada:

(1) Three times the amount of actual damages which the state of Nevada has sustained as a result of Defendant Healogics' and Defendant Nevada Hospitals' conduct;

(2) A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendant Healogics and Defendant Nevada Hospitals caused to be presented to the state of Nevada;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXI
## New Jersey False Claims Act

405.    Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

406.    This is a qui tam action brought by Relators on behalf of the state of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. §2A:32C-1 (2008) et seq.

407.    N.J. Stat. § 2A:32C-1 provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee, officer or agent of the state or to any contractor, grantee, or other recipient of state funds a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

408.   By virtue of conduct alleged herein, Defendant Healogics and Defendant New Jersey Hospitals conspired to, and did in fact, violate N.J. Stat. § 2A:32C-1 by knowingly causing false claims and false records to be made, used and presented to the state of New Jersey.

409.   The state of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant New Jersey Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant New Jersey Hospitals and third party payers in connection therewith.

410.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of New Jersey in connection with Defendant Healogics' and Defendant New Jersey Hospitals' conduct.

411.   Had the state of New Jersey known that false representations were and false records were created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant New Jersey Hospitals and third party payers in connection with that conduct.

412.   As a result of Defendant Healogics' and Defendant New Jersey Hospitals' violations of N.J. Stat. § 2A:32C-1, the state of New Jersey has been damaged in an amount in excess one million dollars, exclusive of interest.

413.   Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to N.J. Stat. § 2A:32C-1 et seq. on behalf of themselves and the state of New Jersey.

414.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant New Jersey Hospitals:

To the state of New Jersey:

(1) Three times the amount of actual damages which the state of New Jersey has sustained as a result of Defendant Healogics' and Defendant New Jersey Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics and Defendant New Jersey Hospitals caused to be presented to the state of New Jersey;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to N.J. Stat. § 2A:32C-1 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXII
## New Mexico Medicaid False Claims Act

415.    Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

416.    This is a qui tam action brought by Relators on behalf of the state of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act N.M. Stat. Ann§§ 27-14-1 *et seq.* Section 3 provides liability in pertinent part as follows:

"A person shall not:

(1) knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee, or other recipient of state funds a false or fraudulent claim for payment or approval;

(2) knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

(3) conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim..."

417.    By of the conduct alleged herein, Defendant Healogics and Defendant New Mexico Hospitals conspired to, and did in fact, violate, N.M. Stat. Ann§§ 27-14-1 et seq. by knowingly causing false claims and false records to be made, used and presented to the state of New Mexico.

418.    The state of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant New Mexico Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant New Mexico Hospitals and third party payers in connection therewith.

419.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of New Mexico in connection with Defendant Healogics' and Defendant New Mexico Hospitals' conduct.

420.    Had the state of New Mexico known that false representations were made or false records created with regard to the above conduct, it would not have paid the claims submitted by

Defendant Healogics and Defendant New Mexico Hospitals and third party payers in connection with that conduct.

421. As a result of Defendant Healogics' and Defendant New Mexico Hospitals' violations of N.M. Stat. Ann§§ 27-14-1 et seq. the state of New Mexico has been damaged in an amount in excess of one million dollars, exclusive of interest.

422. Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to N.M. Stat. Ann§§ 27-14-1 et seq. on behalf of themselves and the state of New Mexico.

423. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant New Mexico Hospitals:

To the state of New Mexico:

(1) Three times the amount of actual damages which the state of New Mexico has sustained as a result of Defendant Healogics' and Defendant New Mexico Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics and Defendant New Mexico Hospitals caused to be presented to the state of New Mexico;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to N.M. Stat. Ann§§ 27-14-1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXIII
## New York False Claims Act

424.     Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

425.     This is a qui tam action brought by Relators on behalf of the state of New York to recover treble damages and civil penalties under the New York False Claims Act, 2007 N.Y. Laws 58, Section 39, Article XIII Section 189.

426.     The New York False Claims Acy provides liability for any person who:

1(a)   knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for payment or approval;

1(b)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government;

1(c)   conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

427.     By virtue of the conduct alleged here, Defendant Healogics and Defendant New York Hospitals conspired to, and did in fact, violate 2007 N.Y. Laws 58, Section 39, Article XIII, by knowingly causing false claims and false records to be made, used and presented to the state of New York.

428.     The state of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant New York

Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant New York Hospitals and third party payers in connection therewith.

