UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,                    Civil Action Case No.: 6:14-cv-283 GJK
and the States of CALIFORNIA,
COLORADO, CONNECTICUT,
DELAWARE, FLORIDA, GEORGIA,
HAWAII, ILLINOIS, INDIANA, IOWA,
LOUISIANA, MICHIGAN, MINNESOTA,
MONTANA, NEVADA, NEW JERSEY,
NEW MEXICO, NEW YORK, NORTH
CAROLINA, OKLAHOMA, RHODE
ISLAND, TENNESSEE, TEXAS,
WASHINGTON, WISCONSIN, the
Commonwealths of MASSACHUSETTS and
VIRGINIA and the DISTRICT of
COLUMBIA, ex rel. BENJAMIN A. VAN
RAALTE, M.D., MICHAEL J. CASCIO,
M.D. and JOHN J. MURTAUGH,

                    Plaintiffs/Relators,

v.

HEALOGICS, INC.,
                    Defendant.

_____/


**CORRECTED[1] SECOND AMENDED COMPLAINT UNDER THE FALSE CLAIMS ACT 31
U.S.C. § 3730(b) AND RELATED STATE FALSE CLAIMS ACTS**

─────────────────────────────────────────

[1] This is a corrected version of the Second Amended Complaint which solely adds back claims for the State of Wisconsin upon their request and drops claims for Maryland pursuant to Md. Code Ann., Health Gen, 2-604(a)(7).

Plaintiffs/Relators, Benjamin A. Van Raalte, M.D, Michael J. Cascio, M.D., and John J. Murtaugh (collectively "Relators"), file their Second Amended Complaint in accordance with the False Claims Act, 31 U.S.C. §3730(b) (hereinafter "FCA") and the above named states' False Claims Acts[2] and further state as follows:

## I.    PARTIES

1.    Under the FCA and state False Claim Acts, a person or persons with knowledge of false or fraudulent claims against the government (a "relator") may bring an action on behalf of the federal government, state government, and themselves.

2.    Relators herein are "original sources" of the information underlying the Amended Complaint, as that term is used in the False Claims Acts relied on here, and have previously voluntarily disclosed to the government the information and allegations giving rise to this matter.

---

[2] California False Claims Act, Cal. Gov. Code §§12650, *et seq*.; Colorado Medicaid False Claims Act, Col. Rev. Stat. 25.5-4-304, *et seq*.; Connecticut False Claims Act For Medical Assistance Programs, Conn. Gen. Stat. Sec. 17b-301a, *et seq*.; Delaware False Claims and Reporting Act, 6 Del. C. §§1201; the District of Columbia False Claims Act, D.C. Code §§2-30814381.01, *et seq*.; the Florida False Claims Act, Fla. Stat. §68.081 *et seq*.; Georgia State False Medicaid Claims Act. Ga. Code §49-4-168, *et seq*.; the Hawaii False Claims Act, False Claims to the State, HRS §§661-21, *et seq*.; the Illinois False Claims Act, 740 ILCS 175, *et seq*.; the Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. §5-11-5.5. *et seq*.; Iowa False Claims Act, Iowa Code Ch. 685 *et seq*.; the Louisiana Medical Assistance Programs Integrity Law, La, R.S. §§46:437, *et seq*.: Massachusetts False Claims Act ALM GL ch12 §§5A, *et seq*.; the Michigan Medicaid False Claims Act, MCLS §§400.601, *et seq*.; Minnesota False Claims Act, Minn. Stat. §15C.01 *et seq*.; the Montana False Claims Act, Mont Code §§17-8-401, *et seq*.; the Nevada False Claims Act, Submission of False Claims to State or Local Government, Nev. Rev. Stat. Ann. §§357.010 *et seq*., the New Mexico False Claims Act, N.M. Stat Ann. §§27-14-1 *et seq*.; New Mexico Fraud Against Taxpayers Act, N.M. Stat. §§44-9-1 *et seq*.; New Jersey False Claims Act, N.J. Stat. §§2A:32C-1.the New York False Claims Act, NY CLS St2007 N.Y. Laws 58, Section 39, Article XIII Section 189, later amended at N.Y. State Fin, §§187. Law §§188 *et seq*.; North Carolina False Claims Act, NCGSA § 1-607 *et seq*.; Oklahoma Medicaid False Claims Act, 63 Okla. Stat. §§5053, *et seq*.; Rhode Island State False Claims Act., R.I. Gen. Laws §§9-1.1-1, *et seq*.; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-181, *et seq*.;: the Tennessee False Claim Act, Tenn. Code Ann. §4~18-101, *et seq*.; the Texas Medicaid Fraud Prevention Act, Tex. Hum, Res. Code, §36.001, *et seq*.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1, *et seq*.; the Washington State Medicaid Fraud False Claims Act, RCWA § 74.66.005 *et seq*.; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §§20.931, *et seq*.

**A.     Relator Dr. Van Raalte**

3.     Benjamin A. Van Raalte, M.D. is a resident of Bettendorf, Iowa.  Dr. Van Raalte is a Board Certified Diplomat of the American Board of Plastic Surgery and the National Board of Medical Examiners and is licensed to practice in the states of Iowa, Wisconsin, and Illinois.

4.     Dr. Van Raalte began working in Healogics Inc. wound care centers, located in Bettendorf, Iowa and Moline, Illinois in mid-May 2009.  Dr. Van Raalte worked for Defendant until June 2012.

5.     Dr. Van Raalte presently practices plastic surgery in Davenport, Iowa.

**B.     Relator Dr. Cascio**

6.     Relator Michael J. Cascio, M.D., is a resident of St. George, Utah.  Dr. Cascio is a Board Certified Diplomat of the American Academy of Family Physicians, is Board Certified in Undersea and Hyperbaric Medicine, is a Certified Wound Specialist and is licensed to practice in the states of Florida, Missouri, and Utah.  He practices Wound Care and Hyperbaric Medicine full-time.

7.     From November 2007 through May 11, 2014, Dr. Cascio practiced in the Wound Care & Hyperbaric Medicine Center at South Seminole Hospital in Longwood, Florida and in the Dr. P. Phillips Comprehensive Wound Care Center in Orlando, Florida.  He served as Medical Director during most of that time.

8.     As a result of his refusal to engage in Defendant's fraudulent practices, Dr. Cascio was removed as medical director effective June 30, 2014 and ultimately forced out of his practice.

**C.    Relator John Murtaugh**

9.      Relator John Murtaugh is a resident of Orlando, Florida.    Mr. Murtaugh has over thirteen years in the medical products field as a sales representative, including several wound care companies.

10.     John Murtaugh began working for Healogics Inc. as a Program Director of the wound care center in Dr. Phillips Hospital in Orlando, Florida, in April 2013.  As a result of John Murtaugh's refusal to implement Defendant's fraudulent scheme he was constantly pressured, harassed, and monitored.  Mr.  Murtaugh was employed by Defendant as a Program Director until he left in October 2013.  Mr. Murtaugh is certain that if he had not left Healogics voluntarily to accept an employment offer with his current company, he would have been terminated within a few weeks.

**D.    Defendant Healogics**

11.     Defendant Healogics, Inc. (hereinafter "Healogics" or "Defendant") is a for-profit Florida corporation.  Its headquarters are located at 5220 Belfort Road, Suite 200, Jacksonville, FL 32256.  Healogics was formed as a result of the merger between National Healing Corporation and Diversified Clinical Services, Inc. in April 2012.

12.     Healogics is the nation's largest for-profit provider of wound care services and has partnered with over 800 hospitals throughout the United States to operate wound care centers.  In these hospitals, Healogics provides treatment for various chronic and non-healing wounds, including venous ulcers, pressure ulcers, arterial ulcers, necrotizing infections, surgical wounds and burns, soft-tissue radionecrosis, and diabetic lower extremity ulcers.  They provide hyperbaric oxygen therapy for multiple diagnoses to include osteoradionecrosis, acute and

refractory osteomyelitis, acute arterial insufficiency, crush injuries, compromised flaps and grafts and problem wounds.

13.     In 2014, private equity firm Clayton, Dubilier & Rice acquired Healogics for $910 million.  The transaction closed in the third quarter of 2014.  In March of 2015 Healogics acquired their largest competitor, Accelecare Wound Centers, Inc., thus creating the largest wound care center operator in the United States.

## II.     JURISDICTION AND VENUE

14.     Healogics is headquartered in, and transacts business in, the Middle District of Florida.

15.     This Court has jurisdiction over this case pursuant to 31 U.S.C. 3732 (a), as well as under 28 U.S.C. § 1345, where the acts proscribed by 31 U.S.C. § 3729 et seq. and complained of herein occurred in this District and elsewhere.

16.     Venue is proper in this District pursuant to 31 U.S.C. § 3732 (a), and 28 U.S.C. §1391 as Healogics is headquartered in and transacts business in this District, and many of the practices and conduct which are the subject of this complaint were designed, created, and implemented from this District.

17.     This Court has supplemental jurisdiction over this case for the claims brought on behalf of the named states pursuant to 31 U.S.C. §3732(b) and/or 28 U.S.C. § 1367, inasmuch as recovery is sought on behalf of these states which arises from the same transactions and occurrences as the claims brought on behalf of the United States.

18.     Aside from the original pleadings in this matter, the facts and circumstances alleged in this Second Amended Complaint have not been publicly disclosed in a criminal, civil

or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

## III.    FACTUAL BACKGROUND

19.    Wound care centers, such as those operated by Healogics, typically treat chronic wounds.  A chronic wound is defined as one that is unresponsive to initial therapy or persistent in the face of appropriate care and not defined by size, complexity or failure to heal within a limited time frame.[3]

20.    Healogics contracted with hospitals throughout the United States to run the day-to-day operations of the hospitals' wound care centers.  Healogics incentivized hospitals to contract with them by agreeing to provide hyperbaric oxygen chambers, employ some or all of the support staff, conduct the necessary marketing that a wound care center requires and manage wound healing data through a proprietary wound management software program named i-Heal.  In doing so, Healogics created and implemented a nationwide scheme to generate unjustified and costly medical procedures in order to make or cause to be made, fraudulent invoices to Medicare, Medicaid and TRICARE, among others.  Healogics implemented its fraudulent scheme with the knowledge, consent, and cooperation of hospitals throughout the country.

21.    Hospitals were informed by Healogics that they could expect certain profits from the wound care centers when the facilities are operated the "Healogics Way."  The anticipated profits included spin-off or ancillary revenue created by the wound care center operations for things like diagnostic studies, lab work, wound supplies, etc.

---

[3]    AMERICAN SOCIETY OF PLASTIC SURGEONS, EVIDENCE-BASED CLINICAL PRACTICE GUIDELINE: CHRONIC SOUNDS OF THE LOWER EXTREMITY 1. May 2007.   Available at http://www.plasticsurgery.org/Documents/medical-professionals/health-policy/evidence-practice/Evidence-based-Clinical-Practice-Guideline-Chronic-Wounds-of-the-Lower-Extremity.pdf.

22.     The basic operation under the "Healogics Way" worked as follows: hospitals billed insurers; including government programs like Medicaid, Medicare and other government sponsored insurance programs for the technical component of treatments provided in the wound care center.  In some cases, hospitals may also bill for the professional component of services provided if they employed the health care providers who provided the services.  Healogics was transitioning towards such a model at the time Relators were forced out.

23.     Prior to any patient interaction at any of the hospitals where Healogics maintained operations, a document known as a superbill would be placed into the patient's chart.  The superbill lists all procedures and corresponding CPT codes for purposes of billing insurers.  At the end of the patient visit, the attending nurse and/or the treating physician would check off procedures that were more extensive than were actually performed or were not medically necessary.  For example, billing for surgical/excisional debridements when a less expensive selective debridement was performed, or billing for costly hyperbaric treatments on patients whose diagnoses were fraudulently altered in order to qualify the patients for Hyperbaric Oxygen Therapy ("HBOT").

24.     An administrative assistant, wound center employee, or biller then entered the "facility" portion of the visit charges into the hospital billing system.  Hospitals would then bill insurers such as Medicare, Managed Medicare, Medicaid, Managed Medicaid, TRICARE and other government funded health insurance programs for the charges incurred using code C1300.  Only hospitals in outpatient settings may bill for the facility portion of HBOT.  As a result, Healogics needs partner hospitals to provide the setting in which to bill the technical or facility fees related to HBOT.

25.      In order to submit claims for the physician's fee for procedures performed, the physician would be responsible for filling out their own superbill with corresponding CPT codes of the procedure performed.  The physician would then submit those superbills to insurers such as Medicare, Managed Medicare, Medicaid, Managed Medicaid, and other government-funded insurance programs for the "professional" charges incurred through their private practices.

26.      A majority of the Defendant's wound care center patients were under some type of government insurance.  Healogics' payor mix reflects a range of 50% to 90% of all patients treated were Medicare, Managed Medicare, Medicaid, Managed Medicaid or TRICARE patients, depending on the location of the particular wound care center.

27.      Each month a Healogics employee, usually the Program Director, would prepare an invoice to the hospital indicating how much the hospital owed Healogics for operating the wound care center that month.  There were generally three components that made up the basis for the invoice: 1) the number of hyperbaric oxygen or HBO segments, 2) the number of wound care visits/procedures, and 3) the number of hours of medical director time.  The data for these components is derived from Healogics' databases as well as daily and weekly reports generated by the Program Director.

28.      Healogics provided each hospital a specific budget showing them how much money the wound care centers should make each month.  The budget was built on the faulty premise that certain benchmarks created by Healogics were obtainable and appropriate in all of the centers.

29.      Healogics developed and relied upon these national benchmarks in order to audit, manage, and maximize the billing for each of its wound care centers.  Healogics' benchmarks were more than mere targets that each wound care center should strive towards; rather, they were

structured corporate mandates that blatantly disregarded whether or not patients being treated in the centers actually needed the more expensive treatments or ever actually received them.

30.     The scheme was carried out by Healogics with an "everyone wins" explanation, wherein patients received otherwise expensive treatments for little or no direct cost, doctors were able to bill extensively, hospitals improved their respective bottom lines and Healogics' revenue and corporate valuation grew tremendously.  The downside to this scheme was that the insurers, notably the government insurance programs that covered a great majority of the patients, were stuck paying out millions of dollars with little to no medical benefit to their insureds.

31.     In order to meet the budgets and benchmarks so that "everyone wins," Healogics, through a common course of action, educated, trained, directed and ensured that its employees and contracted panel physicians did things the "Healogics Way."

32.     Doing things the "Healogics Way" meant, among other things, fraudulently up-coding debridement procedures, falsifying eligibility in order to bill for unnecessary but expensive hyperbaric oxygen treatments, and requiring that patients undergo frequently unnecessary testing called transcutaneous oxygen measurement or TCOM.

33.     Healogics accomplished this scheme by seeking out and instructing employees, agents and contractors who would go along with its plot.  Healogics' schemes were national in scope.  If Defendant's contracted physicians, Program Directors, Clinical Coordinators or even Zone Medical Directors were not meeting these budgets or benchmarks by performing or billing for higher revenue producing procedures, then Healogics, in conjunction with the hospital, would pressure and harass them until they either conformed to the benchmarks or were forced out. Once forced out, noncompliant Program Directors, Clinical Coordinators and physicians were

replaced with "team players" who would go along with this scheme and perform or bill for higher revenue producing procedures whether the procedures were medically necessary or not.

34.     Employees like John Murtaugh and panel physicians like Drs. Cascio and Van Raalte who refused to participate in Healogics' fraudulent practices, were singled out, publically pressured, punished by withholding necessary resources and eventually replaced with someone willing to do the Defendant's bidding to focus on profits rather than patients or following government policies and rules.

35.     The scheme could not have succeeded without the willing and active participation of Healogics partner hospitals.  Defendant and its partner hospitals, along with many of their employees and contractors, have profited greatly from the fraud perpetrated on the United States and various states and private insurers.  The fraudulent conduct continues to this day: Healogics has no intention of changing its practices and partner hospitals have no intention of returning money fraudulently obtained from government programs.

**A.  CMS Guidelines and Background on Debridements**

36.     One of the primary procedures used in treating wounds is debridement. Debridement is the removal of unhealthy tissue from a wound in order to promote healing. There are currently two types of debridements that are reimbursable under Centers for Medicare and Medicaid Services ("CMS") guidelines: selective and surgical/excisional.

37.     The main clarifying difference between a selective debridement and a surgical/excisional debridement is the type of tissue removed. Selective debridement does not involve removal of subcutaneous fat, muscle tissue or bone, while surgical/excisional debridements do.

38.     Fraud in debridement coding is not a new or novel scheme. In May 2007, the Office of the Inspector General for the Department of Health and Human Services (OIG-HHS) released a report on Medicare Payments for Debridement Services for 2004.  The OIG-HHS had seen a dramatic increase in the number of Medicare claims submitted for the surgical debridement of wounds under CPT codes 11040–11044.

39.     In 2004, Medicare paid out $188 million for surgical debridement services. However, as much as 64% of surgical debridement services that year did not meet Medicare program requirements.

40.     CMS determined that this resulted in $64 million dollars of improper payments. A variety of problems were noted, including 47% of miscoded services were not actually surgical debridement.[4]

41.     The OIG found that CMS should either develop a National Coverage Determination ("NCD") or instruct contractors to develop more uniform policy guidance that defines surgical debridement and appropriate coding and documentation practices.  It was also recommended that CMS instruct carriers to conduct additional medical reviews on surgical debridement services with a focus on common coding errors, higher cost services, and providers with aberrant billing patterns.

**42.**     CMS' Local Coverage Determinations (LCDs)[5] dictate the following in regards to Wound Debridement Services (L29128):

Surgical/Excisional Debridement (CPT codes 11042-11047)

_____

[4] DEPARTMENT OF HEALTH & HUMAN SERVICES, OFFICE OF THE INSPECTOR GENERAL; "MEDICARE PAYMENTS FOR SURGICAL DEBRIDEMENT SERVICES IN 2004;" May 2007; _available at_ http://oig.hhs.gov/oei/reports/oei-02-05-00390.pdf.
[5] Medicare Policies and Guidelines, LCD Determination ID: 11000, Original Determination Effective date of February 2, 2009 with latest revision effective date of January 1, 2011

Surgical debridement, also known as excisional debridement, occurs only if material has been excised and is typically reported for the treatment of a wound to clear and maintain the site free of devitalized tissue including necrosis, eschar, slough, infected tissue, abnormal granulation tissue etc., to the margins of viable tissue. *Surgical excision includes going slightly beyond the point of visible necrotic tissue until viable bleeding tissue is encountered in some cases. The use of a sharp surgical instrument does not necessarily substantiate the performance of surgical/excisional debridement. Unless the medical record shows that a surgical/excisional debridement has been performed, debridement should be coded with either selective or non-selective codes* (97597, 97598, or 97602). [emphasis added]

Surgical debridement codes (11042-11047), as performed by physicians and qualified non-physician practitioners licensed by the state to perform those services, are reported by depth of tissue removed and by surface area of the wound. These codes can be very effective but represent extensive debridement, *often painful to the patient*, and could require complex, surgical procedures and sometimes require the use of general anesthesia. Surgical debridement will be considered as "not medically necessary" when documentation indicates the wound is without infection, necrosis, or nonviable tissues and has pink to red granulated tissue.

Documentation for surgical debridement procedures should include the indications for the procedure, the type of anesthesia if and when used, and the narrative of the procedure that describes the wounds, as well as the details of the debridement procedure itself. The CPT code selected should reflect the level of debrided tissue (e.g., skin, subcutaneous tissue, muscle and/or bone), not the extent, depth, or grade of the ulcer or wound. For example, CPT code 11042 defined as "Debridement; subcutaneous tissue" should be used if only necrotic subcutaneous tissue is debrided, even though the ulcer or wound might extend to the bone. In addition, if only fibrin is removed, this code would not be billed, even if bleeding occurs. *It would not be expected that an individual wound would be repeatedly debrided of skin and subcutaneous tissue because these tissues do not regrow very quickly.* (emphasis added)

43.     The same LCD dictates the following in regards to selective debridement:

"Selective Debridement CPT codes 97597 and 97598 are used for the removal of specific, targeted areas of devitalized or necrotic tissue from a wound along the margin of viable tissue. Occasional bleeding and pain may occur. The routine application of a topical or local anesthetic does not elevate active wound care management to surgical debridement. Selective debridement includes:

- *Selective removal of necrotic tissue by sharp dissection including scissors, scalpel, and forceps.* [emphasis added]

- Selective removal of necrotic tissue by high pressure water jet.

Medicare coverage for wound care on a continuing basis for a given wound in a given patient is contingent upon evidence documented in the patient's medical record that the wound is improving in response to the wound care being provided. It is neither reasonable nor medically necessary to continue a given type of wound care if evidence of wound improvement cannot be shown.

Evidence of improvement includes, but is not limited to, measurable changes in at least some of the following:

- Drainage (color, amount, consistency)
- Inflammation
- Swelling
- Pain
- Wound dimensions (diameter, depth, tunneling)
- Granulation tissue
- Necrotic tissue/slough

Such evidence must be documented with each visit. A wound that shows no improvement after 30 days requires a new approach, which may include a reassessment, by a qualified professional, of underlying infection, metabolic, nutritional, or vascular problems inhibiting wound healing, or a new plan of care or treatment method.