429.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of New York in connection with Defendant Healogics' and Defendant New York Hospitals' conduct.

430.    Had the state of New York known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant New York Hospitals and third party payers in connection with that conduct.

431.    As a result of Defendant Healogics' and Defendant New York Hospitals' violations of 2007 N.Y. Laws 58, Section 39, Article XIII, the state of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

432.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to 2007 N.Y. Laws 58, Section 39, Article XIII, on behalf of themselves and the state of New York.

433.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of New York in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant New York Hospitals:

To the state of New York:

(1) Three times the amount of actual damages which the state of New York has sustained as a result of Defendant Healogics' and Defendant New

York Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim Defendant Healogics and Defendant New York Hospitals caused to be presented to the state of New York;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to 2007 N.Y. Laws 58, Section 39, Article XIII, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXIV
## North Carolina False Claims Act

434.    Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

435.    This is a qui tam action brought by Relators on behalf of the state of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, et seq.

436.    The North Carolina False Claims Act, §1-607 provides liability for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

437.    By virtue of conduct alleged herein, Defendant Healogics and Defendant North Carolina Hospitals conspired to, and did in fact, violate §1-607 by knowingly causing false claims and false records to be made, used and presented to the state of North Carolina.

438.    The state of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant North Carolina Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant North Carolina Hospitals and third party payers in connection therewith.

439.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of North Carolina in connection with Defendant Healogics' and Defendant North Carolina Hospitals' conduct.   Compliance with applicable North Carolina statutes and regulations was also an express condition of payment of claims submitted to the state of North Carolina.

440.    Had the state of North Carolina known that false representations were made or false records created in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant North Carolina Hospitals and third party payers in connection with that conduct.

441.    As a result of Defendant Healogics' and Defendant North Carolina Hospitals' violations of the North Carolina False Claims Act, the state of North Carolina has been damaged in an amount in excess of one million dollars, exclusive of interest.

442.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to the North Carolina False Claims Act on behalf of themselves and the state of North Carolina.

443.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant North Carolina Hospitals:

To the state of North Carolina:

(1) Three times the amount of actual damages which the state of North Carolina has sustained as a result of Defendant Healogics' and Defendant North Carolina Hospitals' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics and Defendant North Carolina Hospitals caused to be presented to the state of North Carolina

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to the North Carolina False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action,

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXV
## Oklahoma Medicaid False Claims Act

444.    Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

445.    This is a qui tam action brought by Relators on behalf of the state of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act 63 Okl. St. § 5053 (2008) et seq.

446.    63 Okl. St. § 5053.1 (2)(B) provides liability for any person who:

  (1) knowingly presents, or causes to be presented, to an officer or employee of the state of Oklahoma, a false or fraudulent claim for payment or approval;

  (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

  (3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

447.    By virtue of the alleged conduct, Defendant Healogics and Defendant Oklahoma Hospitals conspired to, and did in fact, violate 63 Okl. St. § 5053.1 et seq. by knowingly causing false claims and false records to be made, used and presented to the state of Oklahoma.

448.    The state of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Oklahoma Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Oklahoma Hospitals and third party payers in connection therewith.

449.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Oklahoma in connection with Defendant Healogics' and Defendant Oklahoma Hospitals' conduct.

450.    Had the state of Oklahoma known that false representations were made or false records created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Oklahoma Hospitals and third party payers in connection with that conduct.

451.    As a result of Defendant Healogics' and Defendant Oklahoma Hospitals' violations of 63 Okl. St. § 5053.1 et seq., the state of Oklahoma has been damaged in an amount far in excess of one million dollars, exclusive of interest.

452.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to 63 Okl. St. § 5053.1 et seq. on behalf of themselves and the state of Oklahoma.

453.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Oklahoma Hospitals:

To the state of Oklahoma:

(1) Three times the amount of actual damages which the state of Oklahoma has sustained as a result of Defendant Healogics' and Defendant Oklahoma Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics and Defendant Oklahoma Hospitals caused to be presented to the state of Oklahoma;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to 63 Okl. St. § 5053.1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXVI
## Rhode Island State False Claims Act

454.    Relators allege and incorporate by reference paragraphs 1–230 of this Amended Complaint as though fully set forth herein.

455.    This is a qui tam action brought by Relators on behalf of the state of Rhode Island to recover treble damages and civil penalties under the Rhode Island state False Claims Act R.I. Gen. Laws § 9-1.1-1 (2008) et seq.