In rare instances, the goal of wound care provided in the outpatient setting may only be to prevent progression of the wound, which due to severe underlying debility or other factors such as inoperability, is not expected to improve."

44.     The reimbursable amounts set by CMS for these two types of debridements are drastically different.   The 2014 Medicare participating provider national unadjusted fees for selective debridements are as follows:

| CPT Code | In office | In hospital | APC[6] |
|----------|-----------|-------------|--------|
| 97597    | $77.02    | $24.72      | $147.39 |
| 97598    | $25.43    | $11.82      | N/A    |

---

[6] Ambulatory Payment Classification

45.     The 2014 Medicare participating provider national unadjusted fees for surgical/excisional debridements are as follows:

| CPT Code | In office | In hospital | APC |
|----------|-----------|-------------|-----|
| 11042 | $117.14 | $63.05 | $274.81 |
| 11043 | $232.49 | $161.20 | $274.81 |
| 11044 | $322.41 | $240.37 | $640.91 |
| 11045 | $42.99 | $28.30 | N/A |
| 11046 | $74.51 | $57.67 | N/A |
| 11047 | $127.17 | $103.17 | N/A |

46.     As is evident from the above reimbursement information, the professional fee reimbursement for surgical debridements are almost triple the selective and the APC reimbursement is more than 86% greater for surgical versus selective.

**B. Healogics' Up-Coding of Debridements**

47.     Healogics trained and directed physicians employed in its wound care centers to up-code more minor selective debridements[7] to the higher revenue producing and more involved surgical/excisional debridement.[8]   The more expensive procedure was billed regardless of the type of procedure that was actually performed. In most cases, a selective debridement was performed but a surgical debridement was billed.

48.     The nationwide benchmark established by Healogics for all wounds assessed by employees working in Healogics wound care centers was that 60% of all wounds required debridement and 80% of all debridements performed required a surgical/excisional debridement. Extrapolating these benchmarks meant that 48%, or roughly half of all patients Defendant

---

[7] CPT codes 97597-97598
[8] CPT codes 11042 – 11047

treated, allegedly received the more painful and more expensive surgical/excisional debridements.

49.     In addition to billing the government for surgical/excisional debridements when they were either unnecessary or not actually performed, Healogics also directed that these procedures be performed on a frequent, often weekly basis for each patient.  The inherent flaw in this approach is that where surgical/excisional debridements are clinically indicated, they are almost never utilized on a weekly recurring basis for the same wound.  If the same wound were surgically debrided each week, very little viable tissue would be left and the wound would not have time to heal.

50.     Healogics provided specific instruction to their wound care center physicians on when to classify a wound debridement as the higher paying surgical/excisional.  This was done despite those instructions being in direct contradiction with the Center for Medicare and Medicaid Services (CMS) wound care guidelines,  National Coverage Determinations (NCDs), Local Coverage Determinations (LCDs) as well as Healogics' own clinical practice guidelines.

51.     Healogics, in its zeal to maximize revenue and keep its hospital partners happy, systematically identified individual wound care center physicians and/or Program Directors who had lower rates of debridement than Healogics' national benchmark of 60%, and punitively classified them as being "non-aggressive."

52.     "Non-aggressive" did not describe the physician's clinical approach of treating wounds, rather it was a code word for physicians who were not "team players": i.e. would not compromise their professional integrity to carry out Healogics' fraudulent scheme.  Healogics targeted these "non-aggressive" physicians for replacement by giving presentations to its partner

hospitals that showed the lost revenue that could be recovered if "non-aggressive" physicians would simply attain the benchmarks set by Healogics.

53.     At these meetings, a strong suggestion was made to pressure the "non-aggressive" physicians or replace them with ones who would meet the lofty revenue goals by up-coding debridements.  The same treatment was directed at Program Directors and Clinical Coordinators whose centers were not meeting Healogics' benchmarks and related profitability.

54.     Healogics' scheme was implemented by finding "team player" physicians who would do Healogics' bidding and eliminating and replacing those who refused.  Healogics was selective in hiring or contracting with treating physicians as they wanted only those doctors who would view treatment options strictly through the subjective Healogics prism and not based on objective clinical findings or regulatory criteria established by CMS.

55.     The reality is that most physicians went along with the scheme because they were able to make their affiliated hospitals extra revenue and personally profit as well.  Some physicians tried to do the right thing, but ultimately relented under pressure from their hospitals, Healogics Program Directors, Area Vice Presidents (AVP), Senior Vice Presidents (SVP), and Regional Directors of Clinical Operations (RDCO).

**C. Dr. Van Raalte's Debridement Experience**

56.     Dr. Van Raalte began working as an independent contractor for Healogics on May 15, 2009, serving as a wound care physician in Healogics' Bettendorf, Iowa clinic and approximately one year later in Healogics' Moline, Illinois clinic.  On the very first day he started working for Healogics, Dr. Van Raalte received a letter explaining when to charge for a surgical/excisional debridement versus a selective debridement. (*See* Exhibit 1)

57.     In reviewing the document, he concluded that the letter was intended to dictate or influence his clinical approach so that higher revenue could be realized through the use of 11042-47 CPT codes in lieu of the lower paying 97597-98 CPT codes.  Dr. Van Raalte concluded that Healogics was not instructing him to over assess and actually perform surgical debridements, merely to bill as he though had.

58.     On March 21, 2010, Dr. Van Raalte attended a medical staff meeting led by his Program Director, Tim Raymon and Medical Director, Gregory Bohn, M.D., which was devoted singularly to the issue of debridement coding.  The primary focus of the meeting was the "non-aggressive" debridement statistics for Healogics' Moline and Bettendorf clinics. Dr. Van Raalte averaged a much lower debridement rate at the time compared to Healogics' specified benchmark of 60% of all wounds assessed being debrided.  (*See* Exhibit 2)

59.     The lower debridement rate caused Tim Raymon and Gregory Bohn to constantly question why Dr. Van Raalte was not conducting more debridements, and particularly more surgical/excisional debridements, even though his patients were healing quicker and at lower cost.  Tim Raymon continued his presentation by pointing out that the Bettendorf and Moline clinics, and more particularly Dr. Van Raalte, were not coding enough of the higher revenue producing surgical/excisional debridements, thus falling well short of the 80% benchmark the company expected.  They did not (and could not) cite specific case examples where a surgical debridement should have been performed or where a surgical debridement was performed but the lower cost selective debridement was billed.

60.     Tim Raymon presented a power point slide titled "Room For Improvement?" This slide utilized pie charts to examine the percentage of the higher paying surgical/excisional debridements being billed by the Moline and Bettendorf clinics.  The message from Healogics

was that the two clinics were not being "aggressive" enough in their use of the higher paying surgical/excisional debridement and that profits were being lost.   They also stressed that physicians not billing or performing sufficient surgical debridements were being closely monitored.

61.    Tim Raymon went over the financial considerations of debridements by presenting another slide that showed all in attendance how much less reimbursement was received by the wound care center for selective debridements in 2011 compared to reimbursement rates for 2006.

62.    The chart clearly demonstrated that there was no financial incentive to perform a selective debridement as Medicare was not reimbursing as much as it once did for the procedure and definitely was not reimbursing at a rate comparable to surgical/excisional debridements.

63.    Healogics insisted that its wound care centers make up this difference by coding most of their debridements as surgical/excisional.  Dr. Van Raalte would not allow Healogics to influence his professional opinion either through letters, such as the one mentioned above, or through the constant personal pressure that was exerted on him by Healogics to bill for or perform more lucrative procedures whether medically necessary or not.  Dr. Van Raalte refused to perform and bill for surgical/excisional debridements that were not indicated by patient interaction or examination.

64.    On November 21, 2011, Dr. Van Raalte attended yet another medical staff meeting led by Tim Raymon and Gregory Bohn to review each physician's debridement rates. At this point in time Dr. Van Raalte's rates were 5.56% for surgical/excisional debridement and 11.81% for selective debridement.  His healing rates were 90% exclusive of venous stasis ulcers

which take longer to heal and were lower for all physicians providing service. *See* Exhibits 3 & 4.

65.     Tim Raymon and Gregory Bohn once again went over the benchmarks that were to be met by the physicians in the wound care centers restating that 60% of all wounds assessed should be debrided and 80% of those should be the higher paying surgical/excisional and only 20% should be the lower paying non-excisional or selective.

66.     Tim Raymon and Gregory Bohn once again chastised those physicians, including Dr. Van Raalte, whose debridement rates were lower than Healogics demanded and explained the financial consequences to the wound care center for their behavior.  The phrase "lost profits" or "lost revenue" was used to describe the financial consequences despite the fact that income from such up-coding is illegal.

67.     Sometime in early 2012, Tim Raymon and Michael Patterson, vice president of operations for Trinity Hospital Moline, met with Dr. Van Raalte because they claimed he was not performing enough profitable procedures and was not meeting the Healogics benchmarks for surgical/excisional debridements.

68.     During the meeting, Dr. Van Raalte was provided with a chart showing how much more physician reimbursement could be made by billing or performing surgical/excisional debridements ($26.89 - $236.56) instead of selective debridements ($11.23 - $23.83).   This meeting was designed to finally get Dr. Van Raalte to increase his level of the higher paying surgical/excisional debridement in order to bill more for his hospital, himself and Healogics.  *See* Exhibit 5.

69.     Dr. Van Raalte refused to comply with their profit focused directives and as a result, his contract with the Healogics wound care centers was not renewed on June 15, 2012.

70.     Dr. Van Raalte's contract was not renewed due to his refusal to up-code selective debridements to surgical/excisional debridements, perform medically unnecessary procedures to increase revenue, and his refusal to place patients into expensive HBO treatments when their diagnosis did not meet the criteria for that treatment.

71.     Healogics told Dr. Van Raalte that his contract would be terminated under the pretext that he had been the subject of several patient complaints and that his patient satisfaction scores were too low.   The nature of the complaints and purported low scores were actually caused by the long wait times produced by Defendant's understaffing the facility in which he worked.

72.     In order to justify terminating Dr. Van Raalte's contract, Healogics severely understaffed the clinic while he was on duty.   This tactic caused long patient waits, routinely two hours, and led to patient complaints against him even though there was no wait to see him once a patient had been screened by the duty nurse.   Healogics implemented the same understaffing tactics with John Murtaugh and Dr. Cascio at the Dr. P. Phillips Hospital Wound Center.   The understaffing was so bad and affected patient care so much, that Dr. Cascio and John Murtaugh approached Hospital Administrators and informed the administrators that patient care was being greatly affected.

73.     Healogics also encouraged the nursing staff, specifically Elizabeth Voss, Sara Wells, and Charity Kyser, to file complaints against Dr. Van Raalte.   The three nurses refused and ultimately left the wound care center.

74.     Dr. Van Raalte was allowed to work an additional three weeks in the wound care center after his contract was terminated while his replacement was trained.   Despite the

termination of his contract, Healogics referred problematic wound care cases to Dr. Van Raalte at his private practice soon after his departure and have continued to do so.

**D. Dr. Cascio's and John Murtaugh's Debridement Experience**

75.     In October 2012, Relator Dr. Michael Cascio and his private practice partner, Dr. Walter Conlan, requested a meeting with Healogics area vice president Suemei Addington.  The purpose of the meeting was to discuss Healogics' recent purchase of the Nautilus Health Care Group, which staffed wound care centers with physicians.  Ms. Addington told both physicians that the goal of the acquisition was not to replace current physicians but to hire physicians in areas that were underserved.

76.     During the meeting Ms. Addington told both physicians that the two wound care centers Dr. Cascio was medical director over, South Seminole Hospital and Dr. P. Phillips Hospital, were not performing well financially.  Ms. Addington explained that the physicians needed to do more surgical/excisional debridements and attempt to meet the national averages that Healogics accomplished in their other wound care centers.

77.     Ms. Addington also told both physicians that they needed to convert more patients to a hyperbaric oxygen treatment plan as their HBO conversion rate was well below national averages.  At this meeting, and during numerous other occasions when speaking with Ms. Addington, Dr. Cascio told her that he did what was medically necessary for each individual patient and that he would not perform procedures merely to increase the bottom line for Defendant.

78.     Lisa Miller-Noble, the Program Director hired by Healogics to work in Dr. Cascio's center resigned on March 14, 2013, due to the extreme pressure of the job.  During Ms.

Miller's time there she was under extreme pressure from Area Vice President Suemei Addington to increase her center's debridement rates and utilization of HBOT.

79.     Erin Cantrell, the Clinical Coordinator at Dr. P. Phillips Wound Center witnessed a mandate from Ms. Addington to change all venous ulcers in patients with diabetes to "diabetic wounds of the lower extremity" even though the primary etiology of the wound was venous. This distinction is crucial in order to qualify patients for HBOT.

80.     In March of 2013, Ms. Miller told several nurses and Erin Cantrell in front of Dr. Cascio that they were to make these changes.  Dr. Cascio reminded Ms. Miller that the physician makes the diagnosis and that it was fraudulent to call a wound something that it is not just to qualify them for more expensive therapies.

81.     On April 23, 2013, John Murtaugh was hired by Healogics as the Program Director of the Dr. P. Phillips Hospital Wound Care Center in Orlando Florida.

82.     The Program Director is responsible for all aspects of the wound care center, including the implementation, ongoing management, and strategic growth of the wound care center program.  The Program Director oversees the day-to-day operations and is responsible for the revenue and cost management of the wound center.  The Program Director is also responsible for marketing the center, maintaining the valuable relationship with the partner hospital, and achieving wound center program metrics.

83.     The position of Program Director was originally described as being part of a triad (including the Clinical Coordinator and Medical Director) and expected to work in conjunction with the other two members of the triad to run the wound center.  When John Murtaugh began his employment, Area Vice President Suemei Addington informed him that he should only put "Director" on his business card instead of "Program Director."   Ms. Addington also informed

Mr. Murtaugh that he should introduce himself at all times as the "Director" and that the Director runs the Center.  This model was much different from the "Triad" model that was originally described to Mr. Murtaugh.  By having one person in charge as a "Director," it allows Healogics to have a stronger influence through the Director on the clinical decisions in the wound care center.

84.     Clinical decisions should be the responsibility of the Medical Director, Clinical Coordinator and panel physicians, but John Murtaugh was instructed by Suemei Addington to repeatedly question physicians on their medical decisions and treatments, even routinely accessing patient charts and reports to do so. (Accessing patient charts, even for physicians who are not the treating physician for a particular patient, is a violation of the Health Insurance Portability and Accountability Act or HIPAA)

85.     During the first few weeks of employment with Healogics, Mr. Murtaugh was told by Suemei Addington and Regional Director of Clinical Operations Nancy Helme that the Dr. P. Phillips Hospital wound care physicians were "non-aggressive" and that they were not coding the more expensive surgical/excisional debridement as often as they should be.

86.     Ms. Addington made it clear to Mr. Murtaugh that part of his job was to get physicians to be more "aggressive" and fall in line with Healogics' targets for debridement percentages.

87.     The tools and techniques used by Healogics to get under-performing physicians in line were relayed to Mr. Murtaugh and included utilizing reports (daily, weekly, monthly and annually) to highlight and publicize trends, posting debridement rates within the center, conducting center leadership meetings, providing corporate directed "education" on coding

debridements, and meeting with hospital partners to discuss and expose the weaknesses of the non-aggressive physicians in order to put pressure on them.

88.     Another example of this pressure was the intentional understaffing of the Dr. P. Phillips wound center.  When Mr. Murtaugh began his employment, South Seminole Hospital Wound Center would help support patients by sending nurses to the Dr. P. Phillips Hospital Comprehensive Wound Center to help handle the case management load.  After a few weeks, Ms. Addington informed Mr. Murtaugh that nursing help from South Seminole Hospital would no longer be allowed, despite the fact that the Dr. P. Phillips only had one full-time Registered Nurse and was severely understaffed.

89.     Ms. Addington made this decision based solely on Mr. Murtaugh's HBO utilization being low and below budget.  Mr. Murtaugh informed Ms. Addington that according to the Staffing Matrix, which was a tool that Program Directors used to schedule and staff the wound centers, the RN Case Manager staffing "did not include activity in the HBO suite" and the Staffing Matrix only managed the wound care visits.  Suemei Addington was so upset that the HBO utilization was low in Mr. Murtaugh's Center, she repeatedly told Mr. Murtaugh that his "HBO was too low for another nurse" and "he could not afford another nurse until he gets his HBO up," despite the fact that HBO volume is exclusive of the wound care visits and has no bearing on the staffing decisions of Registered Nurses for the wound care visits in the wound center.

90.     Every time Mr. Murtaugh requested nurse assistance from South Seminole Hospital Wound Center, Ms. Addington would deny it and state, "South Seminole can't pay for your nurse.  You are robbing Peter to pay Paul."

91.     Due to the severe and intentional understaffing of Mr. Murtaugh's wound center because of not meeting HBO budget and not up-coding debridements, patients experienced extremely long wait times.  As is typical of a wound care center, among the patients who were included in these wait times were numerous paraplegic and quadriplegic patients with sacral and ischial pressure ulcers.  These patients were put at risk from long wait times and increased duration of pressure on their wounds due to Healogics' tactics of understaffing centers.

92.     John Murtaugh and Dr. Cascio both approached Dr. P. Phillips Hospital Administrators, including Director of Nursing Kathy Black, regarding the risks to patients.  John Murtaugh even addressed the situation with Healogics AVP Michael Tanner, and Michael Tanner responded, "Suemei says that your HBO is not high enough."

93.     Despite the efforts to obtain proper staffing to support the wound care visits, no nursing help was ever provided to the staff, thereby continuing to put patients at risk.  Ironically, once Mr. Murtaugh began his employment with his current company, he learned that several other Healogics centers routinely shared nurses when needed.  These included Florida Hospital Fish Memorial Wound Care Center and Bert Fish Medical Center Wound Center.  Mr. Murtaugh believes that the practice of sharing nurses is not an issue at these two centers because they are hitting the Healogics benchmarks for HBO and debridement coding.

94.     Mr. Murtaugh was repeatedly told by Suemei Addington and Nancy Helme that a wound that has any depth into the subcutaneous tissue was to be automatically classified as a surgical/excisional debridement.  This is incorrect according to Medicare LCD on Debridements, which states that debridement coding is not based on the depth of the wound, but rather on the type of tissue removed.  Mr. Murtaugh was told that his physician's refusal to code these

procedures "correctly" was greatly damaging his center financially and jeopardizing his future career with Healogics.

95.     In September 2013, Healogics held a company-sponsored debridement educational meeting for contracted physicians at South Seminole Hospital in Longwood, Florida.

96.     In attendance were Healogics' area medical director Kathleen Minnick, who led the meeting, Dr. Cascio, Dr. Ricardo Ogando, Dr. Barry Cook and Dr. Antonio Crespo, physicians who worked in the Healogics' wound care centers.  Also in attendance were Sue Ann Prouse, Clinical Coordinator at Healogics' South Seminole Wound Care Center, Richard Voorhees, RN, in the South Seminole Wound Care Center, Cindy Johnson, Healogics' acting Program Director of the South Seminole Wound Care Center, Robin Hug, Chief Operations Officer at South Seminole Hospital, and Relator John Murtaugh.

97.     During the meeting, Kathleen Minnick continually made recommendations on coding the higher revenue producing surgical/excisional debridements.  Her recommendations were in direct contradiction with CMS LCD guidelines.  She informed the physicians in attendance that "if a wound bleeds during a debridement, then it is automatically a surgical/excisional debridement and should be coded as such."

98.     Dr. Cascio and other physicians in attendance immediately expressed concern over her statement. Dr. Cascio actually asked to use Kathleen Minnick's own iPad, accessed the internet and pulled up the CMS LCD guidelines reading them aloud so that all attendees could hear.  He advised everyone in attendance that even the lower level selective debridement occasionally bleeds and that bleeding could not be a determination in deciding what to bill.

99.     Kathleen Minnick responded that "the LCD is wrong, they (CMS) don't do what we do."  Dr. Cascio informed her that the LCD provides necessary guidance for determining

what is appropriate and that he disagreed with her.  Kathleen Minnick also made the statement that "you always take a little subcutaneous tissue out of the wound during a debridement, so that is why you can bill for a surgical/excisional debridement." Drs. Cascio and Ogando immediately voiced additional concern over her statements. Dr. Ogando voiced his disagreement when he asked Dr. Minnick, "[a]re you debriding on a microscopic level?"  Dr. Cascio said that even if subcutaneous tissue is removed, if it is not necrotic, it is not medically necessary to remove it. This was paraphrased from what he was reading to the group from the LCD.

100.    While continuing to debate the physicians in attendance over the up-coding of a selective debridement to a surgical/excisional debridement, Kathleen Minnick made the statement that she "does not want to be greedy, so sometimes she will actually bill for a selective debridement."

101.    Mr. Murtaugh and Dr. Cascio were shocked by her statement as it directly conflicted with their knowledge of how to properly code for procedures, namely that procedures are to be coded for what is actually done according to the guidelines and not driven by benchmarks or whether the physician wants to be greedy or not.

102.    Annual business review meetings are conducted at each of Healogics' centers in similar fashion.  The primary focus of the meetings is to review financial results and create plans to get or stay on track.