456.    R.I. Gen. Laws § 9-1.1-1 provides liability for any person who:

(1)    knowingly presents, or causes to be presented, to an officer or employee of the state or a member of the Guard a false or fraudulent claim for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3)    conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

457.    Defendant Healogics and Defendant Rhode Island Hospitals conspired to, and did in fact, violate R.I. Gen. Laws § 9-1.1-1 by knowingly causing false claims and false records to be made, used and presented to the state of Rhode Island by its deliberate and systematic violation of federal and state laws.

458.   The state of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Rhode Island Hospitals' conduct, paid the claims submitted by Defendant and third party payers in connection therewith.

459.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Rhode Island in connection with Defendant Healogics' and Defendant Rhode Island Hospitals' conduct.

460.   Had the state of Rhode Island known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Rhode Island Hospitals and third party payers in connection with that conduct.

461.   As a result of Defendant Healogics' and Defendant Rhode Island Hospitals' violations of R.I. Gen. Laws § 9-1.1-1, the state of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

462.   Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to R.I. Gen. Laws § 9-1.1-1 et seq. on behalf of themselves and the state of Rhode Island.

463.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Rhode Island Hospitals:

To the state of Rhode Island:

(1) Three times the amount of actual damages which the state of Rhode Island has sustained as a result of Defendant Healogics' and Defendant Rhode Island Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics and Defendant Rhode Island Hospitals caused to be presented to the state of Rhode Island;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to R.I. Gen. Laws § 9-1.1-1 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXVII
### Tennessee False Claims Act

464.    Relators allege and incorporate by reference paragraphs 1–230 of this Amended Complaint as though fully set forth herein.

465.    This is a qui tam action brought by Relators on behalf of the state of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

466.    The Tennessee Medicaid False Claims Act, §71-5-182(a)(1) provides liability for any person who:

(A) presents, or causes to be presented to the state, a claim for payment under

the Medicaid program knowing such claim is false or fraudulent;

(B) makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

(C) conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

467.    Defendant Healogics and Defendant Tennessee Hospitals conspired to, and did in fact, violate Tenn. Code Ann. § 71-5-1 82(a)(1) by knowingly causing false claims and false records to be made, used and presented to the state of Tennessee.

468.    The state of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Tennessee Hospitals' conduct, paid the claims submitted by Defendant and third party payers in connection therewith.

469.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Tennessee in connection with Defendant Healogics' and Defendant Tennessee Hospitals' conduct.

470.    Had the state of Tennessee known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Tennessee Hospitals and third party payers in connection with that conduct.

471.    As a result of Defendant Healogics' and Defendant Tennessee Hospitals' violations of Tenn. Code Ann. § 71-5-182(a)(1), the state of Tennessee has been damaged in an amount far in excess of one million dollars, exclusive of interest.

472.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of themselves and the state of Tennessee.

473.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Tennessee Hospitals:

To the state of Tennessee:

(1) Three times the amount of actual damages which the state of Tennessee has sustained as a result of Defendant Healogics' and Defendant Tennessee Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $25,000 for each false claim Defendant Healogics and Defendant Tennessee Hospitals caused to be presented to the state of Tennessee;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXVIII
## Texas False Claims Act

474.    Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

475.    This is a qui tam action brought by Relators on behalf of the state of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 et seq.

476.    V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who:

> (1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:
>
>> (a) on an application for a contract, benefit, or payment under the Medicaid program; or
>>
>> (b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program;
>
> (2) knowingly or intentionally concealing or failing to disclose an event:
>
>> (A)    that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of;
>>
>>> (i)    the person; or
>>>
>>> (ii)    another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and
>>
>> (B)    to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;
>
> (4) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
>
>> (B)    information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;
>
> (5) knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a

donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

477.   Defendant Healogics and Defendant Texas Hospitals conspired to, and did in fact, violate V.T.C.A. Hum. Res. Code § 36.002 by knowingly causing false claims and false records to be made, used and presented to the state of Texas and by its deliberate and systematic violation of federal and state laws.

478.   The state of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendant Healogics and Defendant Texas Hospitals conduct, paid the claims submitted by Defendant and third party payers in connection therewith.

479.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Texas in connection with Defendant Healogics' and Defendant Texas Hospitals' conduct.

480.   Had the state of Texas known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Texas Hospitals and third party payers in connection with that conduct.