103.    On August 27, 2013, Mr. Murtaugh attended an annual business review meeting where Healogics' upper management gave a presentation regarding the Dr. P. Phillips and South Seminole Hospitals' wound care centers' healing rates, median days to heal, and outliers.

104.    In attendance at the meeting were Healogics' senior vice president Michael Tanner, Suemei Addington, Nancy Helme, Cindy Johnson (acting Program Director), nursing

administrator for Dr. P. Phillips Hospital Kathy Black, senior financial manager at Dr. P. Phillips Hospital Stephen Graham, and Chief Operations Officer at South Seminole Hospital Robin Hug.

105.   During the meeting, Michael Tanner and Suemei Addington informed the financial managers from the two hospitals that their wound care center physicians, specifically Dr. Cascio, along with other contracted physicians like Dr. Antonio Crespo, were being "non-aggressive" in their debridement.

106.   Healogics upper management presented slides comparing the Dr. Phillips and South Seminole Hospital wound care physicians' rates of surgical/excisional debridement with Healogics "national" averages demonstrating how much money was being lost due to the fact that the physicians were not up-coding to Healogics' national averages.  (*See* Exhibit 6)

107.   In the case of Dr. Phillips Hospital this amounted to $156,644 annually and in the case of South Seminole, $189,014 annually.  This presentation to the partner hospital is identical to what Dr. Van Raalte experienced and demonstrates that Healogics' strategy of undermining physicians who do not up-code debridements and falsify HBO eligibility to meet benchmarks is national in scope.

108.   During the meeting, Michael Tanner and Suemei Addington continually stressed to the hospital's financial managers that the benchmark was 60% of all wounds assessed should be debrided and that 80% of those wounds should be the higher paying surgical/excisional debridement. After Suemei Addington and Michael Tanner stressed money that the hospital was losing due to the "non-aggressive physicians," Dr. P. Phillips Hospital Sr. Financial Manager asked the question, "Maybe we just get rid of this Cascio guy?" to which Suemei answered "yes" while nodding her head in agreement.

109.    The conversation did not include any discussion on the medical necessity or lack thereof for such wound assessments.  There were no case examples cited where Dr. Cascio miscoded or down-coded a debridement. Particularly disturbing about these meetings is the complete absence of any discussion of healing rates or efficacy.  Dr. Cascio's healing rates and efficacy were well above the national averages for Healogics' wound centers.

110.    In 2012, both wound care centers of which Dr. Cascio was medical director received the Center of Distinction award.  The Center of Distinction designation by Healogics was only given to 1 in 6 wound care centers in its own system nationwide.  The award is given to those centers that meet or exceed Healogics' national averages in the following categories: patient satisfaction is greater than or equal to 92%; healing rate is greater than or equal to 91%; outlier rate, an outlier being a wound that does not hit certain healing benchmarks, less than or equal to 19%; and median days to heal less than or equal to 30 days.  The South Seminole and Dr. P. Phillips Wound Centers were also profitable for their respective hospitals, but the centers were not profitable enough for Healogics.

111.    Sometime in 2013, Dr. Cascio was informed by Nancy Celleri, RN, that his partner Dr. Walter Conlan had performed a selective, non-excisional debridement, CPT 97597, but had circled a higher paying CPT code of 11042 on the billing sheet.

112.    When Nurse Celleri confronted Dr. Conlan at the time he told her that "this is what they (Healogics) want me to do so I'm doing it."

113.    Nurse Celleri also reported this information to Michelle Foster, the Program Director at South Seminole Wound Center and then to Clinical Coordinator Sue Ann Prouse.  As a result of being confronted, Dr. Conlan purportedly went back and adjusted the billing and dictation to reflect the lower paying debridement that he had actually performed.

114.   Dr. Conlan's rate of higher paying surgical excisional debridement more than doubled in the face of constant pressure from Healogics to perform more profitable procedures.

115.   Unlike his partner, Dr. Cascio refused to upcode debridements in order to make more money for Healogics.   Due to his refusal to participate in the scheme to defraud the government and private insurers, Dr. Cascio was removed as medical director on May 11, 2014.

116.   He was effectively terminated from Healogics as Medical Director effective June 30, 2014.

117.   On March 20, 2014, Mr. Murtaugh had a conversation with Dr. Jefferson Mennuti in the physician's office of the Florida Hospital Fish Memorial Wound Care Center.   A chart listing the debridement rates for each contracted physician was prominently displayed in the office.

118.   Mr.  Murtaugh noticed that the selective debridement rate average was 2.5% while the rate for surgical/excisional debridement was approximately 95%.   The public posting of each physician's debridement rates is further proof of the type of pressure Healogics places on its contracted physicians to conform to their corporate, mandated quotas.

119.   Mr. Murtaugh, in reviewing clinical notes for orders for the product which he currently represents, has witnessed specific additional examples of the upcoding of debridements at the Healogics-managed wound care centers.

120.   Mr. Murtaugh had discussions with a previous National Healing (now Healogics) Clinical Coordinator from Rockford, Illinois.   She informed Mr. Murtaugh that she witnessed the same practices of upcoding of debridements and fraudulently falsifying the HBO eligibility of patients during her tenure of 2009-2010.   She also informed Mr. Murtaugh that she continues to see the same fraudulent practices in the wound centers that she currently covers as a sales

representative.   She shared her frustrations about National Healing's debridement practices, wherein she told Mr. Murtaugh that, "the physicians would scrape a little bit and bill for an excisional debridement."   Mr. Murtaugh asked her if National Healing provided her with the guidance, "If it bleeds, then it's an excisional debridement," and she said, "Yes, they did." Healogics Area Medical Director Kathleen Minnick, MD provided the same guidance to Mr. Murtaugh and the wound care center physicians in Orlando.

121.   Mr. Murtaugh's colleague from Rockford, IL told him that when she reviews the medical records from numerous Healogics facilities for orders for her company's products, she notices that, "there are a ton of excisional debridements, but the wound does not get any bigger. Sometimes, it gets smaller!  That's impossible!"  This matches exactly what Mr. Murtaugh has seen when he reviews the medical records for patients at Healogics wound care centers in the central Florida area.

122.   Mr. Murtaugh witnessed debridement upcoding in patient charts.   During the week of November 24, 2015, Relator John Murtaugh noticed extremely high surgical debridement rates from the clinical notes of two patients being treated at the Florida Hospital Fish Memorial Wound Care Center in Orange City, FL.  Relator Murtaugh currently has access to patient records that are submitted from ordering customers (also called requestors) as supporting documents for orders for the product.  Standard protocol for requestors/prescribers of Mr. Murtaugh's product, which is a durable medical equipment provider, is submitting history and physicals, operative reports and any progress notes or clinical notes that would support the prescribers' orders for therapy.

123.   While reviewing documentation for two orders from Florida Hospital Fish Memorial Wound Care Center, Mr. Murtaugh noticed that there was an extremely high amount

of surgical/excisional procedures that were billed, while there were zero selective debridements performed or documented.  These debridements were done despite the fact that the notes stated several times that there was a "small amount (1-33%)" or "No Necrotic tissue present" in the wound bed.  For the first patient, from 8/6/2014 through 10/24/2014, patient notes indicate that six surgical debridements (Five 11042 and one 11043) were billed and no selective debridements were billed.  For the second patient, from 9/25/2014 through 11/6/2014, patient notes indicate that six surgical debridements (Four 11042, one 11043, one 11044) were billed and NO selective debridements were billed.

124.    On July 28, 2015, Mr. Murtaugh was performing a product training competency session with staff members at The Villages Regional Hospital Wound Care Center in The Villages, Florida.  Mr. Murtaugh was asked by Program Director Todd Powell to train his nurses on his current product, which is a routine duty for a sales representative.

125.    As Mr. Murtaugh was setting up for his in-service, he overheard Dr. Avrohm Faber on the phone discussing a patient who he would like to get approved for HBOT.  It immediately became clear to Mr. Murtaugh that Dr. Faber was asking whoever was on the phone as to how to get the HBOT approved despite the patient's wound not having the indications to make it eligible to receive HBOT.

126.    Dr. Faber described the wound as having no bone or tendon exposed and also stated that the patient did not have osteomyelitis.  After mentioning that the patient did not have diabetes, he said to the person on the phone that "HBO should be able to be used."  Dr. Faber said that he "agrees but CMS will not."  He then asked the person on the phone how to "negotiate these waters" because the person on the phone "has experience getting justification in getting these things approved."  Dr. Faber also told the person on the phone that "this would be a

good thing to talk about at a round table."  He also said that "CMS does not understand HBO" and "it is frustrating dealing with them (CMS)."

127.    This is a classic example of Healogics protocols disregarding CMS coverage guidance in regards to HBOT.  Changing a diagnosis in order to falsely qualify wounds for HBOT to increase revenue is standard Healogics practice and is one of the main allegations in this complaint.

128.    Mr. Murtaugh had another conversation that during the first meeting with the Clinical Coordinator Dianne "DiDi" Doane at The Villages Wound Center, Mr. Murtaugh asked how Didi liked her position.  Didi responded by saying that "the toughest part of the job was teaching physicians."  Didi gave an example where a doctor was performing a debridement and "there was muscle showing."  Didi informed Mr. Murtaugh that she told the physician, "Hey, there is muscle showing.  You should bill for a Muscle Debridement."  Mr. Murtaugh did not respond to this statement from Didi, but he knows that this guidance on billing for debridements contradicts Medicare guidelines.  Debridement coding is based on the type of tissue removed, and not what you see in the wound.  This guidance from Didi was very similar to the guidance that Mr. Murtaugh received from Suemei Addington and Nancy Helme of Healogics, who told Mr. Murtaugh that "If you see it's a full thickness wound into subcutaneous tissue and if you see that the wound is deep and the wound has any depth, then the debridement is automatically coded as a surgical/excisional debridement."

**E.  Unnecessary Use of Hyperbaric Oxygen Treatments**

129.    Hyperbaric Oxygen Therapy (HBOT) involves the inhalation of 100% oxygen at increased atmospheric pressures.  HBOT can be used to treat a variety of conditions including air or gas embolisms, carbon monoxide poisoning, decompression sickness (bends), selected

problem wounds, intracranial abscess, necrotizing soft tissue infection, osteoradionecrosis, soft

tissue radionecrosis, chronic refractory osteomyelitis, and acute peripheral arterial insufficiency.



130. The mechanistic basis for treating certain chronic, non-healing wounds with HBO

is that certain wounds, such as diabetic foot ulcers ("DFU"), do not heal due to hypoxia (or

reduced oxygen supply) resulting from diseased or dead capillaries (microangiopathy) that no

longer function normally to bring blood, oxygen, and growth factors which are necessary for

normal wound healing to the wound. Hyperbaric oxygen induces angiogenesis and

vasculogenesis (creation of new small blood vessels) of new capillaries that are not diseased.

Once new capillaries are created at the wound site and into the wound, the previously hypoxic,

non-healing wound can start to heal through normal means. Hyperbaric oxygen therapy can be a

life-saving or limb-sparing treatment in certain circumstances, but there are a number of side

effects and complications that are associated with it and it is not indicated for all wound patients.

131.    Among the potential complications that can occur are ruptured eardrums, temporary worsening of existing myopia (nearsightedness), worsening of existing cataracts, panic attacks from claustrophobia, hyperoxic seizures, and tension pneumothorax from undiagnosed/unknown pneumothorax (collapsed lung).

132.    Patients undergoing HBOT can be placed inside either a monoplace (single person) or multiplace (more than one person) chamber.  Wound centers predominantly utilize monoplace chambers due to the lower operating costs and the lesser skill requirements of technicians operating the chambers than that for multiplace chambers.  The pressure inside the hyperbaric chamber is typically increased to between 2 to 3 atmospheres absolute ("ATA") or the equivalent to being 33 to 66 feet below sea level, depending on the condition being treated. The treatment duration varies accordingly by condition: between 90 minutes to 120 minutes for wounds and 4 - 7 hours or longer for the emergency treatment of decompression sickness. Wound centers, such as Healogics centers, do not typically treat conditions that require more than 2.5 ATA or treat conditions that are emergent (such as decompression sickness), as those conditions require higher pressurization, specialty trained physicians, are more complicated, and require more skilled staff that Healogics cannot or chooses not to provide.  One hundred percent oxygen at sea level is already at the maximum concentration that can be inspired.  In order to increase the dose of oxygen to be breathed in by a patient, the pressure must be raised to increase the oxygen tension (also known as partial pressure of oxygen, or "the concentration of oxygen saturation in the blood.")  It is this increase in the oxygen tension in the body, and thus the tissues, that induces a cascade of events leading to different effects, depending on the condition being treated.  In the case of non-healing microangiopathic wounds like a DFU, the mechanism of action of HBO is the induction of angiogenesis and vasculogenesis.

133.    Various government insurance programs like Medicare provide significant reimbursement for HBOT when it is clinically indicated and meets CMS guidelines.

134.    Disregarding all of the potential harm that can occur to a patient and regardless of the medical necessity, Healogics set benchmarks for the amount of HBOT that was to be conducted in each of their wound care centers.  They actively targeted each and every patient for conversion to HBOT. (See Exhibit 20)

135.    Healogics strived to meet these HBO benchmarks, and thereby increase its revenue and profits.  In order to do so, Defendant had its employees or contractors manipulate patients' actual diagnoses or wound classifications in order to create false support for providing the expensive therapy.  One example is the Healogics guidance to Program Directors, Clinical Coordinators and Physicians that "If a patient has diabetes, then the wound is automatically a diabetic wound."

136.    In a leadership meeting at South Seminole Hospital with Michelle Foster (Program Director), Sue Ann Prouse (Clinical Coordinator), Nancy Helme (Regional Director Clinical Operations, Healogics) and Dr. Cascio in 2013, a discussion ensued regarding the issue of primary etiology of wounds.  It was Nancy Helme's position that the wound center should be calling all venous leg ulcers in patients with diabetes, diabetic wounds of the lower extremity ("DWLE").  Dr. Cascio tried to explain that venous leg ulcers are called 'venous' because the primary etiology of the wound is venous disease, not diabetes. He further explained that diabetes was a complicating factor only.  He explained that calling the wounds DWLE simply because they have diabetes was wrong and it would look like the center was trying to reclassify wounds so that the patients had a better chance of getting a more expensive therapy such as HBO.  In other words, if a venous wound patient develops a bone infection at the base of the wound it

would be considered primary osteomyelitis of a lower extremity in a patient with venous disease and diabetes.   However, if that same patient were classified as a DWLE and developed osteomyelitis then Healogics could say that the wound is a Wagner Grade III DWLE and would qualify for HBO. Dr. Cascio was then told by Nancy Helme that other centers were falling in line with this method of reclassifying venous ulcers to diabetic wounds of the lower extremity.  Dr. Cascio opposed this reasoning and said that he would not be fraudulently reclassifying wounds in his two centers.

137.    Healogics universally approached and described wound classification as "an area of opportunity."  It educated and instructed its employees to be creative in classifying wounds so that both surgical debridements would seem appropriate and the patients would qualify for HBOT.

138.    One of the most widely used diabetic wound classification systems is the Wagner system developed in the 1970s.  It was originally intended as a way to determine which diabetic foot wound would likely result in amputation.  Since CMS selected the Wagner grading system as part of the criteria for DFU to meet eligibility requirements for HBO treatment, practitioners followed suit and applied the grading in assessing diabetic foot wounds.  The Wagner Grading system does not assess the vascular status of the foot.

139.    Dr.  Van Raalte (with seven years of surgical residency in wound care, plastic surgery, and general surgery, and twenty-five years of practical wound care experience), Dr. Michael Cascio (with eight years of practical experience in wound care treatment), and John Murtaugh (with over seven years combined experience as the director of a wound care center and sales representative for wound care products and devices) all have witnessed Healogics pressuring its wound care center employees and contracted physicians to improperly classify

wounds as diabetic ulcers that should be classified as venous leg ulcers or pressure ulcers. Defendant did this in order to qualify patients for HBOT.

140.    John Murtaugh has witnessed this practice in the Florida Hospital Fish Memorial Wound Center.  A patient on therapy requiring Mr. Murtaugh's product was diagnosed with a Venous Leg Ulcer, according to the insurance authorization form submitted for the patient by the wound center for Mr. Murtaugh's product.  The patient was also being treated with compression therapy for the venous disease.  In spite of the Venous Leg Ulcer diagnosis submitted to Medicare for this patient to receive therapy from Mr. Murtaugh's product, the patient received a "ton of HBO," according to wound care Nurse Julie Vaught, that was "for diabetes," according to Dr. Clarence Scott, who is the Medical Director of the wound center.

141.    During a review of the patient's clinical notes, Mr. Murtaugh noticed that the patient's diagnosis was not listed as a Venous Leg Ulcer in the Healogics iHeal chart, but rather as a "Diabetic Wound of the Lower Extremity," or "DWLE."  This patient is a prime example of the scheme to fraudulently reclassify Venous Leg Ulcers as Diabetic Wounds of the Lower Extremity in order to qualify the patient for HBO. To make matters even worse, the patient's "DWLE" was classified as a Wagner Grade II wound (HBO is indicated for Grade III or higher), which did not qualify the wound for HBOT even if the wound was in fact a diabetic wound, which it was not.  In addition, Mr. Murtaugh witnessed Bert Fish Medical Center Program Director Catherine Lunde direct a nurse in the clinic to change a patient's diagnosis from Venous Leg Ulcer to Diabetic Wound of the Lower Extremity.  Catherine Lunde told the nurse to change the diagnosis "so that they can dive him."  Because this was done right out in the open, Mr. Murtaugh believes that the Healogics Program Directors honestly believe that the Healogics

practice of reclassifying a Venous Leg Ulcer to a Diabetic Wound of the Lower Extremity in order to receive HBOT is proper.

142.    Dr. Cascio was in a weekly Leadership Meeting on March 13, 2014, at South Seminole Wound Care & Hyperbaric Medicine Center. Also in attendance were Program Director Virlyn Ellis, Clinical Coordinator Sue Ann Prouse and Hyperbaric Oxygen Technician Curtis "Wayne" Norton.

143.    One of the reports reviewed during the meeting was the Wound Etiology Report, which lists patients' wounds according to their diagnosis. Dr. Cascio noticed that one of his Venous Ulcer patients had been changed to DWLE. Since Wayne Norton was responsible for inputting data on this particular report, Dr. Cascio asked him why his patient's diagnosis had been changed. At first Wayne did not want to answer. After being asked by Dr. Cascio three times he finally said that Sue Ann Prouse told him to change it. Dr. Cascio then asked Sue Ann Prouse why she told Wayne to change his diagnosis, and again after having to ask three times, she abruptly said Nancy Helme, Healogics Regional Director of Clinical Operations "made her do it." The main purpose of these weekly meetings was to identify HBO patients. Venous stasis ulcer is not an indication for HBOT. Healogics regularly pressured staff to change diagnoses from venous ulcer to diabetic wound of the lower extremity to make it easier for the patient to qualify.

144.    CMS NCD guidelines allow for HBOT for a wound classified as a Wagner Grade III. A Wagner Grade I or II wound would not qualify for the expensive therapy. Relators also witnessed Healogics pressure staff and panel physicians to classify Wagner Grade I or II wounds, as Wagner Grade III wounds, which would then qualify the patient for the expensive and lucrative HBOT.

145.    During Dr. Van Raalte's employment with Healogics he observed Healogics' employees obtain wound cultures by running swabs across the ulcer surface. This is an improper technique since the swab will pick up bacteria from the superficial layers of the skin where they normally reside, potentially leading to an inaccurate isolation of the wrong bacteria if infection is present in the bone.

146.    These improper and needless swabs were only done so that wounds could be upgraded to a Wagner Grade III, thus qualifying the patient for the profitable HBOT. The patient that Mr. Murtaugh witnessed at Florida Hospital Fish Memorial Wound Center receiving HBO for a fraudulently classified wound (from Venous Leg Ulcer to a Diabetic Wound of the Lower Extremity) had no presence of Osteomyelitis, yet the patient was still given "a ton of HBO for diabetes."

147.    Dr. Van Raalte challenged the surface cultures as being unnecessary and inaccurate and discussed this with the hospital's infectious disease expert at the time, Dr. Mirza Baig, who agreed that this was an improper technique to obtain a culture and that it had no value whatsoever in determining a patient's course of treatment. Further, Dr. Baig concurred that it could cause harm to the patient who might not receive the proper treatment due to an improper culture being performed.

148.    The Infectious Disease Society of America (IDSA) has developed and validated clinical criteria for recognizing and classifying diabetic foot infections. If infection is suspected, a deep tissue swabbing or soft tissue cultures should be taken at the site where the wound has been cleansed and debrided or if osteomyelitis is suspected, a piece of bone should be sent for culture and histology.[9]

---

[9]    BENJAMIN A. LIPSKY, ET AL., "2012 INFECTIOUS DISEASES SOCIETY OF AMERICA CLINICAL

149.    IDSA also recommends using diagnostic studies, such as x-rays or magnetic resonance imaging ("MRI"), to evaluate patients with suspected osteomyelitis or gas gangrene. It should be noted that IDSA does not support the use of HBO treatments in patients with osteomyelitis.[10]

150.    After challenging these improper cultures, Dr. Van Raalte was labeled a troublemaker by Tim Raymon and Gregory Bohn.  Stunningly, Tim Raymon and Gregory Bohn continued the practice with total disregard to how it might affect patient healing and recovery.