481.   As a result of Defendant Healogics' and Defendant Texas Hospitals' violations of V.T.C.A. Hum. Res. Code § 36.002, the state of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

482.   Defendant Healogics and Defendant Texas Hospitals did not, within 30 days after they first obtained information as to such violations, furnish such information to officials of the state responsible for investigating false claims violations, did not otherwise fully cooperate with

any investigation of the violations, and have not otherwise furnished information to the state regarding the claims for reimbursement at issue.

483.   Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of themselves and the state of Texas.

484.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Texas in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Texas Hospitals:

To the state of Texas:

(1)   Two times the amount of actual damages which the state of Texas has sustained as a result of Defendant Healogics' and Defendant Texas Hospitals' conduct;

(2)   A civil penalty of not less than $5,500 nor more than $11,000 pursuant to V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim which Defendant Healogics and Defendant Texas Hospitals Defendants caused to be presented to the state of Texas;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1)   The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code §36.110, and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## Count XXIX
### Washington State Medicaid Fraud False Claims Act

485.    Relators allege and incorporate by reference paragraphs 1–230 of this Amended Complaint as though fully set forth herein.

486.    This is a qui tam action brought by Relators on behalf of the state of Washington for treble damages and penalties under Washington State Medicaid Fraud False Claims Act, RCW 74.66.020, which provides liability for any person who:

(a)    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c)    Conspires to commit one or more of the violations in this subsection (1)

487.    Defendant Healogics and Defendant Washington Hospitals conspired to, and did in fact, violate the Washington State Medicaid Fraud False Claims Act by knowingly causing false claims and false records to be made, used and presented to the state of Washington.

488.    The state of Washington, by and through the Washington Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Washington Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Washington Hospitals and third party payers in connection therewith.

489.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Washington in connection with Defendant Healogics' and Defendant Washington Hospitals' conduct.

490.    Had the Commonwealth of Washington known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Washington Hospitals and third party payers in connection with that conduct

491.    As a result of Defendant's violations of the Washington State Medicaid Fraud False Claims Act, the state of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

492.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to the Washington State Medicaid Fraud False Claims Act on behalf of themselves and the state of Washington.

493.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Washington in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Washington Hospitals:

To the state of Washington:

(1) Three times the amount of actual damages which the state of Washington has sustained as a result of Defendant Healogics' and Defendant Washington Hospitals' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics and Defendant Washington Hospitals caused to be presented to the state of Washington;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to the Washington State Medicaid Fraud False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**Count XXX**
**Wisconsin False Claims for Medical Assistance Law**

494.   Relators allege and incorporate by reference paragraphs 1–230 of this Amended Complaint as though fully set forth herein.

495.   This is a qui tam action brought by Relators on behalf of the state of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 et seq.

496.   Wis. Stat. § 20.931(2) provides liability for any person who:

(1) conspires to defraud this State by obtaining a false allowance or payment of claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance Program;

(2) knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance Program.

497.   Defendant Healogics and Defendant Wisconsin Hospitals conspired to, and did in fact, violate Wis. Stat. § 20.931 et seq. by knowingly causing false claims and false records to be made, used and presented to the state of Wisconsin.

498.    The state of Wisconsin, by and through the Wisconsin Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Wisconsin Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Wisconsin Hospitals and third party payers in connection therewith.

499.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Wisconsin in connection with Defendant Healogics' and Defendant Wisconsin Hospitals' conduct.

500.    Had the state of Wisconsin known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Wisconsin Hospitals and third party payers in connection with that conduct.

501.    As a result of Defendant Healogics' and Defendant Wisconsin Hospitals' violations of Wis. Stat. § 20.931 et seq., the state of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

502.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Wis. Stat. § 20.931 et seq. on behalf of themselves and the state of Wisconsin.

503.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Wisconsin in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Wisconsin Hospitals:

To the state of Wisconsin:

(1) Three times the amount of actual damages which the state of Wisconsin has sustained as a result of Defendant Healogics' and Defendant Wisconsin Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics and Defendant Wisconsin Hospitals caused to be presented to the state of Wisconsin;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to Wis. Stat. § 20.931 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXXI
## Massachusetts False Claims Act

504.   Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

505.   This is a qui tam action brought by Relators on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12 § 5(A) et seq.

506.   Mass. Gen. Laws Ann. Chap. 12 § 5B provides liability for any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth; or

(3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(9) is a beneficiary of an inadvertent submission of a false claim to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

507.    Defendant Healogics and Defendant Massachusetts Hospitals conspired to, and did in fact, violate Mass. Gen. Laws Ann. Chap. 12 § 5B by knowingly causing false claims and false records to be made, used and presented to the Commonwealth of Massachusetts.