151.    Dr. Van Raalte estimates that 50% of all diabetic wounds that were treated during his employment with Healogics were upgraded to Wagner 3 when they should have properly been classified as Wagner 2 or lower, and thus not eligible for costly HBOT.

**F. Dr. Cascio's Post-Healogics Experience**

152.    On June 16, 2015, while working at Mercy Wound and Hyperbaric Center in Springfield, Missouri, Dr. Cascio evaluated a new wound care patient who had just moved from West Columbia, South Carolina.  He had been followed at a Healogics wound care center from November 25, 2013 to May 28, 2015.  Dr. Cascio requested and later received treatment records on June 23, 2015.  During his first follow up at the Mercy Center, the patient mentioned to Dr. Cascio that he had over 100 hyperbaric treatments for his toe and ankle wounds while at the Healogics Center in South Carolina. He denied ever having a bone infection or long term antibiotics. As Dr. Cascio reviewed his chart it became apparent that all of this patient's

---

PRACTICE GUIDELINE FOR THE DIAGNOSIS AND TREATMENT OF DIABETIC FOOT INFECTIONS." (15 June) E136 (March 2012) *available at*
 www.idsociety.org/uploadedFiles/IDSA/Guidelines-
Patient_Care/PDF_Library/2012%20Diabetic%20Foot%20Infections%20Guideline.pdf
[10] *Id.*

hyperbaric treatments were done based on a false diagnosis. It was also apparent that the patient was billed for an exorbitant number of excisional debridements.

153.    On the patient's first visit to the South Carolina center on November 25, 2013, he was diagnosed with a Wagner Grade II diabetic foot ulcer on the first metatarsal head.  There was no bone, tendon, muscle, or joint capsule exposed.  The deepest level exposed was subcutaneous tissue.  By clinical definition this is a Wagner Grade I ulcer. He was also found to have an ankle wound on the right lateral ankle.  He was noted to have edema (he had a documented history of venous insufficiency) and periwound hemosiderin staining, both classic findings for a venous stasis ulcer, not a diabetic ulcer.

154.    The patient had a swab of one of his wounds, which subsequently grew candida. He also had a TCOM which apparently showed some signs of hypoxia.  Based solely on his positive swab, which only showed yeast, his wound classification changed for both wounds to Wagner Grade III.  Per CMS guidelines, a DFU would qualify for hyperbaric oxygen only if it were a Wagner Grade III, IV or V.  A Wagner Grade III DFU is a deep ulcer with abscess or osteomyelitis (bone infection).  This patient had neither.

155.    At his follow up on December 3, 2013, the patient's wounds were classified as Wagner Grade III and HBOT was ordered or planned.  At this time the patient had a Wagner Grade I DFU on the left great toe and, in Dr. Cascio's opinion, a venous leg ulcer on the right lower extremity.

156.    On December 16, 2013, the patient was seen and noted to have "some signs of infection" and was placed on an oral antibiotic.  However, on that same visit he had a Dermagraft skin substitute applied.  One of the contraindications for use of Dermagraft skin

substitute is an active infection.  On this same visit, in the Assessment and Plan it was noted that the patient "also has had bone scans and MRI revealing no obvious osteomyelitis."

157.    Over the course of the period outlined above, the patient had approximately 53 debridements done on his ankle wound. It appears that all but one were excisional debridements (28 subcutaneous and 24 muscle). On his toe wound approximately 43 debridements were done. All of them it appeared were excisional (30 subcutaneous, 12 muscle, and 1 bone).

158.    Over one year after the patient started at the wound center in South Carolina and after approximately 80 HBO treatments the patient was ultimately diagnosed with osteomyelitis. Dr. Cascio noted that the patient received multiple HBO treatments after this time.  There was no documentation of IV antibiotics given to the patient for treatment of osteomyelitis.  The total billed to Medicare for this one patient was approximately 80 thousand dollars, most of which was fraudulently billed.  Not only was this patient's diagnosis changed fraudulently in order to qualify for more expensive and medically unnecessary hyperbaric treatments but he was also subjected to an extraordinary amount of surgical/excisional debridements which were unnecessary.

## G. John Murtaugh's Post-Healogics Experience

159.    Mr. Murtaugh is currently a medical device sales representative selling advanced wound care products and devices.  Mr. Murtaugh's call points include outpatient wound centers, many of which are managed by Healogics.  Mr. Murtaugh has witnessed the up-coding of debridements and falsifying of HBO eligibility first hand in this role, as one of the duties of a sales representative is to assist in insurance verification and outcomes management by gathering clinical notes from the wound centers.  While gathering clinical notes on patients or during sales visits to the Healogics wound centers, Mr. Murtaugh has witnessed several instances of the

allegations within this complaint, including up-coding debridements and falsifying HBO eligibility.

160.    On August 3, 2015, Mr. Murtaugh arrived in San Antonio, Texas for a company meeting with his current employer.  After checking into the hotel, he accompanied the group to dinner.  During this dinner, Mr. Murtaugh met a Sales Representative with his company who formerly worked as a Clinical Coordinator with National Healing (which is now Healogics) in 2009 and 2010 at the OSF Saint Anthony Wound Healing Center in Rockford, Illinois.  When his colleague learned that Mr. Murtaugh weas also a former Program Director at Healogics she shared some details of her experience with Healogics that were not surprisingly identical to what Mr. Murtaugh experienced during his tenure.

161.    She shared the same concern that Mr. Murtaugh had in regards to the Weekly Leadership Meetings, namely that the meetings have a primary focus of identifying patients to receive HBO therapy.  She told Mr. Murtaugh that the meetings provided constant support for National Healing pushing every patient they could to receive HBO.  She also had the same opinion that Dr. Cascio had regarding the Healogics "Rule in, Don't Rule out" protocol for HBO.

162.    She was disgusted with the fact that National Healing worked up every patient for HBO automatically, and she had to routinely defend why the patients were not receiving HBO therapy.  In standard medicine, physicians rule out disease, but at Healogics (National Healing), the motto was to "Rule in, Don't Rule out."  In other words, Healogics/National Healing wanted the wound center staff to "rule in disease" so that they could fraudulently provide HBO therapy whenever possible to increase revenue.

163.    Mr. Murtaugh's colleague also expressed that the National Healing guidance on diagnosing patients with osteomyelitis was ridiculous.  This faulty guidance was given to her so

that wound centers could fraudulently diagnose wounds with osteomyelitis in order to qualify patients for HBO therapy.  She also told Mr. Murtaugh that the guidance from National Healing in regards to classifying "Chronic Refractory" Osteomyelitis was similarly ludicrous.  In her opinion, patients with osteomyelitis had to be on antibiotics for at least six weeks before the osteomyelitis could be considered "chronic refractory" osteomyelitis, but National Healing "had other ways of classifying it."

164.    The guidance that she received from National Healing is practically identical to the faulty guidance that Healogics Area Medical Director Kathleen Minnick, MD presented to Mr. Murtaugh and the wound center panel physicians during an educational dinner meeting.  Dr. Minnick provided the faulty guidance on diagnosing wounds with chronic refractory osteomyelitis if the wound does not respond in a week.  There are two major faults with Dr. Minnick's guidance: 1) a week is not long enough and 2) the "response" has to do with the bone infection, and not the wound.

165.    On February 4, 2014, John Murtaugh had lunch with Jefferson Menutti, DPM, who works at the Florida Hospital Fish Memorial Wound Care Center.  Mr. Murtaugh scheduled the lunch to discuss the wound care products that Dr. Menutti is utilizing.  To begin the lunch meeting, Dr. Menutti asked John Murtaugh, "So what happened at 'Sand Lake'?" (also known as "Dr. P. Phillips Hospital").  Mr. Murtaugh responded to Dr. Menutti simply that "the position was not for him."  Dr. Menutti asked what the Relator did not like, and Relator responded that he did not like the idea of telling physicians how to practice medicine.  Relator asked Dr. Menutti if there was any pressure from his wound care center program director Pam Harkrider to treat patients with HBOT.  Dr. Menutti informed Mr. Murtaugh that Healogics and Pam Harkrider had Dr. Menutti sign a contract that had a minimum 10% HBO conversion rate (in other words, 10%

of all patients must receive HBOT).  Dr. Menutti told Relator that "Healogics is evil" and that "Healogics is all about money."

166.    During the February 4, 2014, lunch meeting, Dr. Menutti informed Relator that Program Director Pam Harkrider, RN constantly badgers him regarding his HBO conversion rate.  Dr. Menutti stated to Relator that, "Pam is always coming to me with Grade I's, and I just look the other way."  Only Grade III and above diabetic foot ulcers are indicated for HBOT. Program Directors like Pam Harkrider are pushing physicians to provide therapy for non-indicated patients (like Grade I diabetic ulcers) because the wound care center makes more revenue.  In addition, Program Directors receive bonuses based on the financial performance of their respective wound care centers.

**H.  John Murtaugh witnessed HBO Fraud in patient charts.**

167.    Standard protocol for requestors/prescribers of John Murtaugh's companies' products is submitting history and physicals, operative reports and any progress notes or clinical notes that would support the prescribers' orders to support insurance authorization.   While reviewing documentation for an order from Florida Hospital Fish Memorial Wound Care Center, Mr. Murtaugh noticed that there was a Medicare patient who received HBOT though they lacked a diagnosis that was an approved indication for hyperbaric oxygen treatment.

168.    On December 2, 2014, wound care Nurse Julie Vaught, RN informed relator John Murtaugh that "the patient had a ton of HBO."  Upon reviewing the medical records submitted, Relator noticed that although the patient's wound was described as a VENOUS LEG ULCER on Mr. Murtaugh's current company's insurance authorization form for Medicare, it was described as a diabetic wound of the lower extremity and had a "Wagner Grade II" in the patient's chart.  A "Wagner Grade" is specific to diabetic wounds, and is not used to describe venous leg ulcers.

This demonstrates the standard Healogics protocol to fraudulently reclassify venous leg ulcers as "diabetic wounds of the lower extremity" simply because the patient has diabetes.

169.     Further support that the wound diagnosis was in fact a venous leg ulcer was the fact that the patient was treated with a Profore compression wrap, which is a standard treatment for venous leg ulcers.  This is a clear indicator that the etiology of the wound was venous disease and not diabetes. In diabetic foot wounds, off-loading (taking pressure off) the wound is required in order for successful healing to occur.  Placing a compression wrap on a diabetic wound would not off-load the wound but would in fact put pressure on the wound, obstructing the healing process. This demonstrates the Healogics scheme to increase HBO utilization and increase billing from insurance (*i.e.* Medicare).

170.     Relator Murtaugh noted the ICD-9 Diagnosis Codes from May 23, 2015 for this patient which are reflected below:

| | |
|---|---|
| 707.19 | Ulcer of other part of lower limb |
| 250.82 | Diabetes Mellitus with other specified manifestations; Type II, or Unspecified, uncontrolled |
| 250.02 | Diabetes Mellitus Type II or Unspecified – uncontrolled |
| 891.1 | Open Wound – Knee, Leg (except thigh) and ankle – complicated |
| 454.2 | Varicose veins lower extremities with ulcer and inflammation |
| 710.1 | Systemic sclerosis (acrosclerosis, CRST syndrome, Progressive Systemic Sclerosis, Scleroderma) |
| 357.2 | Polyneuropathy in diabetes (associated code, not primary) |
| 205.91 | Unspecified myeloid leukemia; in remission |

171.     In order to bill and get paid for items indicated for venous leg ulcers like compression wraps, Healogics utilized the ICD-9 codes that support venous disease (*e.g.* 454.2).

On the other hand, in order to bill for HBO services indicated for diabetic wounds of the lower extremity, Healogics utilized the diabetes codes (250.82, 250.02) along with a wound code that is non-specific and generic (707.19  Ulcer of other part of lower limb).  In other words, Healogics picks and chooses whether the wound is a venous leg ulcer *or* a diabetic wound of the lower extremity, depending on whether or not that particular diagnosis helps them to collect reimbursement on submitted claims.  This patient demonstrates Healogics' practice of falsifying patient eligibility in order to administer and bill for HBOT.

172.    On September 10, 2014, John Murtaugh had lunch with the staff at the Bert Fish Medical Center Wound Center, which is operated by Healogics.  After having lunch with the staff and reviewing the ordering process for Mr. Murtaugh's product and answering questions, John Murtaugh began a private conversation with Program Director Catherine Lunde.  After discussing a new product that Relator will be promoting, the conversation turned to Healogics and the recent developments in Orlando, Florida involving the removal of AVP Suemei Addington.  Catherine told Relator that she had heard that Suemei Addington got pushed out because of her intimidating management style and the Orlando Health Staff complained. Catherine told Relator that she or her colleagues in her area would never work for Suemei because of her intimidating tactics.

173.    In addition, Catherine also stated that, "Suemei would have been fired (and not moved to Texas) if she was not a producer for Healogics."  In other words, Suemei made money for Healogics, so Healogics looked the other way in regards to her intimidating tactics and bullying.  As Catherine stated in previous conversation with Relator, she said, "Healogics is all about the money, especially since the merger."

174.    Finally, as Relator was about to leave, Linda Sawyer, RN interrupted the conversation to ask Catherine a question.  Linda was a new nurse who had only been in the wound center for about a month.  The conversation is below:

| | |
|---|---|
| Linda: | "Excuse me, Catherine.  Can I ask you a question about the patient that just came in?  There is an HBO Workup in the chart and it wasn't in the last visit?" |
| Catherine: | "He must be a candidate for HBO. Who is it?" |
| Linda: | "The patient has a venous ulcer.  It's on the ankle." |
| Catherine: | "Is the patient diabetic?" |
| Linda: | "Yes." |
| Catherine: | "Then they'll call it a diabetic wound, or DWLE, so they can dive the patient." |

175.    This guidance on classifying venous ulcers as DWLE (Diabetic Wounds of the Lower Extremities) is the same guidance from Healogics that Relators John Murtaugh and Michael Cascio, MD refused to follow and ultimately led to them being forced out of their positions.

**I.  Healogics iHeal Software**

176.    Healogics created software for use in its wound centers which automatically and artificially classified wounds on the lower extremities of diabetic patients as "wounds of the lower extremity."

177.    The software, called iHeal, is an electronic medical record system and database that was developed by Diversified, an earlier incarnation of Healogics that is used in all of the Healogics' wound care centers.  This in-house, proprietary software artificially limits a physician's discretion in treating wounds and automatically classifies all wounds on the lower extremities of a diabetic patient as diabetic wounds of the lower extremity regardless of their true nature and will not allow the physician to override that classification.

178.    Whenever a physician enters information into iHeal about a patient who has been diagnosed with diabetes, the software thereafter requires the physician to grade the wound using the Wagner Grading Scale which is specific to diabetic ulcers.

179.    Physicians are not given the choice of selecting partial thickness or full thickness to describe the wound depth of venous ulcers that happen to be on a diabetic patient, nor are they given the option of selecting Stage 1 – 4 for pressure ulcers.

180.    Not all wounds on diabetic patients are diabetic wounds, but iHeal does not allow physicians to take into consideration the primary etiology of the wound if the patient has diabetes.

181.    Healogics designed iHeal in this fashion in order to classify wounds that would qualify for expensive HBO treatment regardless of the clinical judgment of the physicians working in the wound care centers.

182.    As a result of the software design, numerous patients' wounds were misclassified and mistreated resulting in financial harm to the government and private insurers.

**J.   Osteomyelitis**

183.    Osteomyelitis is an infection of the bone or bone marrow. Chronic refractory osteomyelitis is defined as chronic osteomyelitis that persists or recurs after appropriate interventions have been performed or where acute osteomyelitis has not responded to accepted management techniques. Interventions and management include surgical bone debridement and parenteral antibiotics that have been attempted over a 4 - 6 week period and may include the removal of hardware placed from previous surgery.  Per CMS NCD guidelines, HBOT is not indicated for primary osteomyelitis outside of the diabetic foot but is indicated for chronic refractory osteomyelitis.

184.    In September 2013, Dr. Cascio and John Murtaugh were at a meeting where Healogics' Area Medical Director, Dr. Kathleen Minnick, instructed all of the physicians and clinical coordinators in attendance that she only waited one week for the wound to respond before classifying osteomyelitis as chronic refractory osteomyelitis and that she recommended all of the employees in attendance do the same. She said that the focus should be on whether or not the wound is responding, not the infection.   Dr. Cascio brought up that HBOT for chronic refractory osteomyelitis is for osteomyelitis that does not respond to both surgical intervention and antibiotic therapy and has nothing to do with whether or not the wound size changes.   Dr. Antonio Crespo, an infectious disease and wound care physician in attendance agreed with Dr. Cascio.

185.    All of the physicians at the meeting vehemently disagreed with her instruction as all agreed that one week was not long enough to assess whether or not antibiotic therapy had failed.  All of the physicians, including Dr. Crespo, also disagreed with Dr. Minnick's guidance that reclassifying the osteomyelitis as chronic refractory osteomyelitis is based on the wound's response.   Healogics provided this instruction to its employees for the express purpose of qualifying more patients for unnecessary HBOT and thereby meeting their corporate imposed revenue benchmarks.

186.    In April of 2014, Dr. Cascio was working in the Dr. Phillips Wound Center and was seeing a patient who was just starting antibiotic therapy for primary osteomyelitis of the sacrum.  It was a stage IV pressure ulcer in a paraplegic patient who had difficulty staying off of his wound. Since the therapy had started one week prior, it was too early to determine if the antibiotic treatment was effective.   However, the patient's wound measurements were unchanged from the previous visit.  Sandi Wommack, the Program Director at the center was waiting for Dr.

Cascio when he exited the patient's room. She asked if Dr. Cascio was going to initiate HBOT on the patient for chronic refractory osteomyelitis.  He explained that it was too early to determine if the therapy was ineffective. Mrs.  Womack said that she had just been at their DASH meeting (a meeting of the region's Program Directors and Clinical Coordinators) and they were instructed to use wound improvement, not infection improvement as their metric to start HBOT.  Dr. Cascio explained that the Medicare guidelines were clear on this topic and the determining factor for qualifying a patient for HBOT for a diagnosis of chronic refractory osteomyelitis is whether or not the bone infection failed to resolve not the wound itself. He explained further that the name explains it. It is the osteomyelitis that is refractory, not the wound.  Once again, Dr. Cascio was told by Sandi Womack that the clinics in which he was the Medical Director were the only clinics not falling in line with this mandate.

## K.  CMS Coverage of Hyperbaric Oxygen Treatments

187.    CMS' LCD for Florida[11], titled Policies and Guidelines for Hyperbaric Oxygen Therapy (HBOT) (L28887), identify HBOT as a medical treatment in which the patient is entirely enclosed in a pressure chamber breathing 100% oxygen (O2) at greater than one atmosphere (atm) pressure.

188.    The delivery system for HBO uses either a single person or a multiple person chamber.  In either setting, the time the patient spends receiving oxygen under higher than atmospheric pressure in the chamber is decided by the physician and generally ranges from 90 minutes at 2.4 ATA or 120 minutes at 2.0 ATA for wound conditions treated in wound centers. In order to receive Medicare reimbursement for HBOT, services must be rendered under the direct supervision of the physician.

---

[11] The Florida LCD is consistent with the National Coverage Determinations and is used here for ease of reference.

189. HBOT is covered by Medicare for the following conditions that would generally be seen in a wound care center:

Chronic refractory osteomyelitis persists or recurs following appropriate interventions. These interventions include the use of antibiotics, aspiration of the abscess, immobilization of the affected extremity, and surgery. HBOT is an adjunctive therapy used with the appropriate antibiotics. Antibiotics are chosen on the basis of bone culture and sensitivity studies. HBOT can elevate the oxygen tensions found in infected bone to normal or above normal levels. This mechanism enhances healing and the body's antimicrobial defenses. It is believed that HBOT augments the efficacy of certain antibiotics (gentamicin, tobramycin, and amikacin). Finally, the body's osteoclast function of removing necrotic bone is dependent on a proper oxygen tension environment. HBOT provides this environment. HBO treatments are delivered at a pressure of 2.0 to 2.5 atm abs for duration of 90-120 minutes. It is not unusual to receive daily treatments following major debridement surgery. The required numbers of treatments vary on an individual basis. Medicare can cover the use of HBOT for chronic refractory osteomyelitis that has been demonstrated to be unresponsive to conventional medical and surgical management.

HBO's use in the treatment of osteoradionecrosis and soft tissue radionecrosis is one part of an overall plan of care. Also included in this plan of care is debridement or resection of nonviable tissue in conjunction with antibiotic therapy. Soft tissue flap reconstruction and bone grafting may also be indicated. HBO treatment can be indicated both preoperatively and postoperatively. HBOT must be utilized as an adjunct to conventional therapy. The patients who suffer from soft tissue damage or bone necrosis present with disabling, progressive, painful tissue breakdown. They may present with wound dehiscence, infection, tissue loss and graft or flap loss. The goal of HBO treatment is to increase the oxygen tension in both hypoxic bone and tissue to stimulate growth in functioning capillaries, fibroblastic proliferation and collagen synthesis. The recommended daily treatments last 90-120 minutes at 2.0 to 2.5 atm abs. The duration of HBOT is highly individualized.