508.    The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Massachusetts' Hospitals conduct, paid the claims submitted by Defendant Healogics and Defendant Massachusetts Hospitals and third party payers in connection therewith.

509.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendant Healogics' and Defendant Massachusetts Hospitals' conduct.

510.    Had the Commonwealth of Massachusetts known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Massachusetts Hospitals and third party payers in connection with that conduct.

511.   As a result of Defendant Healogics' and Defendant Massachusetts Hospitals' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

512.   Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5(c)(2) on behalf of themselves and the Commonwealth of Massachusetts.

513.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Massachusetts Hospitals:

To the Commonwealth of Massachusetts:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendant Healogics' and Defendant Massachusetts Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics and Defendant Massachusetts Hospitals caused to be presented to the Commonwealth of Massachusetts;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12, §5F and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXXII
### Virginia Fraud Against Taxpayers Act

514.   Relators allege and incorporate by reference paragraphs 1 – 230 of this Amended Complaint as though fully set forth herein.

515.   This is a qui tam action brought by Relators on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Tax Payers Act. Sec. 8.01-216.3a, which provides liability for any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth; or

(3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

516.   Defendant Healogics and Defendant Virginia Hospitals conspired to, and did in fact, violate the Virginia Fraud Against Tax Payers Act §8.01-216.3a by knowingly causing false claims and false records to be made, used and presented to the Commonwealth of Virginia.

517.   The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant Virginia Hospitals' conduct, paid the claims submitted by Defendant Healogics and Defendant Virginia Hospitals and third party payers in connection therewith.

518.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendant Healogics' and Defendant Virginia Hospitals' conduct.

519.    Had the Commonwealth of Virginia known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant Virginia Hospitals and third party payers in connection with that conduct

520.    As a result of Defendant's violations of Virginia Fraud Against Tax Payers Act §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount in excess of one million dollars, exclusive of interest.

521.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Virginia Fraud Against Tax Payers Act §8.01-216.3 on behalf of themselves and the Commonwealth of Virginia.

522.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant Virginia Hospitals:

To the Commonwealth of Virginia:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant Healogics' and Defendant Virginia Hospitals' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics and Defendant Virginia Hospitals caused to be presented to the Commonwealth of Virginia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to VA Code ANN § 32.1-315 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## Count XXXIII
## District Of Columbia Procurement Reform Amendment Act

523.     Relators allege and incorporate by reference paragraphs 1–230 of this Amended Complaint as though fully set forth herein.

524.     This is a qui tam action brought by Relators and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.13 et seq.

525.     D.C. Code § 2-308.14(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

(3) conspires to defraud the District by getting a false claim allowed or paid by the District;

(8) is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

526.    Defendant Healogics and Defendant District of Columbia Hospitals conspired to, and did in fact, violate D.C. Code § 2-308.14(a) by knowingly causing thousands of false claims to be made, used and presented to the District of Columbia as well as making, using or causing to made or used false records to get said claims approved or paid, as well as by failing to disclose the false claims or returning amounts owed after discovering the falsity.

527.    The District of Columbia, by and through the District of Columbia Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' and Defendant District of Columbia Hospitals' illegal conduct, paid the claims submitted by Defendant Healogics and Defendant District of Columbia Hospitals and third party payers in connection therewith.

528.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Defendant Healogics' and Defendant District of Columbia Hospitals' illegal conduct.

529.    Had the District of Columbia known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and Defendant District of Columbia Hospitals and third party payers in connection with that conduct.

530.    As a result of Defendant Healogics' and Defendant District of Columbia Hospitals' violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess one million dollars, exclusive of interest.

531.     Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of themselves and the District of Columbia.

532.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics and Defendant District of Columbia Hospitals:

To the District of Columbia:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' illegal conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the District of Columbia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## VII.  Demand for Jury Trial

Pursuant to Rule 38 of Federal Rules of Civil Procedure, Plaintiffs/Relators hereby demand a trial by jury.

Dated this 28th day of June, 2014.

Respectfully submitted,

BY: 

John Yanchunis (FBN 324681)
jyanchunis@forthepeople.com
James D. Young (FBN 567507)
jyoung@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida  33602
(813) 318-5169 Telephone
(813) 222-4793 Facsimile
*Attorneys for Plaintiffs/Relators*