Treatment of diabetic wounds of the *lower extremities* in patients who meet the following criteria: Patient has type I or type II diabetes and has a lower extremity wound that is due to diabetes. Patient has a wound classified as Wagner grade III or higher (Grade 3 - Osteitis, abscess, or osteomyelitis, Grade 4 - Gangrene of the forefoot, Grade 5 - Gangrene of the entire foot); *and a patient has failed an adequate course of standard wound therapy.*

Pursuant to the aforementioned guidelines, the use of HBOT "will be covered as adjunctive therapy only after there are no measurable signs of healing for at least 30 days of treatment with standard wound therapy and must be used in addition to standard wound care."

190.    The 2014 Medicare participating provider allowable fee for Hyperbaric Oxygen

treatment is as follows:

CPT Code – 99183 – Professional fee for physician or other qualified health care
professional attendance and supervision of HBO, per session:   Reimbursement
$214.94.

HCPC Code – C1300 – Facility fee for HBOT, hyperbaric oxygen under pressure,
full body chamber, per 30 minute interval/segment:   Reimbursement $110.93 (A
segment is defined as a 30-minute interval).   For example, a two-hour HBO
treatment (4 segments of 30 minutes each or C1300 x 4) would total $443.72 paid
to the facility.   This would be in addition to the physician's professional fee
described in CPT code 99183 above.

191.    An HHS/OIG report published in October 2000 on hyperbaric oxygen therapy

evaluated the extent and appropriateness of the therapy reviewing Medicare claims data between

1995 and 1998. In addition to this report, CMS polices and published research studies conclude

as follows:

Many hyperbaric practices are started with little information on proper utilization
or reimbursement policies. According to interviews with hyperbaric physicians, many
hyperbaric units are not started by physicians. They are started by facilities which may
have little knowledge of proper utilization and standards of care.

Hyperbaric therapy is generally reserved as a last resort, when other treatment
options are exhausted.   The population targeted is generally elderly and very ill. The
average age of a hyperbaric Medicare patient is 70. At least 45 percent are diabetic and
almost 40 percent have some form of heart disease. It also appears that about 18 percent
are deceased within two years of treatment.

Diagnosis codes are sometimes used inappropriately to obtain reimbursement for
uncovered indications.  Although the guidelines specifically describe fourteen indications
for which hyperbaric treatment is reimbursable by Medicare, some providers have taken
great latitude in how they interpret those conditions, while others appear to deliberately
use inaccurate ICD-9 codes to bypass carrier and intermediary edits. The HHS/OIG
reviewers found 13 percent of beneficiaries had diagnoses listed on their claims that
misrepresented their true medical condition suggesting that diagnosis codes are, at times,
selected for the purpose of bypassing the carrier and intermediary edits used to flag
potentially inappropriate treatments per OIG.

The report of 2000, when hyperbaric treatment was not widely available, found that $14.2 Million (of the $49.9 million allowed charges for outpatient hospitals and physicians) was paid in error for hyperbaric treatments. Nearly 32 percent of beneficiaries received treatments for either non-covered conditions (22.4 percent, $10.5 million) or documentation did not adequately support HBO2 treatments (9.2 percent, $3.7 million). It also found that an additional $4.9 million was paid for treatments deemed to be excessive and eleven percent of beneficiaries were treated for appropriate indications, but received more treatments than were considered medically necessary by physician reviewers.  The excessive treatments represent $4.9 million paid for potentially ineffective procedures. It was also found that the lack of testing and treatment monitoring raised quality of care concerns. Of the 68 percent of beneficiaries treated for covered conditions, 37 percent received questionable quality care with respect to either lack of appropriate testing prior to initiation of treatment or insufficient progress documented to justify continuation of therapy.  The treatments with suspect quality accounted for as much as $11.1 million in payments.

192.     Pursuant to recommendations made by the OIG, CMS implemented a plan for a Medicare prior authorization process for non-emergent HBOT rendered in three states -- Illinois, Michigan, and New Jersey beginning on March 1, 2015, for Michigan and on July 15, 2015, for Illinois and New Jersey, to continue for three years.  As stated by CMS, "these states were selected as the initial states for the model because of their high utilization and improper payment rates for this service."  The plan is to test whether prior authorization will help reduce expenditures and reduce utilization of services that do not comply with Medicare policy by ensuring claims are not submitted for payment until after all relevant clinical and medical documentation requirements are met.  Thus far, the results have shown a significant increase in denials of submitted reimbursement claims and a significant decrease in the payout by CMS for hyperbaric oxygen treatment of claimed wound diagnoses that have not been supported by the documentation or are not compliant with coverage, coding, and payment rules.

193.     Without question, HBOT is the golden goose of wound care centers providing huge revenue to hospitals and companies like Defendant.  Along those lines, Drs. Van Raalte and Cascio, and Mr.  Murtaugh, witnessed during their employment with, or while working on behalf

of Healogics, a constant drive to increase the utilization of HBOT by setting arbitrary benchmarks that were to be met by all employees for the purpose of increasing revenue regardless of the medical necessity of the therapy.

194.     In a meeting with Tim Raymon, and vice president of operations Michael Patterson, that was called primarily because Dr. Van Raalte was not ordering as much HBOT as Healogics wanted, Tim Raymon made the statement that "if I don't produce a profit for them [Healogics], I'm out of here."

195.     Tim Raymon routinely reviewed patient charts and conspired with Healogics' medical director, Gregory Bohn, to override physician diagnoses, including Dr. Van Raalte's, by upgrading wounds that were properly classified as a Wagner Grade I or II to Wagner Grade III, in order to qualify the patient for the expensive HBOT per the aforementioned CMS LCD guidelines.

196.     This was done strictly to qualify patients for the high revenue producing HBOT thereby enriching Healogics.  Dr. Van Raalte estimates that another 10% of non-diabetic HBO patients had no factors that qualified them for the therapy based on CMS LCD guidelines but received HBOT anyway.

197.     In the facility where Dr. Van Raalte was employed the following Medicare patients[12] received HBOT who were not qualified per CMS LCD coverage guidance and for which Medicare was billed:

1)     April 2011. Patient suffering from osteomyelitis which was not indicated for HBOT but was ordered by Healogics' Medical Director Gregory Bohn. *See* Exhibit 7

---

[12] Patient names are removed for privacy, but will be provided upon request.

2)      May 2011. Patient had re-vascularization of the foot which resolved the patient's underlying pathology of large vessel ischemia and rendered HBOT unnecessary. Indications were changed to qualify for HBO.  *See* Exhibit 8

3)      June 2011. Patient seen by Dr. Van Raalte for ischemic toe and forefoot due to vasculitis. Not an HBO candidate but criteria changed after he saw patient so that she could be placed into HBOT. Patient still required amputation.  *See* Exhibit 9.

4)      October 2011. Patient had a Wagner Grade II diabetic ulcer but got HBOT after upgrading of wound to a Wagner Grade III.  *See* Exhibit 10.

5)      Patient had a seroma after breast biopsy. HBO not indicated as her seroma classified as a radiation wound but which needed no treatment. Received 45 segments of HBOT even though no wound and no biopsy.  *See* Exhibit 11.

6)      October 2011. Patient had tip of toe swabbed in order for wound care center to get a positive culture which would then allow Healogics to upgrade Wagner Grade II to a Wagner Grade III. Patient then given HBOT that they did not qualify for. *See* Exhibit 12.

7)      October 2011. Patient received vascular stents for toes. Not diabetic and suffering from end stage vascular disease due to age. Needed amputation but was given HBOT instead.  *See* Exhibit 13.

8)      November 2011. Patient had a venous wound that started as a blister on mid-calf. Blister was a superficial wound, not deep or infected. HBOT ordered after physician incorrectly classified as (hypoxic) in order to qualify patient for HBOT. *See* Exhibit 14.

9)      December 2011. Patient had a Wagner Grade II toes 1 cm ulcer.  Dr. Van Raalte upon observing patient cancelled HBOT ordered by another physician due to the fact that it was not indicated, would serve no benefit and could be detrimental to the patient due to pain and dementia. Within two hours Healogics' Medical Director Bohn ordered HBOT for patient.  *See* Exhibit 15.

10)     December 2011. Patient had a Wagner Grade 2 wound that was classified as a Wagner Grade III in order to place patient into HBOT.  *See* Exhibit 16.

11)     March 2012. Patient had two 5mm wound that was a Wagner Grade 2 but that was upgraded to a Wagner Grade III to qualify patient for HBOT.  *See* Exhibit 17.

198.    The patient cases described above are examples of the fraudulent practices of Healogics which was endemic throughout its centers.

**L. John Murtaugh's Experience with HBO**

199.    Unlike his co-relators, Mr. Murtaugh was not a medical professional.  Rather, he was hired to run and oversee the profitability of the wound center at Dr. P. Philips Hospital as the Program Director.  Early during his employment with Healogics, Mr. Murtaugh learned that each wound care center had a benchmark regarding the amount of patients who should receive HBOT with no concern or regard for the medical necessity of the procedure.

200.    Sometime in late-May, 2013, Mr.  Murtaugh was provided a copy of a document titled "Leesburg Regional Medical Center Wound Care and Hyperbaric Center 2013 Annual Business Review" by Suemei Addington.  *See* Exhibit 18.

201.    Ms. Addington told him that he should model the annual business review for his clinic after the Leesburg presentation.  In discussions with her, and in reviewing the document, he learned that Healogics expected that every clinic nationwide should have a minimum 10% HBO conversion rate which, in laymen's terms, meant that a minimum of 10% of all patients who came to the wound care centers for treatment should be given the HBOT.

202.    In mid-August, 2013, Mr. Murtaugh prepared an annual business review titled "The Comprehensive Wound Care Center at Dr. Phillips Hospital, Q3 2013 Annual Business Review."  This was to be presented to financial managers of Dr. P. Phillips Hospital on August 27, 2013 by Michael Tanner, Suemei Addington and John Murtaugh.  *See* Exhibit 6.

203.    Mr.  Murtaugh compiled the patient data in the presentation while Maureen Fera, Healogics' Revenue Cycle Manager, who worked in reimbursement, compiled all of the financial data. When putting the presentation together, Mr. Murtaugh used Healogics' company-wide standard language for the 2013 financial initiatives and goals section further evidencing the minimum 10% HBOT benchmark that Healogics mandated for all of its wound care centers.

204.     During the August 27, 2013, presentation, Mr. Murtaugh repeatedly witnessed Michael Tanner and Suemei Addington criticizing Drs. Cascio and Crespo and other contracted panel physicians to the hospital financial managers for not meeting the 10% HBOT benchmark. Mr. Tanner and Ms. Addington pointed out how much revenue was lost because these doctors were not meeting those arbitrary benchmarks.

205.     Soon after the August 27, 2013 presentation, Dr. Cascio met with South Seminole Hospital's Chief Operating Officer Robin Hug to discuss Healogics' complaints that physicians working in the wound care center, including Dr. Cascio, were not meeting the benchmarks set by Healogics.

206.     In the past, Dr. Cascio had met with Ms. Hug and Kathy Black, a nursing administrator for Dr. Phillips Hospital, at different times to discuss Healogics' complaints.  Dr. Cascio always felt that they were in his corner and supportive of him not meeting Healogics' arbitrarily set benchmarks.

207.     Dr. Cascio concluded that due to financial considerations, specifically the revenue that Healogics claimed was being lost, Robin Hug and Kathy Black had started to side with Healogics.

## M. Overutilization of Transcutaneous Oxygen Measurement (TCOM) Testing

208.     Transcutaneous Oxygen Measurement or TCOM, also known as TpO2 testing, is where oxygen tension measurements are taken transcutaneously (through unbroken skin) using an oximetry device (sensor pad attached to the skin) to measure oxygen saturation in capillaries at various levels along the extremity.

209.    On July 15 - 16, 2013, Mr. Murtaugh attended Healogics' quarterly meeting, known internally as a DASH meeting, in Lakeland, Florida.  This DASH meeting was led by Michael Tanner and Suemei Addington.

210.    During this meeting Suemei Addington announced a new corporate-wide initiative that "every patient coming into the wound care centers would receive a TCOM test."

211.    While there is increased revenue associated with the widespread unnecessary testing, Healogics' true objective was to use the TCOM tests to identify and justify the more expensive HBO therapies.

212.    This new policy directly conflicted with CMS LCD coverage guidance. The TCOM test is time consuming, expensive and is not always indicated depending on the patient's wound.  John Murtaugh witnessed several clinical coordinators question this proclamation at the meeting.

213.    Jane Naylor, RN, Clinical Coordinator over Healogics' Manatee Wound Care Center, asked Suemei Addington, "[w]hat about a 17 year old with a wound on his leg? Do we do a TCOM on him?" to which Suemei Addington replied "[y]es, how else can we determine perfusion in the wound?"

214.    Dr. Cascio, upon hearing that Ms. Addington had made this pronouncement, knew a TCOM was not always necessary to determine perfusion in the wound as there were several other ways to assess perfusion, such as a hand held Doppler or an Ankle-brachial Index ("ABI"), but which Healogics could not bill for.  Dr. Cascio also knew that Healogics' own published clinical practice guidelines did not mandate a TCOM to determine perfusion on every patient.

215.    On July 17, 2013, Mr. Murtaugh discussed the new initiative with Dr. Cascio. Dr. Cascio concluded, and John Murtaugh agreed, that performing a TCOM on every new patient was an overutilization of testing, was only indicated in a small handful of patients, and was in direct conflict with Healogics' own Clinical Practice Guidelines ("CPG") as well as CMS' LCD. *See* Exhibit 19.  Dr. Cascio thereafter refused to allow the two clinics in which he was Medical Director, to comply with the Healogics mandate.

216.    Over the course of the weeks following the Healogics mandate that a TCOM test be performed on every new patient, Mr. Murtaugh was continually questioned by Suemei Addington and Nancy Helme on why the new mandate was not being followed at South Seminole and Dr. Phillips Hospitals.

217.    At a meeting at South Lake Hospital Wound Care Center between John Murtaugh, Suemei Addington, Nancy Helme and Sue Ann Prouse, Mr. Murtaugh explained that after discussing the mandate with Dr. Cascio, and reviewing CMS LCD guidelines as well as internal clinical practice guidelines, it was determined that a TCOM test was not indicated for every patient. Suemei Addington and Nancy Helme became upset and continued to push John Murtaugh and Dr. Cascio to implement the TCOM protocol.

218.    In late April/early May, 2014, Mr. Murtaugh had a conversation with Michelle "Micah" DiProspero, a former HBO Technician for Healogics. Michelle DiProspero told him that a Healogics facility, in which she previously worked performed TCOM tests, the results of which did not support HBOT.  Those tests were subsequently not billed for and results were discarded by Healogics.

219.    Dr. Cascio observed Healogics' employees performing TCOMs who did not have the proper training and certification, but who conducted the testing in order to follow the mandate set forth by Healogics. As the guidelines state:

> *The accuracy of non-invasive vascular diagnostic studies depends on the knowledge, skill and experience of the technologist and the physician performing the interpretation of the study.*

220.    Healogics did not have enough sufficiently trained and certified personnel to comply with the mandate that "every patient coming into the wound care centers would receive a TCOM test." The corporate mandate to conduct a TCOM on every patient is in direct conflict with the aforementioned CMS guidelines and was set forth merely to increase Defendant's profits with blatant disregard to patient care and medical necessity.

221.    In addition to constantly harassing Mr. Murtaugh and Dr. Cascio to implement the TCOM mandate, Ms. Addington, Ms. Helme and other representatives of Healogics spoke with administrators of South Seminole and Dr. Phillips Hospitals comparing Dr. Cascio's clinics to twelve other wound care centers in their region and showing how his clinics were not producing the revenue that Healogics' other centers were producing.

222.    In late August or early September of 2013, soon after a meeting that Dr. Cascio had with Cindy Johnson, Healogics' interim Program Director at South Seminole Hospital, to discuss normal clinic agenda items, Dr. Cascio was informed that Healogics had started a compliance investigation.

223.    The investigation was based on the fact that Dr. Cascio had told Cindy Johnson that to up-code selective debridement to the higher revenue producing surgical/excisional debridement would be fraudulent and that he would not allow the wound care centers where he was medical director to do so.

224.    Barry Grosse, Healogics' compliance director, conducted the investigation and interviewed both Dr. Cascio and John Murtaugh, among others.   During the interviews Dr. Cascio and Mr. Murtaugh informed Mr. Grosse that Healogics was pressuring physicians to up-code selective debridement to the higher revenue producing surgical/excisional debridement, to perform more surgical/excisional debridement regardless of the medical necessity of the procedure and to do unnecessary testing, namely TCOM testing, that was mandated by Healogics.   Mr. Murtaugh also told Mr. Grosse that he was not comfortable with the Healogics guidance that "any wound on a patient with diabetes is automatically a diabetic ulcer" because it was fraudulent.   Mr. Murtaugh explained to Mr. Grosse that he had never seen this before and that you can have a patient have a venous leg ulcer and also be a diabetic.

225.    At the conclusion of the interviews, Mr. Grosse told Dr. Cascio and Mr. Murtaugh that it was his conclusion that no fraud had actually taken place since their center had not billed for any of the procedures.   Mr. Murtaugh explained to Mr. Grosse that no fraud had taken place at their center because Dr. Cascio had refused to comply with Healogics' mandate that every new patient should receive a TCOM and that Dr. Cascio refused to allow physicians in the wound care centers to up code selective debridement to surgical/excisional debridement or to falsify HBO eligibility for patients just to produce more revenue for Healogics.   Mr. Murtaugh and Dr. Cascio explained that they had been repeatedly told that this practice was occurring in every other center and that "the South Seminole and Dr. P. Phillips Hospital Wound Centers were the only two that were not following the Healogics guidelines."

226.    Soon after his interview with Grosse, Mr.  Murtaugh had a discussion with Jim Hirkel, Healogics' program director of their Bartow Wound Care Center, regarding the TCOM mandate.   Jim Hirkel told him that he had implemented the mandate at his facility and was

presently conducting a TCOM test on every new patient.  Mr. Grosse had recommended that Mr. Murtaugh if he had any new updates or if he did know of a wound center that was following the TCOM mandate.

227.    Mr.  Murtaugh told Jim Hirkel that he should read the CMS LCD and Healogics' own clinical practice guidelines as the mandate directly conflicted with both.

228.    Soon after his discussion with Jim Hirkel, Mr. Murtaugh informed Mr. Grosse that he had become aware that the Bartow Wound Care Center was performing TCOM testing on every new patient.  Unfortunately, Mr. Grosse seemed disinterested in the information he was provided and no action was taken.

229.    In a meeting that Mr. Murtaugh had with Kathy Black, nursing administrator for Dr. P. Phillips Hospital, several weeks after providing the information to Grosse about the overutilization of TCOM testing at Bartow Wound Care Center, Ms. Black informed Mr. Murtaugh that Healogics had contacted her and told her that its compliance investigation was complete and no wrong doing had been discovered.

230.    Dr. Cascio expressed his concern to all parties involved that the compliance investigation should not have been conducted in the two centers in that he was Medical Director and not allowing fraudulent activities, but in those centers which reportedly were following Healogics' mandates for medically unnecessary treatments.

## N.  CMS Guidelines (Transcutaneous Oxygen Tension Measurements)

231.    Medicare Guidelines[13] for TCOM testing, state that:

*Transcutaneous oxygen tension measurements (Tp02) are to be utilized in conditions for which hyperbaric oxygen therapy (HBO) is being considered, as*

---

[13] LCD Determination ID: 93922, original determination effective date of February 2, 2009, and latest revision effective date of January 31, 2012.

*well as for monitoring the course of HBOT. The following conditions are considered medically indicated uses for Tp02 testing prior to, and during the course of HBOT:*

- *Acute traumatic peripheral ischemia*
- *Crush injuries and suturing of severed limbs*
- *Progressive necrotizing infections (necrotizing fasciitis)*
- *Acute peripheral arterial insufficiency*
- *Preparation and preservation of compromised skin grafts (not for primary management of wounds)*
- *Soft tissue radionecrosis (death of soft tissue from radiation treatment) as an adjunct to conventional treatment*
- *Tp02 used to determine a line of demarcation between viable and non-viable tissue when surgery or amputation is anticipated*

232.    In regard to utilization, Medicare guidelines also state:

*Customarily, transcutaneous oxygen tension measurements (TpO2) are acceptable for evaluating healing potential in non-healing or difficult-to-heal wounds at a frequency of no more than twice in any 60-day period.*

233.    Medicare guidelines also clearly state that there are limitations on when TCOM testing can be used:

*Non-invasive vascular testing studies are medically necessary only if the outcome will potentially impact the clinical management of the patient. For example, if a patient is (or is not) proceeding on to other diagnostic and/or therapeutic procedures regardless of the outcome of non-invasive studies, and non-invasive vascular procedures will not provide any unique diagnostic information that would impact patient management, then the non-invasive procedures are not medically necessary. If it is obvious from the findings of the history and physical examination that the patient is going to proceed to angiography, then non-invasive vascular studies are not medically necessary. It is also expected that the studies are not redundant of other diagnostic procedures that must be performed.*

234.    The Medicare guidelines referenced above mandate that certain training and experience must be attained in order to conduct TCOM testing as follows:

The accuracy of non-invasive vascular diagnostic studies depends on the knowledge, skill and experience of the technologist and the physician performing the interpretation of the study. Consequently, the technologist and the physician must maintain proof of training and experience. All non-invasive vascular diagnostic studies must be: (1) performed by a qualified physician, or (2) performed under the general supervision of a qualified physician by a technologist

who has demonstrated minimum entry level competency by being credentialed in vascular technology, and/or (3) performed in a laboratory accredited in vascular technology.

Examples of certification in vascular technology for non-physician personnel include:

- Registered Vascular Technologist (RVT) credential
- Registered Vascular Specialist (RVS) credential

These credentials must be provided by nationally recognized credentialing organizations such as:

- The American Registry of Diagnostic Medical Sonographers (ARDMS) which provides RDMS and RVT credentials
- The Cardiovascular Credentialing International (CCI) which provides RVS credential

Appropriate nationally recognized laboratory accreditation bodies include:

- Intersocietal Commission for the Accreditation of Vascular Laboratories (ICAVL)
- American College of Radiology (ACR)

Additionally, the transcutaneous oxygen tension measurements (Tp02) may be performed by personnel credentialed as a certified hyperbaric registered nurse (CHRN) or certified hyperbaric technologist (CHT) by the National Board of Diving and Hyperbaric Medical Technology (NBDHMT).
General Supervision means the procedure is furnished under the physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually performs the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.

235.    The 2014 Medicare participating provider allowable fee for transcutaneous

oxygen tension measurements (TCOM) testing is as follows:

CPT Code - 93922 - *Limited* bilateral noninvasive physiologic studies of upper or

lower extremity arteries, 1-2 levels.

| CPT Code - 93922 | Reimbursement |
| --- | --- |
| Physician's Component | $12.18 |
| Technical Component | $77.02 |
| Global | $89.20 |

CPT Code - 93923- *Complete* bilateral noninvasive physiologic studies of upper or lower extremity arteries, 3 or more levels.

| CPT Code - 93923 | Reimbursement |
|---|---|
| Physician's Component | $22.57 |
| Technical Component | $117.50 |
| Global | $140.07 |

236.     Based on the mandate of July 2013, 95% of all TCOM tests that are currently being performed in Defendant's wound care centers are not and cannot be clinically supported, are unnecessary, and are causing Medicare, Medicaid, TRICARE, and private insurers to be fraudulently billed.

237.     Dr. Cascio, during his employment with Healogics, saw an average of 1,400 patients per year come through his wound care centers.  By following clinical guidelines, approximately 5% of those patients had TCOM tests appropriately performed on them compared to the 100% figure required by the Healogics as of July 16, 2013.

238.     Had Dr. Cascio implemented the corporate directive, it would have resulted in the submission of approximately 1,330 false claims per year just from the two clinics where he is the Medical Director.  Healogics was successful in implementing its 100% TCOM directive in numerous centers across the country resulting in tens of thousands of false claims for unnecessary TCOM testing ranging in expense from $89.20 to $140.07 per test.

## IV.    THE FALSE CLAIMS ACTS

239.     The federal False Claim Act ("FCA") as amended, provides in pertinent part that:

[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1)

240.    The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

241.    No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

242.    In addition to the FCA, Relators bring these claims under the state False Claims Acts or their equivalents (the state FCAs) for each state in which Defendant conducts business.[14] The state FCAs are largely modeled on the federal FCA with similar provisions and interpretations, but will be differentiated as necessary in individual counts below.

## V.    GOVERNMENT HEALTH INSURANCE PROGRAMS

### A. Cost Reporting and Claims Processing Procedures Under The Medicare Program

243.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 *et seq*., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426-1.

244.    Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.  CMS contracts with private companies, referred to as "fiscal intermediaries,"

---

[14] *See* Footnote 1 herein.

to administer and pay claims from the Medicare Trust Fund.  42 U.S.C. § 1395(u).  In this capacity, the fiscal intermediaries act on behalf of CMS.  42 C.F.R. § 413.64.  Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

245.    There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. §§ 1395c - 1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them.  42 U.S.C. §§ 1395j-1395w-5.

246.    Reimbursement of the facility charges is covered under the Hospital Outpatient Prospective Payment System or OPPS. The allegations herein involve Part B and OPPS for services billed by Defendant or its agents to Medicare.

247.    The Balanced Budget Act of 1997 granted authority to CMS to establish a prospective payment system for hospital outpatient services.

248.    On August 1, 2000, CMS began using the OPPS, which was authorized by Section 1833(t) of the Social Security Act (the Act) as amended by Section 4533 of the Balanced Budget Act of 1997.

249.    The OPPS was designed to better predict and manage program expenditures by assigning fixed payment amounts to groups of services similarly to the inpatient prospective payment system (Diagnosis-Related Groups).

250.    The OPPS system is applicable only to hospitals and groups all hospital outpatient services into Ambulatory Payment Classifications (APCs).  The payment amounts for each APC

are established by CMS and are based on the estimated costs associated with the services assigned within the APC.

251.    The costs are calculated using national, aggregate data from hospitals' claims and cost reports.  Medicare payment for outpatient services provided in hospitals is based on set rates under Medicare Part B when paying for services such as X-rays, emergency department visits, and partial hospitalization services in hospital outpatient departments.

252.    Payments made under OPPS cover facility resources including equipment, supplies, and hospital staff but do not include services of physicians or non-physician practitioners covered under the Medicare Fee Schedule.

253.    Hospitals may only bill for the outpatient services that are provided at the hospital's expense.  CMS requires hospitals billing outpatient services to use Healthcare Common Procedure Coding System ("HCPCS") codes submitted on the CMS 1450 form (UB04).  When the claim is received the claims administrator is responsible for applying the appropriate APC payment rates to the HCPCS codes.

**B.  Conditions of Participation and Conditions of Payment**

254.    To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc.  The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

**C.  Medical Necessity and Appropriateness Requirements**

255.    One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, the medical goods and services are (1) shown to be

medically necessary, and (2) are supported by necessary and accurate information.  42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

256.    Various claims forms, including but not limited to the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.  42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406.  Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  *Id.*; *see* also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

257.    The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

**D.  Obligation to Refund Overpayments**

258.    As another condition of participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports).  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. *see also* 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

259.    Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.  42 U.S.C.

§ 1395u(l)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg.

CMS is entitled to collect interest on overpayments.  42 U.S.C. § 1395l(j).

## E.  Other Federally-Funded Health Care Programs

260.    Although false claims to Medicare are the primary FCA violations at issue in this case, there were medically unnecessary upcoded/overbilled procedures for two other federally-funded health care benefit programs: Medicaid and TRICARE/CHAMPUS.  Accordingly, those other two programs are briefly discussed as well.

### i.    Medicaid

261.    The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals.  CMS administers Medicaid on the federal level while state agencies serve as the administrator or counterpart.    Reimbursement  of  physician  charges  is  governed  by  Part  B  of  Medicare. Reimbursement  of  the  facility  charges  is  covered  under  the  Hospital  Outpatient  Prospective Payment System.  As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

### ii.    TRICARE, Formerly Known as CHAMPUS

262.    A federal program, established by 10 U.S.C. §§ 1071 - 1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired  service  members,  and  their  dependents. Although  TRICARE  is  administered  by  the Secretary  of  Defense,  the  regulatory  authority  establishing  the  TRICARE  program  provides reimbursement  to  individual  health  care  providers  applying  the  same  reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2)

(institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. §§ 1395, et seq.).

263.    Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).  Like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records.  32 C.F.R. §§ 199.9(b)(3) - (b)(5).

## VI.    CAUSES OF ACTION

### Count I
### Federal False Claims Act
### (31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))

264.    Plaintiffs allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

265.    Through the acts described above, Defendant and  its  agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and are still presenting or causing to be presented, to the United States government and state governments participating in the Medicare and Medicaid, and other government sponsored insurance programs, false and fraudulent claims, records, and statements in order to obtain reimbursement for healthcare services that were falsely billed and/or not medically necessary, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. §3729 (a)(1)(A).

266.    As a result of Defendant's actions, as set forth above, the United States of America and the state governments participating in Medicare, Medicaid and other government

sponsored insurance programs have been, and continue to be, severely damaged.  By virtue of

Defendant's conduct, the United States and listed States suffered damages and therefore are

entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not

less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation

Adjustment Act of 1990.

### Count II
### Federal False Claims Act
### (31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))

267.    Plaintiffs allege and incorporate by reference paragraphs 1–263 of this Second

Amended Complaint as though fully set forth herein.

268.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of

the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements material to the payment of false or fraudulent claims, in

violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

269.    As a result of Defendant's actions, as set forth above, the United States of

America and the state governments participating in the Medicare and Medicaid, and other

government sponsored insurance programs have been, and may continue to be, severely

damaged.  By virtue of Defendant's conduct, the United States and listed States suffered

damages and therefore are entitled to treble damages under the False Claims Act, plus a civil

penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the

Federal Civil Penalties Inflation Adjustment Act of 1990.

### Count III
### Violation of the Federal False Claims Act
### (31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G))

270.     Plaintiffs allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

271.     Through the acts described above and otherwise, Defendant and its agents and employees knowingly made, used, or caused to be made or used, false records and statements material to obligations to pay or transmit money to the government, or knowingly concealed, improperly avoided or decrease their obligation to pay money to the United States government that they improperly or fraudulently received.

272.     Defendant also failed to disclose to the government material facts that would have resulted in substantial repayments by them to the federal and state governments in violation of 31 U.S.C. § 3729(a)(1)(G).

273.     Defendant, at all relevant times to this action, had an ongoing legal obligation to report and disclose overpayments to the government pursuant to 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C, 42 C.F.R. §§ 489.40, 489.31, 42 U.S.C. § 1320a-7b(a)(3), 42 U.S.C. § 1395u; and 42 C.F.R. § 489.20(g), and failed to do so.

274.     As a result of Defendant's actions, as set forth above, the United States of America and the state governments participating in the Medicare and Medicaid, and other government sponsored insurance programs have been, and may continue to be, severely damaged.  By virtue of Defendant's conduct, the United States and listed States suffered damages and therefore are entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

**Count IV**
**Violation of the False Claims Act,**
**31 U.S.C. § 3729(a)(3) (2006), and 31 U.S.C. § 3729(a)(1)(C) (2012)**
**Conspiracy to Submit False Claims**

275.    Plaintiffs allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

276.    Defendant entered into agreements with each of its partner hospitals and conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States, acting through its programs, Medicare, Medicaid, and other government sponsored insurance programs, for money to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3) (2006) and 31 U.S.C. § 3729(a)(1)(C) (2012).

277.    As part of the schemes and agreements to obtain reimbursement from the United States in violation of federal laws, Defendant conspired to file or cause to be filed billings for payment for unnecessary services, services not rendered, and/or upcoded services, and to cause the United States to pay claims for health care services based on false claims, false statements, and false records that the services were provided in compliance with all laws regarding the provision of health care services when they were not so provided.

278.    By virtue of Defendant's conspiracy to defraud the United States and the state governments, the United States and listed States suffered damages and therefore are entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## VIII.   Prayer for Relief

WHEREFORE, Plaintiffs/Relators, on behalf of the United States, demand judgment against Defendant as to Counts I-IV of the Second Amended Complaint, as follows:

A. That Defendant cease and desist from violating 31 U.S.C. §3729 *et seq.* and the equivalent provisions of the state statutes set forth above.

B. That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States government has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each false claim, together with the costs of this action, with interest, including the cost to the United States government for its expenses related to this action.

C. That this Court enters judgment against Defendant for the maximum amount of actual damages under 31 U.S.C. §3729 *et seq.*

D. That Plaintiffs/Relators be awarded all costs incurred, including their attorneys' fees.

E. That in the event the United States government subsequently intervenes in this action, Plaintiffs/Relators be awarded 25% of any proceeds of the claim, and that in the event the United States government does not intervene in this action, Relators be awarded 30% of any proceeds.

F. That the United States and Plaintiffs/Relators receive all relief, both in law and in equity, to which they are entitled.

**Count V**
**California False Claims Act**
**Cal. Gov't. Code §§ 12650 et seq.**

279. Plaintiffs allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

280. This is a qui tam action brought by Plaintiffs on behalf of the state of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 et seq.

281. Cal. Gov't Code § 12651(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

(4) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

282.    Defendant violated Cal. Gov't Code § 12651(a)(1), (2), (3) and (4) by the aforementioned conduct and failed to disclose the falsity of its claims, or return amounts paid upon said false claims within reasonable time after discovery of the false claim.

283.    The state of California, by and through the California Medicaid program (Medi-Cal) and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by Defendant and third parties in connection therewith.

284.    Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of California in connection with Defendant's conduct.  Compliance with applicable California statutes and regulations was also an express condition of payment of claims submitted to the state of California.

285.    Had the state of California known that false representations and false records were made regarding the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

286.    As a result of Defendant's violations of Cal. Gov't Code § 12651(a), the state of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

287.    Plaintiffs/Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to Cal. Gov't Code §12652(c) on behalf of themselves and the state of California.

288.    This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the state of California in the operation of its Medicaid program.

WHEREFORE, Plaintiffs respectfully request this Court to award the following relief to the following parties and against Defendant:

To the state of California:

(1) Three times the amount of actual damages which the state of California has sustained as a result of the Defendant Healogics' conduct;

(2) A civil penalty of no less than $5,500 and up to $11,000 for each false claim which Defendant Healogics presented or caused to be presented to the state of California;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Plaintiffs:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### Count VI
### Colorado False Medicaid Claims Act
### CRSA § 25.5-4-305

289.    Plaintiffs allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

290.    This is a qui tam action brought by Plaintiffs on behalf of the state of Colorado to recover treble damages and civil penalties under CRSA § 25.5-4-305.

291.    The Colorado False Medicaid Claims Act provides liability for any person who:

(a)    Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(b)    Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(f)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act";

(g)    Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

292.    Defendant Healogics violated CRSA § 25.5-4-305(a), (b), (f), and (g) by virtue of the aforementioned conduct and failed to disclose the falsity of  its claims, or return amounts paid upon said false claims within reasonable time after discovery of the false claim.

293.    The state of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant and third parties in connection therewith.

294.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Colorado in connection with Defendant Healogics' conduct.  Compliance with applicable Colorado statutes and regulations was also an express condition of payment of claims submitted to the state of Colorado.

295. Had the state of Colorado known that false representations and false records were made regarding the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

296. As a result of Defendant Healogics' violations of the Colorado Medicaid False Claims Act, the state of Colorado has been damaged in an amount in excess of one million dollars exclusive of interest.

297. Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who has brought this action on behalf of themselves and the state of Colorado.

298. This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the state of Colorado in the operation of its Medicaid program.

WHEREFORE, Plaintiffs respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Colorado:

(1)     Three times the amount of actual damages which the state of Colorado has sustained as a result of the Defendant Healogics' conduct;

(2)     A civil penalty of up to $10,000 for each false claim which Defendant Healogics Hospitals presented or caused to be presented to the state of Colorado;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

(5)     Such further relief as this Court deems equitable and just.

To Plaintiffs:

(1)     The maximum amount allowed pursuant to the Colorado Medicaid False

Claims Act and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## Count VII
## Connecticut False Claims Acts for Medical Assistance Programs
## Conn. Gen. Stat. Sec. 17b-301a, *et seq.*

299.     Plaintiffs allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

300.     This is a qui tam action brought by Plaintiffs on behalf of the state of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. Sec. 17b-301a, et seq.

301.     Conn. Gen. Stat. Sec. 17b-301b provides liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under a medical assistance program administered by the Department of Social Services".

302.     In addition, subsection 3 prohibits a conspiracy to commit a violation of this section.

303.     Defendant Healogics violated the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. Sec. 17b-301a, *et seq.* by virtue of the aforementioned conduct.

304.     The state of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant and third parties in connection therewith.

305.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Connecticut in connection with Defendant Healogics' conduct.  Compliance with applicable Connecticut statutes and regulations was also an express condition of payment of claims submitted to the state of Connecticut.

306.     Had the state of Connecticut known that false representations and false records were made regarding the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

307.     As a result of Defendant Healogics' and Defendant Connecticut Hospitals' violations of the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. Sec. 17b-301a, et seq., the state of Connecticut has been damaged in an amount in excess of one million dollars, exclusive of interest.

308.     Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who has brought this action on behalf of themselves and the state of Connecticut.

309.     This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the state of Connecticut in the operation of its Medicaid program.

WHEREFORE, Plaintiffs respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Connecticut:

(1)     Three times the amount of actual damages which the state of Connecticut has sustained as a result of the Defendant Healogics' conduct;

(2)     A civil penalty of up to $11,000 for each false claim which Defendant

Healogics presented or caused to be presented to the state of Connecticut;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Plaintiffs:

(1)     The maximum amount allowed pursuant to the Connecticut False Claims
        Act for Medical Assistance Programs, and/or any other applicable
        provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in
        connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Count VIII**
**Delaware False Claims and Reporting Act**
**6 Del. C. § 1201(a)**

310.     Plaintiffs allege and incorporate by reference paragraphs 1–263 of this Second

Amended Complaint as though fully set forth herein.

311.     This is a qui tam action brought by Relators on behalf of the state of Delaware to

recover treble damages and civil penalties under the Delaware False Claims and Reporting Act,

Title 6, Chapter 12 of the Delaware Code.  6 Del. C. § 1201(a) provides liability for any person

who:

(1)     knowingly presents, or causes to be presented, directly or indirectly, to an
        officer or employee of the government a false or fraudulent claim for
        payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, directly or
        indirectly, a false record or statement to get a false or fraudulent claim
        paid or approved; or

(3)     conspires to defraud the government by getting a false or fraudulent claim

Page 84 of 148

allowed or paid.

312.    Defendant Healogics violated 6 Del. C. § 1201(a)(1), (2) and (3) by conspiring to and knowingly causing false claims to be made, used and presented to the state of Delaware, by knowingly making, using, or causing to made or used false records to get said false claims paid.

313.    The state of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of the Defendant's conduct, paid the claims submitted by Defendant Healogics and third party payers in connection therewith.

314.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Delaware in connection with Defendant Healogics' conduct.  Compliance with applicable Delaware statutes and regulations was also an express condition of payment of claims submitted to the state of Delaware.

315.    Had the state of Delaware known that false representations and false records were made regarding the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

316.    As a result of Defendant Healogics' violations of 6 Del. C. § 1201(a), the state of Delaware has been damaged in an amount far in excess of one million dollars, exclusive of interest.

317.    Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of themselves and the state of Delaware.

318.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Delaware in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Delaware:

    (1)     Three times the amount of actual damages which the state of Delaware has sustained as a result of Defendant Healogics' conduct;

    (2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics caused to be presented to the state of Delaware;

    (3)     Prejudgment interest; and

    (4)     All costs incurred in bringing this action.

    (5) Such further relief as this Court deems equitable and just.

To Relators:

    (1)     The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;

    (2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3)     An award of reasonable attorneys' fees and costs; and

    (4)     Such further relief as this Court deems equitable and just.

**Count IX**
**Florida False Claims Act**
**Fla. Stat. §§ 68.081 *et seq*.**

319.     Plaintiffs allege and incorporate by reference paragraphs 1–264 of this Second Amended Complaint as though fully set forth herein.

320.     This is a qui tam action brought by Relators on behalf of the state of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 et seq.   Fla. Stat. §§ 68.082(2) provides liability for any person who:

(a)     knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c)     conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

321.     Defendant Healogics conspired to, and did in fact violate Fla. Stat. § 68.082(2)(a), (b) and (c) by knowingly causing false claims to be made, used and presented to the state of Florida, by its deliberate and systematic violation of federal and state laws, and by knowingly making using or causing to me made or used false records or statements to get said false claims paid.

322.     The state of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third parties in connection therewith.

323.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Florida in connection with Defendant Healogics' conduct.   Compliance with applicable Florida statutes and regulations was also an express condition of payment of claims submitted to the state of Florida.

324.     Had the state of Florida known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

325.    As a result of Defendant Healogics' violations of Fla. Stat. § 68.082(2), the state of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

326.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of themselves and the state of Florida.

327.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Florida in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Florida:

(1)    Three times the amount of actual damages which the state of Florida has sustained as a result of Defendant Healogics' conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics caused to be presented to the state of Florida

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1)    The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action,

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

**Count X**
**Georgia False Medicaid Claims Act**
**O.C.G.A. §§ 49-4-168 (2008)** *et seq.*

328.    Plaintiffs allege and incorporate by reference paragraphs 1–264 of this Second Amended Complaint as though fully set forth herein.

329.    This is a qui tam action brought by Relators on behalf of the state of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 (2008) *et seq*.

330.    O.C.G.A. § 49-4-168.1(a) provides liability for any person who:

(1)    knowingly presents, or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3)    conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

331.    Defendant Healogics violated O.C.G.A. § 49-4-168.1(a)(1), (2) and (3) by engaging in the conduct described herein and knowingly caused false claims to be made, used and presented to the state of Georgia by its deliberate and systematic violation of federal and state laws.  Further, Defendant Healogics knowingly made, used, or caused to be made or used false records or statements in order to get said false claims paid by the state of Georgia.  The Defendant acted together with its partner hospitals in a conspiracy to defraud the Georgia Medicaid program.

332.    The state of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant and third parties in connection therewith.

333.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Georgia in connection with Defendant Healogics' conduct.

334.    Had the state of Georgia known that false representations were made, or false records used, in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third party payers in connection with that conduct.

335.    As a result of Defendant Healogics' violations of O.C.G.A. § 49-4-168, the state of Georgia has been damaged in excess of one million dollars exclusive of interest.

336.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to O.C.G.A. § 49-4-168 on behalf of themselves and the state of Georgia.

337.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Georgia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Georgia:

(1)     Three times the amount of actual damages which the state of Georgia has sustained as a result of Defendant Healogics' conduct;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each

false claim Defendant Healogics caused to be presented to the state of Georgia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

(5)     Such further relief as this Court deems equitable and just.

To Relators:

(1)     The maximum amount allowed pursuant to O.C.G.A. § 49-4-168 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Count XI**
**Hawaii False Claims Act**
**Haw. Rev. Stat. §§ 661-21 *et seq.***

338.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

339.    This is a qui tam action brought by Relators on behalf of the state of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 et seq.

340.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who:

(1)     knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3)     conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

(8)     is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

341.   Defendant Healogics conspired to, and did in fact, violate Haw. Rev. Stat. §661-21(a)(1),(2),(3), and (8) by knowingly causing false claims to be made, used and presented to the state of Hawaii by its deliberate and systematic violation of federal and state laws, and by knowingly making, using, or causing to be made or used, false records or statements to get said false claims paid by the state and failed to disclose the falsity of their claims, or return amounts paid upon said false claims within reasonable time after discovery of the false claim.

342.   The state of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant and third parties in connection therewith.

343.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Hawaii in connection with Defendant Healogics' conduct.

344.   Had the state of Hawaii known that false representations were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

345.   As a result of Defendant Healogics' violations of Haw. Rev. Stat. § 661-21(a) the state of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

346.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of themselves and the state of Hawaii.

347.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Hawaii:

(1)    Three times the amount of actual damages which the state of Hawaii has sustained as a result of Defendant Healogics' illegal conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics caused to be presented to the state of Hawaii;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1)    The maximum amount allowed pursuant to Haw. Rev. Stat. §661-27 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

**Count XII**
**Illinois Whistleblower Reward and Protection Act**
**740 ILCS 175 *et seq*.**

348.     Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

349.     This is a qui tam action brought by Relators on behalf of the state of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 et seq.

350.     740 ILCS 175/3(a) provides liability for any person who:

(1)     Knowingly presents, or causes to be presented, to an officer or employee of the state of a member of the Guard a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3)     Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

351.     Defendant Healogics conspired to, and did in fact, violate 740 ILCS 175/3(a) by knowingly causing false claims and false records to be made, used and presented to the state of Illinois.

352.     The state of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant and third parties in connection therewith.

353.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Illinois in connection with Defendant Healogics' conduct.

354.    Had the state of Illinois known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

355.    As a result of Defendant Healogics' violations of 740 ILCS 175/3(a), the state of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

356.    Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the state of Illinois.

357.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Illinois in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Illinois:

(1)    Three times the amount of actual damages which the state of Illinois has sustained as a result of Defendant Healogics' conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics caused to be presented to the state of Illinois;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5)    Such further relief as this Court deems equitable and just.

To Relators:

(1)    The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Count XIII**
**Indiana False Claims and Whistleblower Protection Act**
**Indiana §§ Code 5-11-5.5 *et seq*.**

358.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

359.    This is a qui tam action brought by Relators on behalf of the state of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code §§ 5-11-5.5 *et seq*.

360.    Sec. 2.(b) of the Act provides liability for any person who knowingly or intentionally:

(1)     presents a false claim to the state for payment or approval;

(2)     makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

(6)     makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7)     conspires with another person to perform an act described in subdivisions (1) through (6); or

(8)     causes or induces another person to perform an act described in subdivisions (1) through (6).

361.    Defendant Healogics conspired to, and did in fact, violate Indiana Code §§ 5-11-5.5 *et seq*. by knowingly causing false claims and false records to be made, used and presented to the state of Indiana and failed to disclose the falsity of their claims, or return amounts paid upon said false claims within reasonable time after discovery of the false claim.

362.    The state of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third party payers in connection therewith.

363.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Indiana in connection with Defendant Healogics'.

364.    Had the state of Indiana known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics' and third parties in connection with that conduct.

365.    As a result of Defendant Healogics' violations of Indiana Code §§ 5-11-5.5 et seq., the state of Indiana has been damaged in excess of one million dollars, exclusive of interest.

366.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to Indiana Code §§ 5-11-5.5 et seq. on behalf of themselves and the state of Indiana.

367.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Indiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Indiana:

(1)    Three times the amount of actual damages which the state of Indiana has sustained as a result of Defendant Healogics';

(2)    A civil penalty of not less than $5,000 for each false claim which

Defendant Healogics caused to be presented to the state of Indiana;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

(5)     Such further relief as this Court deems equitable and just.

To Relators:

(1)     The maximum amount allowed pursuant to Indiana Code §§ 5-11-5.5 et seq. and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Count XIV**
**Iowa False Claims Act**
**ICA §§ 685.1 *et seq.***

368.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

369.    This is a qui tam action brought by Relators on behalf of the state of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, ICA §§ 685.1 *et seq.*

370.    The Iowa False Claims Act provides liability for any person who:

a.      Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

b.      Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

c.      Conspires to commit a violation of paragraph "a", "b", "d", "e", "f", or "g".

371.    Defendant Healogics, by and through their partner hospitals conspired to, and did in fact, violate the Iowa False Claims Act, ICA §§ 685.1 *et seq*. by knowingly causing false claims and false records to be made, used and presented to the state of Iowa.

372.    The state of Iowa, by and through the Iowa Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third parties in connection therewith.

373.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Indiana in connection with Defendant Healogics' conduct.

374.    Had the state of Iowa known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics' and third parties in connection with that conduct.

375.    As a result of Defendant Healogics' violations of the Iowa False Claims Act, ICA §§ 685.1 *et seq*. the state of Iowa has been damaged in excess of one million dollars, exclusive of interest.

376.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to the Iowa False Claims Act, ICA §§ 685.1 *et seq*. on behalf of themselves and the state of Iowa.

377.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Iowa in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following relief to

the following parties and against Defendant Healogics:

To the state of Iowa:

    (1)    Three times the amount of actual damages which the state of Iowa has sustained as a result of Defendant Healogics' conduct;

    (2)    A civil penalty of not less than $5,500 or more than $11,000 for each false claim which Defendant Healogics caused to be presented to the state of Iowa;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

    (5)    Such further relief as this Court deems equitable and just.

To Relators:

    (1)    The maximum amount allowed pursuant to the Iowa False Claims Act, ICA §§ 685.1 *et seq.* and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## Count XV
### Louisiana Medical Assistance Programs Integrity Law (MAPIL)
### La. Rev. Stat. Ann. §§ 437.1 *et seq.*

378.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

379.    This is a qui tam action brought by Relators on behalf of the state of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 437.1 *et seq.*

380.    La. Rev. Stat. Ann. § 438.3 provides:

A.   No person shall knowingly present or cause to be presented a false or fraudulent claim.

B.   No person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

C.   No person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs.

D.   No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

E.(1)   No person shall knowingly submit a claim for goods, services, or supplies which were medically unnecessary or which were of substandard quality or quantity.

381.   Through the conduct alleged herein, Defendant Healogics conspired to and did in fact, violate La. Rev. Stat. Ann. § 438.3 by knowingly causing false claims and false records to be made, used and presented to the state of Louisiana, for the purposes of obtaining payment and concealing an obligation to pay money back to the medical assistance programs.  In addition, Defendant Healogics did knowingly submit claims for services which were medically unnecessary.

382.   The state of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third parties in connection therewith.

383.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Louisiana in connection with Defendant Healogics' conduct.

384.    Had the state of Louisiana known that false representations and false records were made with respect to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

385.    As a result of Defendant Healogics' violations of La. Rev. Stat. Ann. § 438.3 the state of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

386.    Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. §439.1(A) on behalf of themselves and the state of Louisiana.

387.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Louisiana:

(1)    Three times the amount of actual damages which the state of Louisiana has sustained as a result of Defendant Healogics' conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant Healogics caused to be presented to the state of Louisiana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5)    Such further relief as this Court deems equitable and just.

To Relators:

(1)    The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A)

and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

### Count XVI
### Michigan Medicaid False Claims Act
### MI ST Ch. 400.603 *et seq.*

388.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

389.    This is a qui tam action brought by Relators on behalf of the state of Michigan to recover treble damages and civil penalties under the Michigan Medicaid False Claims Act. MI ST Ch. 400.603 *et seq.*

390.    Section 3 of Chapter 400.603 provides liability in pertinent part as follows:

(1)     A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits;

(2)     A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit…

391.    Defendant Healogics conspired to, and did in fact, violate, MI ST Ch. 400.603 et seq. by knowingly causing false claims and false records to be made, used and presented to the state of Michigan as alleged herein.

392.    The state of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third parties in connection therewith.

393.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Michigan in connection with Defendant Healogics' conduct.

394.     Had the state of Michigan known that false representations were made or false records created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

395.     As a result of Defendant Healogics' violations of MI ST Ch. 400.603 *et seq.* the state of Michigan has been damaged in an amount in excess of one million dollars, exclusive of interest.

396.     Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to MI ST Ch. 400.603 *et seq.* on behalf of themselves and the state of Michigan.

397.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Michigan in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Michigan:

(1)     Three times the amount of actual damages which the state of Michigan has sustained as a result of Defendant Healogics' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics caused to be presented to the state of Michigan;

(3)     Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5)    Such further relief as this Court deems equitable and just.

To Relators:

(1)    The maximum amount allowed pursuant to MI ST Ch. 400.603 et seq. and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

**Count XVII**
**Minnesota False Claims Act**
**Minn. Stat. §§ 15.C01** *et seq.*

398.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

*399.*    This is a qui tam action brought by Relators on behalf of the state of Minnesota for treble damages and penalties under the Minnesota False Claims Act, Minn. Stat. §§ 15.C01 *et seq*.

400.    The Minnesota False Claims Act § 15C.02 provides liability for any person who:

(1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)    knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)    knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7);

401.    Defendant Healogics conspired to, and did in fact, violate the Minnesota False Claims Act by knowingly causing false claims and false records to be made, used and presented to the state of Minnesota vis-à-vis the allegations herein.

402.    The state of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third parties in connection therewith.

403.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Minnesota in connection with Defendant Healogics' conduct.

404.    Had the state of Minnesota known that false representations were made and false records created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

405.    As a result of Defendant Healogics' violations of the Minnesota False Claims Act, the state of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

406.    Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to the Minnesota False Claims Act on behalf of themselves and the state of Minnesota.

407.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Minnesota:

    (1)    Three times the amount of actual damages which the state of Minnesota has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the state of Minnesota;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

    (5)    Such further relief as this Court deems equitable and just.

To Relators:

    (1)    The maximum amount allowed pursuant to the Minnesota False Claims Act and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

### Count XVIII
### Montana False Claims Act
### Mont. Code Ann. § 17-8-403(1)(A)-(B)

408.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

409.    This is a claim for treble damages and penalties under the Montana False Claims Act.

410.    By virtue of the acts described above, Defendant Healogics knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana state government to approve and pay such false and fraudulent claims.

411.    Each claim submitted as a result of Defendant Healogics' illegal conduct represents a false or fraudulent record or statement.  As such, each claim for reimbursement for wound treatment submitted to Montana represents a false or fraudulent claim for payment.

412.    Relators cannot at this time identify all of the false claims for payment that were caused by Defendant Healogics' in Montana.  The false claims were presented by separate entities, across the United States, over many years. Relators have no control over or dealings with such entities and have no access to the records in the Defendants' possession.

413.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Montana in connection with Defendant Healogics' conduct.

414.    Had the state of Montana known that false representations were made or false records created with respect to the above conduct, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

415.    The Montana state government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant Healogics, paid and continues to pay the claims that would not be paid but for Defendant's conduct.

416.    By reason of the Defendant's acts, the state of Montana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

417.    The state of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant Healogics.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Montana:

(1)    Three times the amount of actual damages which the state of Montana has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the state of Montana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5)    Such further relief as this Court deems equitable and just.

To Relators:

(1)    The maximum amount allowed pursuant to Montana Code Ann. § 17-8-403(1)(A)-(B) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

**Count XIX**
**Nevada False Claims Act**
**N.R.S. §§ 357.010, *et seq*.**

418.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

419.     This is a qui tam action brought by Relators on behalf of the state of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. §§ 357.010, *et seq*.

420.     N.R.S. § 357.040(1) provides liability for any person who:

    (a)     Knowingly presents or causes to be presented a false claim for payment or approval;

    (b)     Knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

    (c)     Conspires to defraud by obtaining allowance or payment of a false claim;

    (h)     Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

421.     By virtue of the conduct alleged herein, Defendant Healogics conspired to, and did in fact, violate N.R.S. § 357.040(1) by knowingly causing false claims and false records to be made, used and presented to the state of Nevada.

422.     The state of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third parties in connection therewith.

423.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Nevada in connection with Defendant's conduct.

424.     Had the state of Nevada known that false representations were made and false records created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

425.     As a result of Defendant Healogics' violations of N.R.S. § 357.040(1) the state of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

426.     Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of themselves and the state of Nevada.

427.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Nevada in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Nevada:

(1)     Three times the amount of actual damages which the state of Nevada has sustained as a result of Defendant Healogics' conduct;

(2)     A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendant Healogics caused to be presented to the state of Nevada;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

(5)     Such further relief as this Court deems equitable and just.

To Relators:

(1)     The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Count XX**
**New Jersey False Claims Act**
**N.J. Stat. §§ 2A:32C-1 (2008)** *et seq.*

428.    Relators allege and incorporate by reference paragraphs 1–264 of this Second Amended Complaint as though fully set forth herein.

429.    This is a qui tam action brought by Relators on behalf of the state of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 (2008) *et seq.*

430.    N.J. Stat. § 2A:32C-1 provides liability for any person who:

    (1)    knowingly presents, or causes to be presented, to an officer or employee, officer or agent of the state or to any contractor, grantee, or other recipient of state funds a false or fraudulent claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

    (3)    conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

431.    By virtue of conduct alleged herein, Defendant Healogics conspired to, and did in fact, violate N.J. Stat. § 2A:32C-1 by knowingly causing false claims and false records to be made, used and presented to the state of New Jersey.

432.    The state of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third parties in connection therewith.

433.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the state of New Jersey in connection with Defendant Healogics' conduct.

434.    Had the state of New Jersey known that false representations were and false records were created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

435.    As a result of Defendant Healogics' violations of N.J. Stat. § 2A:32C-1, the state of New Jersey has been damaged in an amount in excess one million dollars, exclusive of interest.

436.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who have brought this action pursuant to N.J. Stat. §§ 2A:32C-1 *et seq*. on behalf of themselves and the state of New Jersey.

437.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant:

To the state of New Jersey:

(1)    Three times the amount of actual damages which the state of New Jersey has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics caused to be presented to the state of New Jersey;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5)    Such further relief as this Court deems equitable and just.

To Relators:

    (1)    The maximum amount allowed pursuant to N.J. Stat. § 2A:32C-1 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

### Count XXI
### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann §§ 27-14-1 *et seq.*

438.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

439.    This is a qui tam action brought by Relators on behalf of the state of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann §§ 27-14-1 *et seq.* Section 3 provides liability in pertinent part as follows:

A person shall not:

    (1)    knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee, or other recipient of state funds a false or fraudulent claim for payment or approval;

    (2)    knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

    (3)    conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim...

440.    By of the conduct alleged herein, Defendant Healogics conspired to, and did in fact, violate, N.M. Stat. Ann §§ 27-14-1 *et seq.* by knowingly causing false claims and false records to be made, used and presented to the state of New Mexico.

441.     The state of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third parties in connection therewith.

442.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of New Mexico in connection with Defendant Healogics' conduct.

443.     Had the state of New Mexico known that false representations were made or false records created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

444.     As a result of Defendant Healogics' violations of N.M. Stat. Ann §§ 27-14-1 *et seq.* the state of New Mexico has been damaged in an amount in excess of one million dollars, exclusive of interest.

445.     Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to N.M. Stat. Ann §§ 27-14-1 *et seq.* on behalf of themselves and the state of New Mexico.

446.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of New Mexico:

(1)     Three times the amount of actual damages which the state of New Mexico has sustained as a result of Defendant's conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics caused to be presented to the state of New Mexico;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1)   The maximum amount allowed pursuant to N.M. Stat. Ann §§ 27-14-1 *et seq.* and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

**Count XXII**
**New York False Claims Act**
**2007 N.Y. Laws 58, Section 39, Article XIII Section 189**
**and N.Y. State Fin. Law §§ 188 *et seq.***

447.   Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

448.   This is a qui tam action brought by Relators on behalf of the state of New York to recover treble damages and civil penalties under the New York False Claims Act, 2007 N.Y. Laws 58, Section 39, Article XIII Section 189 and later as amended at N.Y. State Fin. Law §§ 188 *et seq.*

449.   The New York False Claims Act provides liability for any person who:

1(a)   knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for payment or approval;

1(b)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government;

1(c)   conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

450.   By virtue of the conduct alleged here, Defendant Healogics conspired to, and did in fact, violate New York's False Claims Act by knowingly causing false claims and false records to be made, used and presented to the state of New York.

451.   The state of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third parties in connection therewith.

452.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of New York in connection with Defendant Healogics' conduct.

453.   Had the state of New York known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

454.   As a result of Defendant Healogics' violations of New York's False Claims Act, the state of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

455.   Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to 2007 N.Y. Laws 58, Section 39, Article XIII and N.Y. State Fin. Law §§ 188 *et seq*., on behalf of themselves and the state of New York.

456.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of New York in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of New York:

(1)    Three times the amount of actual damages which the state of New York has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim Defendant caused to be presented to the state of New York;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5)    Such further relief as this Court deems equitable and just.

To Relators:

(1)    The maximum amount allowed pursuant to 2007 N.Y. Laws 58, Section 39, Article XIII, and N.Y. State Fin. Law §§188 et seq., and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

### Count XXIII
### North Carolina False Claims Act
### N.C. Gen. Stat. §§ 1-605 *et seq.*

457.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

458.    This is a qui tam action brought by Relators on behalf of the state of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq*.

459.    The North Carolina False Claims Act, § 1-607 provides liability for any person who:

(1)    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3)    Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

460.    By virtue of conduct alleged herein, Defendant Healogics conspired to, and did in fact, violate § 1-607 by knowingly causing false claims and false records to be made, used and presented to the state of North Carolina.

461.    The state of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third parties in connection therewith.

462.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of North Carolina in connection with Defendant Healogics' conduct.    Compliance with applicable North Carolina statutes and regulations was also an express condition of payment of claims submitted to the state of North Carolina.

463.    Had the state of North Carolina known that false representations were made or false records created in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

464.    As a result of Defendant Healogics' violations of the North Carolina False Claims Act, the state of North Carolina has been damaged in an amount in excess of one million dollars, exclusive of interest.

465.    Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to the North Carolina False Claims Act on behalf of themselves and the state of North Carolina.

466.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of North Carolina:

(1)    Three times the amount of actual damages which the state of North Carolina has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the state of North Carolina

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5)    Such further relief as this Court deems equitable and just.

To Relators:

(1)    The maximum amount allowed pursuant to the North Carolina False

Claims Act and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action,

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Count XXIV**
**Oklahoma Medicaid False Claims Act**
**63 Okl. St. §§ 5053 *et seq.***

467.     Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

468.     This is a qui tam action brought by Relators on behalf of the state of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act 63 Okl. St. §§ 5053 (2008) *et seq*.

469.     63 Okl. St. § 5053.1 (2)(B) provides liability for any person who:

(1)     Knowingly presents, or causes to be presented, to an officer or employee of the state of Oklahoma, a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3)     Conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

470.     By virtue of the alleged conduct, Defendant Healogics conspired to, and did in fact, violate 63 Okl. St. § 5053.1 by knowingly causing false claims and false records to be made, used and presented to the state of Oklahoma.

471.     The state of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant Healogics and third parties in connection therewith.

472.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Oklahoma in connection with Defendant Healogics' conduct.

473.     Had the state of Oklahoma known that false representations were made or false records created with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

474.     As a result of Defendant Healogics' violations of 63 Okl. St. §§ 5053.1 *et seq*., the state of Oklahoma has been damaged in an amount far in excess of one million dollars, exclusive of interest.

475.     Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to 63 Okl. St. §§ 5053.1 *et seq*. on behalf of themselves and the state of Oklahoma.

476.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Oklahoma:

(1)     Three times the amount of actual damages which the state of Oklahoma has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the state of Oklahoma;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5)    Such further relief as this Court deems equitable and just.

To Relators:

(1)    The maximum amount allowed pursuant to 63 Okl. St. §§ 5053.1 *et seq.* and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

**Count XXV**
**Rhode Island State False Claims Act**
**R.I. Gen. Laws §§ 9-1.1-1 *et seq.***

477.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

478.    This is a qui tam action brought by Relators on behalf of the state of Rhode Island to recover treble damages and civil penalties under the Rhode Island state False Claims Act R.I. Gen. Laws §§ 9-1.1-1 (2008) *et seq*.

479.    R.I. Gen. Laws § 9-1.1-1 provides liability for any person who:

(1)    Knowingly presents, or causes to be presented, to an officer or employee of the state or a member of the Guard a false or fraudulent claim for payment or approval;

(2)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3)   Conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

480.   Defendant Healogics conspired to, and did in fact, violate R.I. Gen. Laws § 9-1.1-1 by knowingly causing false claims and false records to be made, used and presented to the state of Rhode Island by its deliberate and systematic violation of federal and state laws.

481.   The state of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims submitted by Defendant and third parties in connection therewith.

482.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Rhode Island in connection with Defendant Healogics' conduct.

483.   Had the state of Rhode Island known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

484.   As a result of Defendant Healogics' violations of R.I. Gen. Laws § 9-1.1-1, the state of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

485.   Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to R.I. Gen. Laws § 9-1.1-1 et seq. on behalf of themselves and the state of Rhode Island.

486.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Rhode Island:

(1)     Three times the amount of actual damages which the state of Rhode Island has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the state of Rhode Island;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

(5)     Such further relief as this Court deems equitable and just.

To Relators:

(1)     The maximum amount allowed pursuant to R.I. Gen. Laws § 9-1.1-1 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Count XXVI**
**Tennessee False Claims Act, T.C.A §§ 4-18-101 *et seq*.,**
**and**
**Tennessee Medicaid False Claims Act, T.C.A. §§ 71-5-181 *et seq*.**

487.     Relators allege and incorporate by reference paragraphs 1–264 of this Second Amended Complaint as though fully set forth herein.

*488.*   This is a qui tam action brought by Relators on behalf of the state of Tennessee to recover treble damages and civil penalties under the Tennessee False Claims Act, T.C.A §§ 4-18-101 *et seq*., and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq*.

489.   The Tennessee False Claims Act § 4-18-103 provides liability for any person who commits any of the following acts:

(1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision;

(9) Knowingly makes, uses, or causes to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or any political subdivision.

490.   The Tennessee Medicaid False Claims Act, § 71-5-182(a)(1) provides liability for any person who:

(A)   presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

(B)   makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid

for or approved by the state knowing such record or statement is false;

(C) conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

491. Defendant conspired to, and did in fact, violate the Tennessee False Claims Act, T.C.A §§ 4-18-101 *et seq.*, and the Tennessee False Medicaid Claims Act T.C.A. § 71-5-1 82(a)(1) by knowingly causing false claims and false records to be made, used and presented to the state of Tennessee.

492. The state of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by Defendant and third parties in connection therewith.

493. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Tennessee in connection with Defendant Healogics' conduct.

494. Had the state of Tennessee known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

495. As a result of Defendant's violations of T.C.A §§ 4-18-103 (1),(2),(3),(7) and (9), as well as T.C.A. § 71-5-182(a)(1)(A),(B) and (C), the state of Tennessee has been damaged in an amount far in excess of one million dollars, exclusive of interest.

496. Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to T.C.A

§§ 4-18-101 *et seq.*, and T.C.A.. § 71-5-183(a)(1) on behalf of themselves and the state of Tennessee.

497.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant:

To the state of Tennessee:

    (1)     Three times the amount of actual damages which the state of Tennessee has sustained as a result of Defendant's conduct;

    (2)     A civil penalty of not less than $5,000 and not more than $25,000 for each false claim Defendant caused to be presented to the state of Tennessee;

    (3)     Prejudgment interest; and

    (4)     All costs incurred in bringing this action.

    (5)     Such further relief as this Court deems equitable and just.

To Relators:

    (1)     The maximum amount allowed pursuant to the Tennessee False Claims Act, T.C.A §§ 4-18-101 *et seq.*, and the Tennessee False Medicaid Claims Act T.C.A. § 71-5-183(c) and/or any other applicable provision of law;

    (2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)     An award of reasonable attorneys' fees and costs; and

    (4)     Such further relief as this Court deems equitable and just.

**Count XXVII**
**Texas Medicaid Fraud Prevention Act**
**V.T.C.A. Hum. Res. Code §§ 36.001 *et seq.***

498. Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

499. This is a qui tam action brought by Relators on behalf of the state of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code §§ 36.001 *et seq*.

500. V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who:

(1) Knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

    (a) on an application for a contract, benefit, or payment under the Medicaid program; or

    (b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program;

(2) Knowingly or intentionally concealing or failing to disclose an event:

    (A) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of;

        (i) the person; or

        (ii) another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and

    (B) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

(4) Knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

    (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) Knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under

the Medicaid program.

501.    Defendant Healogics conspired to, and did in fact, violate V.T.C.A. Hum. Res. Code § 36.002 by knowingly causing false claims and false records to be made, used and presented to the state of Texas and by its deliberate and systematic violation of federal and state laws.

502.    The state of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendant Healogics conduct, paid the claims submitted by Defendant and third parties in connection therewith.

503.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Texas in connection with Defendant Healogics' conduct.

504.    Had the state of Texas known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

505.    As a result of Defendant Healogics' violations of V.T.C.A. Hum. Res. Code § 36.002, the state of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

506.    Defendant Healogics did not, within 30 days after they first obtained information as to such violations, furnish such information to officials of the state responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the state regarding the claims for reimbursement at issue.

507.     Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of themselves and the state of Texas.

508.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Texas in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

To the state of Texas:

(1) Two times the amount of actual damages which the state of Texas has sustained as a result of Defendant's conduct;

(2) A civil penalty of not less than $5,500 nor more than $11,000 pursuant to V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim which Defendant Healogics caused to be presented to the state of Texas;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

(5) Such further relief as this Court deems equitable and just.

To Relators:

(1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code §36.110, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**Count XXVIII**
**Washington State Medicaid Fraud False Claims Act**

509.     Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

510.     This is a qui tam action brought by Relators on behalf of the state of Washington for treble damages and penalties under Washington State Medicaid Fraud False Claims Act, RCW 74.66.020, which provides liability for any person who:

> (a)     Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (b)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (c)     Conspires to commit one or more of the violations in this subsection (1)

511.     Defendant Healogics conspired to, and did in fact, violate the Washington State Medicaid Fraud False Claims Act by knowingly causing false claims and false records to be made, used and presented to the state of Washington.

512.     The state of Washington, by and through the Washington Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by Defendant and third parties in connection therewith.

513.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Washington in connection with Defendant's conduct.

514.     Had the state of Washington known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

515.    As a result of Defendant's violations of the Washington State Medicaid Fraud False Claims Act, the state of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

516.    Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to the Washington State Medicaid Fraud False Claims Act on behalf of themselves and the state of Washington.

517.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Washington in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant:

To the state of Washington:

(1)    Three times the amount of actual damages which the state of Washington has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the state of Washington;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

(5)    Such further relief as this Court deems equitable and just.

To Relators:

(1)    The maximum amount allowed pursuant to the Washington State Medicaid Fraud False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in

connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Count XXIX**
**Wisconsin False Claims for Medical Assistance Law**
**Wis. Stat. § 20.931 et seq.**

518.    Relators allege and incorporate by reference paragraphs 1–267 of this Second

Amended Complaint as though fully set forth herein.

519.    This is a qui tam action brought by Relators on behalf of the state of Wisconsin to

recover treble damages and civil penalties under the Wisconsin False Claims for Medical

Assistance Law, Wis. Stat. § 20.931 et seq.

520.    Wis. Stat. § 20.931(2) provides liability for any person who:

(1)     conspires to defraud this State by obtaining a false allowance or payment
        of claim for medical assistance, or by knowingly making or using, or
        causing to be made or used, a false record or statement to conceal, avoid,
        or decrease an obligation to pay or transmit money or property to the
        Medical Assistance Program;

(2)     knowingly makes, uses or causes to be made or used a false record or
        statement to conceal, avoid, or decrease any obligation to pay or transmit
        money or property to the Medical Assistance Program.

521.    Defendant Healogics conspired to, and did in fact, violate Wis. Stat. § 20.931 et

seq. by knowingly causing false claims and false records to be made, used and presented to the

state of Wisconsin.

522.    The state of Wisconsin, by and through the Wisconsin Medicaid program and

other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the claims

submitted by Defendant Healogics and third parties in connection therewith.

523.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the state of Wisconsin in connection with Defendant Healogics' conduct.

524.    Had the state of Wisconsin known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct.

525.    As a result of Defendant Healogics' violations of Wis. Stat. § 20.931 et seq., the state of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

526.    Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to Wis. Stat. § 20.931 et seq. on behalf of themselves and the state of Wisconsin.

527.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Wisconsin in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant Healogics:

 To the state of Wisconsin:

(1)    Three times the amount of actual damages which the state of Wisconsin has sustained as a result of Defendant Healogics' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant Healogics caused to be presented to the state of Wisconsin;

(3)    Prejudgment interest; and

(4)     All costs incurred in bringing this action.

(5)     Such further relief as this Court deems equitable and just.

To Relators:

(1)     The maximum amount allowed pursuant to Wis. Stat. § 20.931 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

### Count XXX
### Massachusetts False Claims Act
### Mass. Gen. Laws Ann. Chap. 12 §§ 5(A) *et seq.*

528.    Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

529.    This is a qui tam action brought by Relators on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap. 12 §§ 5(A) *et seq.*

530.    Mass. Gen. Laws Ann. Chap. 12 § 5B provides liability for any person who:

(1)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth; or

(3)     conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(9)     is a beneficiary of an inadvertent submission of a false claim to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the

commonwealth or political subdivision within a reasonable time after discovery of the false claim.

531.    Defendant conspired to, and did in fact, violate Mass. Gen. Laws Ann. Chap. 12 § 5B by knowingly causing false claims and false records to be made, used and presented to the Commonwealth of Massachusetts.

532.    The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by Defendant and third parties in connection therewith.

533.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendant's conduct.

534.    Had the Commonwealth of Massachusetts known that false representations and false records were made with regard to the above conduct, it would not have paid the claims submitted by Defendant and third parties in connection with that conduct.

535.    As a result of Defendant Healogics' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

536.    Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5(c)(2) on behalf of themselves and the Commonwealth of Massachusetts.

537.     This Court is requested to accept pendant jurisdiction of this related state claim as

it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to

the following parties and against Defendant Healogics:

To the Commonwealth of Massachusetts:

(1)     Three times the amount of actual damages which the Commonwealth of
Massachusetts has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each
false claim which Defendant caused to be presented to the Commonwealth
of Massachusetts;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

(5)     Such further relief as this Court deems equitable and just.

To Relators:

(1)     The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap.
12, §5F and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in
connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Count XXXI**
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. §§ 8.01-216.1 *et seq*.**

538.     Relators allege and incorporate by reference paragraphs 1–263 of this Second

Amended Complaint as though fully set forth herein.

539.    This is a qui tam action brought by Relators on behalf of the Commonwealth of

Virginia for treble damages and penalties under Virginia Fraud Against Tax Payers Act. Sec.

8.01-216.3a, which provides liability for any person who:

(1)    knowingly presents, or causes to be presented, a false or fraudulent claim
for payment or approval;

(2)    knowingly makes, uses, or causes to be made or used, a false record or
statement to obtain payment or approval of a claim by the commonwealth;
or

(3)    conspires to defraud the commonwealth or any political subdivision
thereof through the allowance or payment of a fraudulent claim;

(9)    is a beneficiary of an inadvertent submission of a false claim to the
common wealth or political subdivision thereof, subsequently discovers
the falsity of the claim, and fails to disclose the false claim to the
commonwealth or political subdivision within a reasonable time after
discovery of the false claim.

540.    Defendant conspired to, and did in fact, violate the Virginia Fraud Against Tax

Payers Act §8.01-216.3a by knowingly causing false claims and false records to be made, used

and presented to the Commonwealth of Virginia.

541.    The Commonwealth of Virginia, by and through the Virginia Medicaid program

and other state healthcare programs, and unaware of Defendant Healogics' conduct, paid the

claims submitted by Defendant Healogics and third parties in connection therewith.

542.    Compliance with applicable Medicare, Medicaid and the various other federal and

state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the Commonwealth of Virginia in connection with

Defendant Healogics' conduct.

543.     Had the Commonwealth of Virginia known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant Healogics and third parties in connection with that conduct

544.     As a result of Defendant's violations of Virginia Fraud Against Tax Payers Act §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount in excess of one million dollars, exclusive of interest.

545.     Relators are private citizens with direct and independent knowledge of the allegations of this Second Amended Complaint, who have brought this action pursuant to Virginia Fraud Against Tax Payers Act §8.01-216.3 on behalf of themselves and the Commonwealth of Virginia.

546.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant:

To the Commonwealth of Virginia:

(1)     Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the Commonwealth of Virginia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

(5)     Such further relief as this Court deems equitable and just.

To Relators:

(1)     The maximum amount allowed pursuant to Va. Code Ann. §§ 8.01-216.7 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**Count XXXII**
**District of Columbia False Claims Act**
**D.C. Code §§ 2-381.01 *et seq.***

547.     Relators allege and incorporate by reference paragraphs 1–263 of this Second Amended Complaint as though fully set forth herein.

548.     This is a qui tam action brought by Relators and the District of Columbia to recover treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code §§ 2-381.01 *et seq.*

549.     D.C. Code § 2-381.02(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(7) Conspires to commit a violation of paragraph (1), (2), (3), (4), (5), or (6) of this subsection;

(8) Is a beneficiary of an inadvertent submission of a false or fraudulent claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false or fraudulent claim to the District;

550.     Defendant conspired to, and did in fact, violate D.C. Code § 2-381.02(a) by knowingly causing thousands of false claims to be made, used and presented to the District of Columbia as well as making, using or causing to made or used false records to get said claims

approved or paid, as well as by failing to disclose the false claims or returning amounts owed after discovering the falsity.

551.    The District of Columbia, by and through the District of Columbia Medicaid program and other state healthcare programs, and unaware of Defendant's illegal conduct, paid the claims submitted by Defendant and third parties in connection therewith.

552.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Defendant's illegal conduct.

553.    Had the District of Columbia known that false representations and false records were made in regard to the above conduct, it would not have paid the claims submitted by Defendant and third parties in connection with that conduct.

554.    As a result of Defendant's violations of D.C. Code § 2-381.02(a) the District of Columbia has been damaged in an amount far in excess one million dollars, exclusive of interest.

555.    Relators are private citizens with direct and independent knowledge of the allegations of this Amended Complaint, who has brought this action pursuant to D.C. Code § 2-381.01 et seq. on behalf of themselves and the District of Columbia.

556.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following relief to the following parties and against Defendant:

To the District of Columbia:

(1)     Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's illegal conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the District of Columbia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

(5)     Such further relief as this Court deems equitable and just.

To Relators:

(1)     The maximum amount allowed pursuant to D.C. Code § 2-381.01 et seq.and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## DEMAND FOR JURY TRIAL

557.     Pursuant to Rule 38 of Federal Rules of Civil Procedure, Plaintiffs/Relators hereby demand a trial by jury.

Dated this 11th day of January, 2015.

Respectfully submitted,

By:  */s/ John A. Yanchunis*
John Yanchunis (FBN 324681)
jyanchunis@forthepeople.com
James D. Young (FBN 567507)
jyoung@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida  33602
(813) 318-5169 Telephone
(813) 222-4793 Facsimile
*Attorneys for Plaintiffs/Relators*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this January 11, a copy of the Relators' Second Amended Complaint has been served by electronic filing with the Clerk via the CM/ECF system, which electronically notifies all registered participants.

The following participants were served via Certified U.S. mail:

1. Honorably Attorney General Loretta E. Lynch
   950 Pennsylvania Ave.
   Washington, DC 20530-0001

2. Katie M. Wilson, Assistant Attorney General
   Wisconsin Department of Justice Assistant
   Attorney General Division of Legal Services
   Post Office Box 7857
   Madison, Wisconsin 53707-7857

3. Walter Smith, Assistant Attorney General
   Medicaid Fraud Control Unit
   P.O. Box 40114
   Olympia, Washington 98504

4. Greg T. Kinskey, Assistant Attorney General
   Ken Paxton, Attorney General of Texas
   Charles E. Roy, First Assistant Attorney General
   James E. Davis, Deputy Attorney General for Civil Litigation
   Office of the Attorney General Civil Medicaid Fraud Division
   P.O. Box 32548
   Austin, Texas 78711-2548

5. Nina D. Bonner, Deputy Attorney General
   Medicaid Fraud Control Unit
   Office of the Attorney General of New Jersey
   P.O. Box 094
   Trenton, NJ 08625-0094

6. Jason Evans, First Assistant
   Attorney General Health Care Fraud Division
   P.O.Box 30218
   Lansing, MI 48909

The following participants were served via Federal Express delivery:

1.  Jane Drummey, Assistant Attorney General
    441 4th Street, N.W.
    Suite 630 S
    Washington, D.C. 20001

2.  Kimberly M. Bolton, Assistant Attorney General
    Office of the Virginia Attorney General
    Medicaid Fraud Control Unit
    900 E. Main St.
    Richmond, VA 23219

3.  Mary Elizabeth McCulIohs, Assistant Attorney General Medicaid Fraud and Integrity
    Division
    Office of the Tennessee Attorney General
    425 Fifth Avenue North
    Nashville, TN 37243

4.  James F. Dube, Assistant Attorney General
    150 South Main Street
    Providence, RI 02903

5.  Christopher P. Robinson Assistant Attorney General
    Medicaid Fraud Control Unit
    Oklahoma Office of Attorney General
    313 N.E. 21st Street
    Oklahoma City, OK 73105

6.  Steven K. McCallister, Assistant Attorney General
    5505 Creedmoor Rd., Ste. 300
    Raleigh, NC 27612

7.  Diana Elkind, Special Assistant Attorney General
    Medicaid Fraud Control Unit
    New York State Office of the Attorney General
    120 Broadway, 13th Floor
    New York, NY 10271

8.  Patricia Padrino Tucker, Director
    New Mexico MFCU
    Office of the Attorney General
    111 Lomas Blvd NW, Suite 300
    Albuquerque, NM 87102

9.  Mark Kemberling Chief Deputy Attorney General
    Office of the Attorney General
    555 East Washington Avenue
    Suite 3900
    Las Vegas, Nevada 89101-1068

10. Chris McConnell, Assistant Attorney General
    Montana Department of Justice Investigations Bureau, Medicaid Fraud Control Unit
    215 N. Sanders St.
    Helena, MT 59620

11. Chuck Roeherdanz, Assistant Attorney General
    445 Minnesota Street
    Suite 900
    St. Paul, Minnesota 55101-2127

12. Steven L. Hoffman, Assistant Attorney General/Deputy Chief
    Medicaid Fraud Division
    One Ashburton Place, 18th Floor
    Boston, Massachusetts 02108

13. Nicholas J. Diez, Assistant Attorney General
    Louisiana Department of Justice
    1885 N. Third St.
    Baton Rouge, LA 70802

14. Roderick Reynolds, Assistant Attorney General
    321 E 12th St
    Lucas State Office Building, 3rd Floor
    Des Moines, IA 50319-0083

15. Jessica L. Harlan-York, Deputy Attorney General
    Indiana Medicaid Fraud Control Unit
    8005 Castleway Drive
    Indianapolis, IN 46250-1946

16. Frederick H. Crystal, Bureau Chief
    Medicaid Fraud Control Unit
    Office of the Illinois Attorney General
    100 W. Randolph St., 13th Floor
    Chicago, IL 60601

17. Michael L. Parrish, Deputy Attorney General
    MFCU Department of the Attorney General
    333 Queen Street, 10th Floor
    Honolulu, HI 96813

18. Kevin D. Bradberry, Assistant Attorney General
    Georgia Medicaid Fraud Control Unit
    200 Piedmont Ave., S.E.
    West Tower, 19th Floor
    Atlanta, GA 30334

19. Tiphanie P. Miller, Deputy Attorney General
    Delaware Medicaid Fraud Control Unit
    Office of the Attorney General
    900 N. King Street, Fourth Floor
    Wilmington, Delaware 19801

20. Robert B. Teitelman Assistant Attorney General
    55 Elm Street
    Hartford, CT 06106

21. George A. Codding, Senior Assistant Attorney General
    Medicaid Fraud Control Unit
    1300 Broadway, 9th Floor
    Denver, CO 80203

22. Erin M. Van De Walle, Assistant Attorney General
    Office of the Attorney General
    Medicaid Fraud Control Unit
    Complex Civil Enforcement Bureau
    Concourse Center 4
    3507 East Frontage Rd., Suite 200
    Tampa, FL 33607-1795


I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 11, 2016

                              Respectfully submitted,
                        By: *John A. Yanchunis*
                              John Yanchunis (FBN 324681)
                              jyanchunis@forthepeople.com
                              MORGAN & MORGAN
                              COMPLEX LITIGATION GROUP
                              201 North Franklin Street, 7th Floor
                              Tampa, Florida  33602
                              (813) 318-5169 Telephone
                              (813) 222-4793 Facsimile

                              James D. Young (FBN 567507)
                              jyoung@forthepeople.com

MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone
(904)366-7677 Facsimile

*Attorneys for Plaintiff/Relator*