## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA;
the STATES OF CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE, FLORIDA,
GEORGIA, HAWAII, ILLINOIS, INDIANA,
IOWA, LOUISIANA, MICHIGAN, MINNESOTA,
MONTANA, NEVADA, NEW JERSEY, NEW
MEXICO, NEW YORK, NORTH CAROLINA,
OKLAHOMA, RHODE ISLAND, TENNESSEE,
TEXAS, WASHINGTON, and WISCONSIN;
the COMMONWEALTHS OF MASSACHUSETTS
and VIRGINIA; and the DISTRICT OF COLUMBIA;
*ex rel.* BENJAMIN A. VAN RAALTE, MICHAEL
J. CASCIO, and JOHN J. MURTAUGH,

       Plaintiffs/Relators,               Case No. 6:14-cv-283-Orl-18KRS

v.

HEALOGICS, INC.,

       Defendant.

_____/

### DEFENDANT HEALOGICS, INC.'S MOTION TO DISMISS WITH PREJUDICE RELATORS' CORRECTED SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendant Healogics, Inc. moves to dismiss with prejudice relators' Corrected Second Amended Complaint, Doc. 37 (the Complaint), under Federal Rules of Civil Procedure 9(b) and 12(b)(6).  Healogics states the following in support of its motion:

### INTRODUCTION

Healogics, the sole remaining defendant in this case, is a Florida business dedicated to healing patients' life-threatening wounds.  Millions of people in the United States suffer from chronic wounds—large, painful, open sores, often brought on by age, diabetes, or paralysis.

1

Chronic wounds typically appear as ulcers or lesions on a patient's legs or feet, with bleeding and infection.  If left unhealed, these wounds threaten amputation and death.  General practitioners can try to treat these wounds in their clinics, but many are extremely difficult to heal.  They require specialized physicians and aggressive care.  Healing these wounds is Healogics' mission.

Healogics is the world's largest and most medically sophisticated provider of advanced wound-care services.  It and its predecessor companies have studied and healed severe wounds for over a decade and have unparalleled expertise on what saves patients' limbs and lives.  Procedures include debridement, hyperbaric oxygen therapy, and transcutaneous oxygen measurement, which are all government-approved to help wounded patients.  These treatments are provided in wound-care centers.  A wound-care center is a last resort, a place patients go when other treatments have failed.  Healogics provides specialized medical equipment and support staff at these centers, educates the doctors who work there, and tracks data to ensure the centers are healing patients at acceptable rates and following best practices.

Relators present a false view of Healogics' practices, but even under their version of the facts, they fail to state a claim.  It is not enough that relators have alleged a scheme to encourage upcoding or unnecessary procedures, though doubtful those allegations are.  They must also connect that scheme to actionable fraud.  This requires relators to allege two things: (1) that Healogics' efforts to encourage fraud had an effect, meaning that it resulted in a specific medical professional changing his patient care; and (2) that a specific false claim was submitted as a result.  None of relators' allegations pass this two-part test, and what is alleged is plainly insufficient.

At best, relators allege that Healogics *tried* to defraud the government by pressuring physicians to upcode or to perform unnecessary procedures.  Relators admit, however, they never gave into that alleged pressure.  (*See, e.g.*, Compl. ¶ 34.)  Relators also allege that

fraudulent claims to the government "*would have* resulted" had they acquiesced (*id.* ¶ 238 (emphasis added)), but that of course is not fraud—and also explains why they cannot identify a single specific false claim.

Unable to allege that they saw fraud firsthand, relators instead speculate that *other* physicians at *other* centers must have done so.  This is guesswork.  Relators pretend otherwise, naming in the case caption 28 states and D.C. as plaintiffs (and, in their previous complaint, 500 now-missing defendants).  This extensive case caption is an illusion intended to obscure the extremely limited geographic scope of relators' allegations.  In reality, relator Dr. Van Raalte worked at just two hospitals in Iowa and Illinois only miles apart.  (*See id.* ¶ 4.)  Relators Dr. Cascio and Mr. Murtaugh worked at just two hospitals in metropolitan Orlando.  *See id.* ¶¶ 7, 10.)  Mr. Murtaugh also includes in the Complaint a few vague anecdotes mentioning five other facilities, *see infra* at 22–23, but here too, one of them is in Illinois and the other four are near Orlando, and none of the anecdotes about these other facilities allege fraud with particularity.  Relators saw no fraud where they worked, allege no fraud at the other five facilities, and have no basis to allege any kind of a broader scheme.

The allegations in this case are thus insufficient.  Relators have tried desperately to state a claim against anyone they can.  They have amended their complaint three times.  (They call their latest amendment a "correction" (*id.* at 1 n.1), but adding and dropping parties and claims is no mere "correction.")  They have added and then dropped 500 defendants.  They have included claims on behalf of dozens of states with no relation to their allegations.  The Complaint should be dismissed and, after this much reckless and futile flailing, further amendment should be denied.  Healogics respectfully moves the Court to dismiss the Complaint with prejudice for failure to state a claim with particularity upon which relief can be granted.  Fed. R. Civ. P. 9(b), 12(b)(6).

## BACKGROUND

The Complaint fails to state a claim. It also fails to accurately describe wound care and Healogics' role in this critical medical field. Chronic wounds are "a silent epidemic" affecting millions of Americans.[1] Chronic wounds are extremely difficult to heal, prone to infection, and prey on the elderly, diabetic, and disabled.[2] When these wounds are treated passively, patients usually suffer more procedures and longer healing times, if healing occurs at all.[3] Much worse, passive treatment can lead to every wound patient's greatest fear: amputation. An amputation procedure alone can cost close to $100,000.[4] Statistically, amputation is a worse fate than cancer. Within five years, 32% of cancer patients will die.[5] For amputees, the figures is 57%.[6]

Healogics' clinical, data-driven, and humane approach to wound treatment saves money and lives. Aggressive, frequent treatment of patients with the full panoply of effective, medically appropriate services, including debridement and hyperbaric oxygen therapy, leads to lower costs,[7] more and faster healing, and fewer amputations and deaths.[8] Even relators do

---

[1] Chandan K. Sen et al., *Human Skin Wounds: A Major and Snowballing Threat to Public Health and the Economy*, 17 Wound Repair & Regen. 763 (2009). This article is reproduced for the Court's convenience as Exhibit A. The other articles cited below are also reproduced as exhibits.

[2] *See id.* at 2, 5.

[3] *See, e.g.*, Elizabeth Lebrun & Robert S. Kirsner, *Frequent Debridement for Healing of Chronic Wounds*, 149 JAMA Derm. 1059, 1059 (2013) (Ex. B).

[4] *See* Jeremy J. Cook & Donald C. Simonson, *Epidemiology and Health Care Cost of Diabetic Foot Problems*, *in The Diabetic Foot* 27 (Aristidis Veves et al. eds., 2012) (Ex. C).

[5] Nat'l Insts. of Health, *Fact Sheet: Cancer*, https://goo.gl/0OpnZV.

[6] *See* Cook & Simonson (Ex. C) at 26.

[7] *See, e.g.*, Anderson W. Chuck et al., *Cost-Effectiveness and Budget Impact of Adjunctive Hyperbaric Oxygen Therapy for Diabetic Foot Ulcers*, 24 Int'l J. Tech. Assessment in Health Care 178 (2008) (hyperbaric oxygen therapy lowers costs) (Ex. D); Ginger S. Carls et al., *The Economic Value of Specialized Lower-Extremity Medical Care by Podiatric Physicians in the Treatment of Diabetic Foot Ulcers*, 101 J. Am. Podiatric Med. Ass'n 93 (2011) (frequent treatment of diabetic foot ulcers by specialists lowers costs) (Ex. E).

[8] *See, e.g.*, James Wilcox et al., *Frequency of Debridements and Time to Heal*, 149 JAMA Derm. 1050 (2013) (Ex. F); Robert J. Goldman, *Hyperbaric Oxygen Therapy for Wound Healing and Limb Salvage: A Systematic Review*, Phys. Med. & Rehab., May 2009, at 471 (Ex. G). *See generally* F, L. Game et al. , *Effectiveness of Interventions to Enhance Healing of Chronic Ulcers of the Foot in Diabetes: A Systematic Review*, 32

not contest the efficacy of these techniques or their government approval.  Despite these benefits, many doctors know little about proper aggressive wound care.  It is a specialized and quickly evolving field.  There is thus "a practice gap" between how most doctors treat patients and the "best-practice approach."  Ex. B at 1059.  To close that gap, Healogics utilizes statistical analysis, offers clinical practice guidelines, and educates medical professionals.  These methods are not, as relators imply, motivated by greed or fraud.  They are part of Healogics' pursuit of the best possible patient care.

## PROCEDURAL HISTORY

On February 9, 2014, relators filed a Complaint, presumably on behalf of the United States, 28 states, and the District of Columbia.  (*See* Doc. 1 (under seal).)  On June 30, 2014, they filed a first Amended Complaint, naming Healogics and 500 hospitals as defendants.[9]  (*See* Doc. 11; Doc. 34.)  On August 31, 2015, the 28 states and the District of Columbia declined to intervene.  (*See* Doc. 26.)  On September 30, 2015, the United States declined to intervene.  (*See* Doc. 27.)  That same day the Court ordered the first Amended Complaint unsealed and served.  (*See* Docs. 28, 29.)  On December 29, 2015, without seeking the Court's leave, relators filed a Second Amended Complaint against only Healogics.  (*See* Doc. 35.)  They dropped the 500 hospitals.  (*See id.*)  On January 11, 2016, relators filed a self-styled Corrected Second Amended Complaint, but which is in fact a Third Amended Complaint, given that it adds and drops state parties and claims on their behalf.  (*See* Compl. at 1 n.1.)

## LEGAL STANDARDS

This Court's standards present two formidable barriers to relators' fraud Complaint.  To survive a Rule 12(b)(6) motion to dismiss, relators must first "state a claim to relief that is

---

Diab./Metab. Res. & Revs. 154, 156, 159 (2016) (frequent debridement effective; many, but not all, studies show HBOT effective) (Ex. H).

[9] The first Amended Complaint and corresponding Certificate of Interested Persons and Corporate Disclosure Statement list 503 and 504 defendant hospitals, respectively, but that includes 3 duplicates for the Amended Complaint and 4 duplicates for the Certificate.

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint in which "the well-pleaded facts do not permit the court to infer more than the mere *possibility* of misconduct" is not sufficient; such a complaint has only "alleged—but it has not 'shown'— 'that the pleader is entitled to relief.'" *Id.* at 679 (emphasis added and brackets omitted) (quoting Fed. R. Civ. P. 8(a)(2)). Courts take special care to assume as true *only* those well-pleaded facts: "unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal," *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1184 (11th Cir. 2003), nor will "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (brackets and internal quotation marks omitted).

Because this is a False Claims Act (FCA) case, the plausibility standard is coupled with a particularity standard. Relators must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1309 (11th Cir. 2002) (Rule 9(b) applies to FCA complaints). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotation marks omitted). In its classic formulation, the particularity rule requires pleading the "who, what, where, when, and how" of the fraud. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (internal quotation marks omitted). In FCA cases the bar is even higher. The particularity rule purposely "makes it hard for many persons to bring a qui tam suit." *United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994) (per curiam).

## ARGUMENT

The Complaint must be dismissed entirely because it fails to state a claim with particularity. *See* Fed. R. Civ. P. 9(b), 12(b)(6).  Relators never identify a specific physician who was successfully influenced by Healogics to change a patient's treatment and who submitted an actual false claim as a result.  The Complaint also suffers from other defects.  Count IV of the Complaint claims a conspiracy, but that count must be dismissed because the Complaint is utterly devoid of conspiracy allegations.  Counts V–XXXII claim violations of state law, but those counts must be dismissed because they are tethered to the insufficient federal claims.  At a minimum, 26 of the 29 state counts must be dismissed because relators allege no conduct of any sort in those states.  Finally, even if relators sufficiently allege a claim, it is limited to a handful of centers in three states.  If the case moves forward, it should be limited to those centers.

### I.  The Complaint must be dismissed entirely because relators fail to plead fraud with particularity.

The Eleventh Circuit and this District routinely reject complaints like the one in this case. This is because merely alleging a scheme does not satisfy Rule 9(b).  Time after time, complaints have failed despite proffering "detailed allegations of an illegal scheme," *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1325 (11th Cir. 2009); "a pattern of improper practices," *Corsello*, 428 F.3d at 1013; "detail[s] ... [of] an elaborate scheme," *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006); "relatively detailed statements about ... alleged schemes" "accompanied by dozens of pages of exhibits," *Clausen*, 290 F.3d at 1305, 1312; and "great detail regarding a scheme," *United States ex rel. Pelletier v. Liberty Ambulance Serv., Inc.*, No. 3:11-cv-587-J-32MCR, 2016 WL 81355, at *3 (M.D. Fla. Jan. 7, 2016); *see, e.g.*, *United States ex rel. Johnson v. E-Med Source of Fla., Inc.*, No. 8:13-cv-02017-T-27EAJ, 2015 WL 6742059, at *3–4 (M.D. Fla. Nov. 2, 2015) (FCA complaint dismissed); *United States v. Aggarwal*, No. 6:03-cv-117-Orl-31KRS, 2005 WL 6011259, at *7

(M.D. Fla. Feb. 10, 2005) (FCA complaint dismissed).  The reason for their failure is simple.  Rule 9(b) requires not just a scheme, but also "the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services [the relator] describes."  *McInteer*, 470 F.3d at 1359.

Relators here do not provide that "next link."  Each of their allegations stops short of stating with particularity (1) that Healogics actually influenced a specific person to submit false claims, and (2) that a false claim was in fact submitted to the government as a result.  An allegation must provide both to state a claim.  None here do.

*(1) Alleging actual influence on a specific person.*  Alleging influence is crucial.  Similar to off-label-marketing cases like *Hopper*, 588 F.3d 1318; *see also, e.g.*, *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451 (4th Cir. 2013), in which a company might try to defraud the government but needs the cooperation of an independent doctor, relators here must allege not only that Healogics acted improperly, but that a medical professional was actually influenced by that action to submit false claims.  Otherwise, Healogics could not have caused a false claim to be presented or made a false statement material to a false claim.  *See* 31 U.S.C. § 3729(a)(1)(A), (B).  This point was illustrated in *United States ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783 (11th Cir. 2014).  The relator there alleged that a company conscripted physicians to promote, through studies and lectures, illegal off-label uses for its drug.  Those allegations were insufficient because they did not link the promotion to false claims: "There is no allegation that a prescribing doctor who later sought reimbursement attended those lectures or considered the studies.  At no point does Relator allege that any particular prescriber that is alleged to have submitted off-label claims was actually aware of any of [the defendant's] representations as communicated by these doctors."  *Id.* at 796.

Likewise here, relators cannot use shorthand to omit the influence requirement.  (*See, e.g.*, Compl. ¶ 49 ("In addition to billing the government for surgical/excisional debridements ..., Healogics also directs that these procedures be performed on a frequent ... basis for each patient.")).  Relators must instead allege that Healogics successfully influenced physicians to change how patients were treated, and that false claims were submitted as a result.  Relators never do.  *See infra* 12–21 (paragraph-by-paragraph analysis showing no successful influence resulting in the submission of false claims).

The Complaint identifies alleged *efforts* to influence, including faulty guidelines to physicians, withholding of staff, and imposition of benchmarks.  Despite this, those few allegations naming actual people deny that the efforts succeeded.  (*See, e.g.*, Compl. ¶ 34 ("Employees like John Murtaugh and panel physicians like Drs. Cascio and Van Raalte ... refused to participate in Healogics' fraudulent practices ....")).  This leaves relators to speculate that other doctors at other hospitals must have succumbed, but those allegations are hopelessly vague.  (*See, e.g.*, *id.* ¶ 136 ("Dr. Cascio was then told ... that other centers were falling in line.").)

Relators' speculation is apparent from the case caption on down.  Relators' First Amended Complaint needed 12 pages to name 500 defendant hospitals (*see* Doc. 11 at 1–12), and relators still claim that Healogics' "scheme could not have succeeded without the willing and active participation of Healogics [sic] partner hospitals" (Compl. ¶ 35).  Now those supposedly willing and active participants have disappeared.  Certainly relators did not drop 99.8% of the defendants to help Healogics or the hospitals.  "On the contrary, general experience teaches that plaintiffs usually sue *everyone* who might be liable for damages."  *Evangelatos v. Superior Court*, 44 Cal. 3d 1188, 1239 (Cal. 1988) (Kaufman, J., concurring in part, dissenting in part).  Relators dismissed the hospitals because, as the Complaint so clearly demonstrates, they do not have particular and plausible allegations about the hospitals or any successful efforts of

Healogics to influence them.  "Underlying improper practices alone are insufficient to state a claim under the False Claims Act," *Corsello*, 428 F.3d at 1014, especially when the improper practices did not succeed.

(2) *Alleging an actual false claim.*  The lack of influence leading to false claims is not the only missing allegation.  The Complaint also omits "the *sine qua non* of a False Claims Act violation"—an actual false claim.  *Clausen*, 290 F.3d at 1311.  The hallmarks of a properly pleaded healthcare FCA claim—such as billing dates, copies of claims or payments, detailed descriptions of billing procedures, or other indicia of reliability—are absent.  *See, e.g.*, *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1226–27 (11th Cir. 2012); *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010) (per curiam); *Clausen*, 290 F.3d at 1312.  At best, the Complaint makes conclusory statements about Medicare patients and Medicare payments.  It is not sufficient, however, to merely mention "patients whose Medicare forms were improperly completed," with the inference that the wrongdoing "eventually ... resulted in the submission of fraudulent claims."  *Corsello*, 428 F.3d at 1013; *see infra* 16–18 (explaining why the Complaint's mentions of Medicare in ¶¶ 140–141, 152–158, 167–71, and 193–198 are insufficient allegations).  There must be allegations of false claims themselves.

Relators allege just the opposite.  Although they have much to say about what happened at their facilities, even if those statements were true they are irrelevant.  Relators state that "*no fraud had actually taken place* since their center had not billed for any of the procedures." (Compl. ¶ 225 (emphasis added)).  They are thus left to surmise only that fraud could have happened elsewhere.  According to them, unknown doctors at unknown facilities at unknown times must have succumbed to the influence to which they did not succumb and must have submitted unknown false claims to unknown insurers.  That kind of speculation does not satisfy Rule 9(b).  *See Clausen*, 290 F.3d at 1311 (Rule 9(b) "does not permit a False Claims Act

plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted ... to the Government.").

These flaws—no influence and no claims—are apparent when viewing the Complaint as a whole, and also when viewing the Complaint paragraph by paragraph.  Relators' allegations fall into four categories.  *First* are descriptions of laws, regulations, medical procedures, and irrelevant government reports.  (*See* Compl. ¶¶ 1, 36–46, 129–133, 138, 183, 187–192, 208, 231–235, 239–245, 247–259, 261–263.)  *Second* are rote recitations of legal elements.  (*See id.* ¶¶ 2, 246, 260, 264–556.)  These first two categories of allegations indisputably do not state a claim.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("a plaintiff's obligation to provide the grounds for his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" (brackets and internal quotation marks omitted)).  *Third* are broad background allegations about Healogics and high-level summaries of its supposed schemes.  (*See* Compl. ¶¶ 19–35, 47–55, 69–74, 82, 102, 110, 134–137, 139, 144–145, 159, 176–182, 193, 199, 219–221, 236–38.)  *Fourth* are piecemeal anecdotes that make up the rest of the Complaint.  These third and fourth categories contain the allegations that purport to provide the essential *who*, *what*, *where*, *when*, and *why*.  Those essential details, however, are missing.  As mentioned above, no allegation states that (1) Healogics successfully influenced a specific medical professional to improperly change his care, and that (2) a false claim was in fact submitted to the government as a result.  This holds true across all three of the alleged schemes: debridement, hyperbaric oxygen therapy (HBOT), and transcutaneous oxygen measurement (TCOM).

**A. Relators' debridement allegations never state that Healogics successfully influenced a medical professional's care and that a false claim was submitted as a result.**

Debridement is the process of removing tissue from wounds. There are two kinds of debridement referred to in the Complaint: selective debridement (removal of dead tissue from a wound) and surgical/excisional debridement (removal of viable tissue around the wound). The Complaint's debridement section begins with a description of the procedure and an irrelevant reference to a nine-year-old government report. (*See* Compl. ¶¶ 36–46.) It then provides a general overview of Healogics' supposed debridement scheme. (*See id.* ¶¶ 47–55.) These allegations alone are insufficient to state a claim with specificity. They do not identify specific doctors or hospitals that participated in the scheme. Nor do they identify false claims submitted to the government. The rest of the debridement section is a series of anecdotes. Not one provides the needed specificity.

**1. Relators' firsthand anecdotes do not satisfy Rule 9(b).**

Most of the anecdotes allege methods by which Healogics supposedly attempted to influence physicians. (*See generally id.* ¶ 81–87.) These methods allegedly included letters (*id.* ¶¶ 56–57), meetings to discuss finances or clinical metrics (*id.* ¶¶ 58–68, 75–77, 102–109), understaffing certain physicians (*id.* ¶¶ 72–73, 88–93), declining to renew physicians' contracts, (*id.* ¶¶ 69–71, 73–74), and publicly posting debridement rates (*id.* ¶¶ 117–118). None of these allegations state that a doctor or a hospital was actually influenced by this pressure or submitted a false claim as a result. The allegations state the exact opposite, in fact. (*See id.* ¶ 69 (Dr. Van Raalte "refused to comply with [these] profit focused directives"); *id.* ¶ 77 ("Dr. Cascio told her that he did what was medically necessary.")).

Two of the anecdotes allege that Healogics gave advice to physicians that was contrary to government guidelines. The first describes a "mandate" to miscode certain wounds on diabetics. (*See id.* ¶¶ 78–80.) According to the Complaint this went nowhere. (*See id.* ¶ 80

("Dr. Cascio reminded [the coordinator] that the physician makes the diagnosis and that it was fraudulent to call a wound something that it is not just to qualify them for more expensive therapies.")).  The second alleges that Healogics employees gave doctors faulty advice on how to code debridements.  (*See id.* ¶¶ 94–101.)  This also was unsuccessful.  The doctors "immediately expressed concern" over the advice and "disagreed."  (*Id.* ¶¶ 98, 99.)

 The most specific allegation is Dr. Minnick's purported statement at a meeting with other doctors that "sometimes she will actually bill for a selective debridement" instead of a surgical one.  (*Id.* ¶ 100.)  That off-the-cuff statement, if anything, describes *down*coding to a less expensive procedure.  And the statement does not say that Dr. Minnick ever billed *the government*, let alone billed the government for a false claim, nor does it provide the kind of specificity required by Rule 9(b).

### 2. Relators' secondhand speculation does not satisfy Rule 9(b).

Unable to allege that they ever witnessed any wrongdoing, relators next present a collection of hearsay and vague snippets that allege supposed wrongdoing committed by other doctors, none of whom are alleged even to be Healogics employees.  This speculation falls far short of Rule 9(b).

In paragraphs 110–116, relators allege that Dr. Cascio's partner, Dr. Conlan, initially upcoded a debridement, but then "went back and adjusted the billing and dictation to reflect the lower paying debridement that he had actually performed."  (*Id.* ¶ 113.)  If anything, then, this is an allegation of a true claim.  While these paragraphs also allege that Dr. Conlan's surgical debridement rate more than doubled, there is still no allegation that any of those surgical debridements should not have been done or that Dr. Conlan submitted a false claim to the government.  Facts "merely consistent with" liability, without more, do not state a *plausible* claim, *Iqbal*, 556 U.S. at 678, much less a *particular* one, *see Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1056 (11th Cir 2015).

In paragraphs 119–121, relators allege that a former Healogics employee saw faulty coding of debridements.   There is no allegation that Healogics' purportedly incorrect guidance to physicians caused this miscoding or that false claims were submitted to the government as a result.

In paragraphs 122–123, relators describe Mr. Murtaugh's review of two patient charts.  Mr. Murtaugh was not employed by Healogics at the time, nor is he "a medical professional" (Compl. ¶ 199), but these charts had more surgical debridements than he thought proper.  Even so, there is no allegation that Healogics influenced these patients' treating physicians or that false claims were submitted for these patients.

In paragraphs 124–127, relators describe Mr. Murtaugh's eavesdropping on a doctor's telephone conversation.  There is no allegation that the doctor on the phone had ever been influenced by Healogics, ever did anything improper, or ever submitted a claim.

Finally, in paragraph 128, relators allege a conversation between Mr. Murtaugh and a Clinical Coordinator.  Relators do not allege that the Clinical Coordinator is a Healogics employee, that her single attempt to influence a physician's debridement-coding decision was successful, or that any false claim was ever submitted as a result.

In sum, all of the debridement allegations suffer from two fatal defects: failure to allege successful influence and failure to identify an actual false claim.

## B. Relators' HBOT allegations never state that Healogics successfully influenced a medical professional's care and that a false claim was submitted as a result.

Relators' HBOT allegations fail for the same reasons as the debridement allegations.  Hyperbaric oxygen therapy, or HBOT, is an FDA-approved treatment for certain wounds.  The Medicare program, recognizing the value of the treatment, has guidelines on reimbursement for this treatment.  The Complaint's HBOT section begins with a description of the procedure and, later, a description of these CMS guidelines, along with an irrelevant reference to a 16-

year-old government report and subsequent government action. (*See id.* ¶¶ 129–133, 187–192.) It also describes in generalized terms Healogics' purported scheme to increase HBOT rates. (*See id.* ¶¶ 134–135, 137–138.) These allegations, citing a nonexistent exhibit (*see id.* ¶ 134 (referencing an "Exhibit 20")), do not identify specific doctors or hospitals that participated in the alleged scheme or false claims that were submitted. The rest of the Complaint's HBOT discussion consists of meaningless anecdotes that follow the same pattern as the debridement anecdotes: firsthand accounts that fail to allege fraud, and secondhand speculation that is too vague.

### 1. Relators' firsthand anecdotes do not satisfy Rule 9(b).

Relators again allege meetings focused on financial or clinical metrics, but again, omit any suggestion that the meetings influenced them or anyone else to change their care or submit false claims as a result. (*See id.* ¶¶ 199–207.) Relators allege Healogics used improper swabbing techniques (*id.* ¶¶ 144–151), and bad software (*id.* ¶¶ 176–182), but without further alleging that the swabs or software caused an actual physician to change her care or submit actual false claims as a result. The closest that relators get to alleging fraud is the passive-voice allegation that "numerous patients' wounds were misclassified and mistreated resulting in financial harm to the government and private insurers" (*id.* ¶ 182), but that kind of conclusory comment fails under Rules 9(b) and 12(b)(6). *See Twombly*, 550 U.S. at 555 ("labels and conclusions ... will not do"); *Clausen*, 290 F.3d at 1313 (rejecting the conclusory allegation that a defendant submitted false claims "on the date of service or within a few days thereafter").

Unsuccessful in this initial attempt, relators next allege that Healogics instructed doctors to misclassify diabetics' venous wounds as diabetic wounds of the lower extremity (*see* Compl. ¶¶ 136, 175), and to misclassify certain kinds of osteomyelitis as chronic refractory osteomyelitis (*see id.* ¶¶ 164, 184–185), in order to qualify ineligible patients for HBOT. Dr.

Cascio and Mr. Murtaugh, however, rejected the supposed mandate to reclassify venous wounds (*see id.* ¶¶ 136, 175), and an oblique reference to "other centers ... falling in line" with the directive is too vague for a fraud claim.  (*Id.* ¶ 136, 186.)  Likewise, the doctors who heard Healogics' alleged advice on osteomyelitis "vehemently disagreed."  (*Id.* ¶ 185.)  Even where lower-level employees allegedly tried to influence treatment to follow these two instructions, Dr. Cascio supposedly caught their mistakes and stopped them, so no fraud occurred.  (*See id.* ¶¶ 142–143, 186.)

Next, in paragraphs 193–198, relators allege that a Healogics Program Director and Medical Director in Dr. Van Raalte's hospitals overrode physician diagnoses to qualify patients for HBOT, but the eleven purported examples omit necessary specifics.  Nine use the passive voice, presumably because relators cannot identify who the actors were: "[i]ndications were changed"; "criteria changed"; "after upgrading of wound"; "[r]eceived 45 segments of HBOT"; "[p]atient then given HBOT"; "was given HBOT"; "HBOT ordered"; "wound ... was classified"; "wound ... was upgraded."  (*Id.* ¶ 197.)  Moreover, all eleven referenced exhibits fail to support the allegations.  The exhibits are wholly unexplained and say nothing about the supposed diagnoses, changes to them, medical indications, patient outcomes, or anything else averred in paragraphs 193–198.

These paragraphs also fail to allege the submission of claims to the government.  It is not enough that they say "the following Medicare patients received HBOT who were not qualified per CMS LCD coverage guidance and for which Medicare was billed."  (*Id.* ¶ 197.)  Such conclusory statements do not provide the specificity Rule 9(b) requires.  As explained in *McInteer*, even details of medical treatment are not enough without a factual basis that actual false claims went to the government:

> As the plaintiff did in *Clausen*, Atkins has described in detail what he believes is an elaborate scheme for defrauding the government by submitting false claims.  *He cites particular patients, dates and corresponding medical records*

> *for services that he contends were not eligible for government reimbursement.*
> *Just like the* Clausen *plaintiff, though, Atkins fails to provide the next link in the*
> *FCA liability chain:* showing that the defendants *actually submitted*
> reimbursement claims for the services he describes.  Instead, he portrays the
> scheme and then summarily concludes that the defendants submitted false
> claims to the government for reimbursement.

*McInteer*, 470 F.3d at 1359 (first emphasis added); *see also Clausen*, 290 F.3d at 1312 n.21

("Even the example of patient H.L. ..., while providing details of medical treatment, offers no

factual basis for the conclusory allegation that LabCorp submitted actual improper claims for

payment to the Government on the 'date of service or within a few days thereafter.'").  Relators

fail to provide the link, and their exhibits do not compensate for that failure.  Again, the exhibits

are wholly unexplained.  Although they say the word "Medicare," there is no explanation of

what information in them, if any, relates to the fraudulent acts alleged in paragraph 197.[10]  That

is insufficient.

### 2.   Relators' secondhand speculation does not satisfy Rule 9(b).

The remainder of the anecdotes in the HBOT section present a familiar pattern.  Unable to

allege fraud firsthand, relators turn to speculation about what might have happened at other

centers.

In Paragraphs 152–158, relators describe Dr. Cascio's review of a patient's records from

an unnamed Healogics center in an unnamed hospital in South Carolina where the patient was

treated by an unnamed doctor.  Although there is a conclusory label that the patient's treatments

were "fraudulently billed" to Medicare (Compl. ¶ 158), there is no allegation identifying any

person actually influenced by Healogics to do something wrong.  Nor is it enough that the

patient's history might be consistent with Healogics' purported scheme.  "Where a complaint

---

[10] The Van Raalte examples raise additional unexplained questions that undermine any ability to allege fraud
with particularity.  If the patients were under the care of Dr. Van Raalte, is it his contention that his treatment
records are false or inconsistent with the bills his hospital submitted to Medicare?  If they were not his patients,
how does he know whether the physical examination and diagnosis by another physician was incorrect,
inconsistent with the treatment records, and inconsistent with the bills submitted to Medicare?  Relators' inability
to answer these key questions underscores their Complaint's legal insufficiency.

pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Paragraphs 140, 141 (the first half), and 167–171 are much the same. In them, relators recount Mr. Murtaugh's assessment of a patient chart at Florida Hospital Fish Memorial. Again, Mr. Murtaugh is "not a medical professional." (Compl. ¶ 199.) According to Mr. Murtaugh, the insurance form listed the patient as being diagnosed with a venous leg ulcer, yet Healogics' software listed the patient as having a diabetic wound. Relators thus infer that the patient was fraudulently misdiagnosed. Nevertheless, there is no allegation identifying the doctor who cared for this patient or that he or she was influenced by Healogics to misdiagnose the patient, *see Iqbal*, 556 U.S. at 678 (facts "merely consistent with" liability do not present a plausible claim), nor can that be inferred from the rest of the Complaint. The Complaint's only substantive allegations about HBOT and physicians at Fish Memorial are those relating to Dr. Jefferson Menutti (*see* Compl. ¶¶ 165–166), but there is no allegation that Dr. Menutti treated this patient. To conclude otherwise would be guesswork that Rule 9(b) forbids.

Even if relators did allege in these paragraphs that Healogics influenced a physician's care, they still do not allege with particularity the submission of a false claim. Relators describe a "*diagnosis* submitted to Medicare," an "insurance *authorization* form for Medicare," and "[t]his patient[']s demonstrat[ion of] Healogics' practice of falsifying patient *eligibility* in order to administer and bill for HBOT." (*Id.* ¶¶ 140, 168, 171 (emphases added)). They also make a non-patient-specific statement about "Healogics [sic] scheme to increase HBO utilization and increase billing from insurance (*i.e.* Medicare)." (*Id.* ¶ 169.) These allegations only describe what *could* have happened with this patient. There is no allegation of what *did* happen. There are no dollar amounts, no bills, no claim forms, and no statement that an identified person submitted actual claims to Medicare.

18

In paragraphs 165–166, relators allege a conversation between Mr. Murtaugh and Dr. Menutti.  Dr. Menutti purportedly signed a contract to convert 10% of his patients to HBOT and "look[ed]" the other way" when presented with ineligible candidates for HBOT, whatever that vague comment means.  (*Id.* ¶ 166.)  These allegations do not state that Dr. Menutti ever improperly treated a patient or that a false claim was ever actually submitted.

The rest of the allegations in this section are even weaker.  In paragraphs 141 (the second half) and 174, relators allege that a Healogics employee asked a nurse to change a patient's diagnosis.  There is no allegation that the nurse did so or that a specific false claim was submitted as a result.  In paragraphs 159–163, relators allege a conversation between Mr. Murtaugh and an unnamed former Healogics employee.  The alleged conversation contained many complaints about Healogics, but nothing about a doctor actually being influenced by Healogics or a resulting false claim.  The unnamed former employee, in fact, "had to routinely defend why the patients were *not* receiving HBO therapy" and criticized rather than agreed with Healogics' clinical guidance.  (*Id.* ¶ 162 (emphasis added)).  Finally, in paragraphs 172–173 relators allege irrelevancies about hospital staff members' opinions of Healogics and the management style of one of its employees.

As with the debridement allegations, the HBOT allegations lack the necessary particularity.  They identify no successful influence on an identified person who in turn submitted actual false claims as a result.

### C. Relators' TCOM allegations never state that Healogics successfully influenced a medical professional's care and that a false claim was submitted as a result.

Like HBOT, transcutaneous oxygen measurement, or TCOM, is FDA-approved.  TCOM tests blood flow to the limbs, and Medicare has a series of guidelines regarding reimbursement for this important procedure.  The Complaint's TCOM section begins with a description of the procedure and, later, a description of CMS guidelines.  (*See id.* ¶¶ 208, 231–235.)  The rest of

the TCOM discussion consists of anecdotes and estimates. None satisfy the specificity requirement.

Once again relators allege a supposed mandate from Healogics, this time to conduct TCOM tests on all new patients. (*See id.* ¶¶ 209–213.) Even under relators' version of the facts, there is no allegation that the mandate ever influenced any identified doctor. (*See id.* ¶¶ 214–217 ("Dr. Cascio thereafter refused to allow the two clinics in which he was Medical Director, to comply with the Healogics mandate.").) Paragraph 218 describes an unnamed Healogics center where TCOM tests were performed, but it falls short of alleging fraud. It says vaguely that "a Healogics facility ... performed TCOM tests." (*Id.* ¶ 218.) Of course, a facility cannot perform tests. People perform tests. Relators never identify those people. Moreover, there is no allegation that these TCOM tests were improper or that it was Healogics' initiative that caused these TCOM tests to be performed. Most importantly, when the TCOM test results did not support HBOT, the "tests were subsequently *not billed for* ...." (*Id.* (emphasis added)). Without billing there can be no false claim.

Next, after a brief and halfhearted attempt to allege that Healogics used unqualified personnel to conduct TCOM tests (*see id.* ¶¶ 219–220), paragraphs 221–230 continue the theme of alleged improper conduct but no actual false claim. Relators allege here that Healogics conducted a compliance investigation after Dr. Cascio and Mr. Murtaugh complained about Healogics' instructions on debridements and TCOMs. The investigation found, however, that "*no fraud had actually taken place* since their center had not billed for any of the procedures." (*Id.* ¶ 225 (emphasis added).) Relators protested that their concern was about other centers, which "they had been repeatedly told" or "which reportedly" were following Healogics' instructions (*id.* ¶ 225, 230), but even for Bartow Wound Care Center, they apparently had no allegation, and have no allegation now, that TCOM tests were ever billed to the government (*see id.* ¶ 226). To the contrary, relators' estimate of financial damage

to the government comes with a devastating admission: "*Had* Dr. Cascio implemented the corporate directive, *it would have* resulted in the submission" of false claims. (*Id.* ¶ 238 (emphasis added).) Dr. Cascio did not implement the alleged directive, however, so no fraud ever took place. This is the opposite of a False Claims Act allegation.

Relators thus must look elsewhere yet again, and their efforts are again unavailing. They make the bald assertion that "Healogics was successful in implementing its 100% TCOM directive in numerous centers across the country," which resulted in "tens of thousands of false claims," which ranged "from $89.20 to $140.07 per test." (*Id.*) This statement contains not a single specific fact. The dollar figures come from a government list, and nothing that matters is identified. Which of the "numerous centers" were involved? Which entities were billed? Which of the claims were false, and why are relators unable to describe even one of them?

This last anecdote thus perfectly encapsulates the entire Complaint. Relators have no allegations of fraud at their facilities because no fraud exists to allege. This leads them to exclaim that there must have been fraud somewhere else. That is pure speculation. Despite working undercover for over a year while their complaint remained sealed—including by eavesdropping on doctors (*see id.* ¶¶ 125–126); collecting gossip from former employees (*see id.* ¶¶ 160–163, 218); and second-guessing patient charts (*see id.* ¶¶ 123–125, 140–41, 152–158)—relators have no concrete allegations about other facilities and no specific false claims actually submitted.[11] The Complaint must be dismissed.

---

[11] Relators cannot save their deficient allegations by claiming some other "indicia of reliability," *United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005), such as corporate-insider status. First, *Walker*'s viability is questionable. *See Lymphatx*, 596 F.3d at 1303 n.4 ("In any event, to the extent that *Walker* conflicts with the specificity requirements of *Clausen*, our prior-panel-precedent rule requires us to follow *Clausen.*"); *see also United States ex rel. Westlund v. Lab. Corp. of Am. Holdings*, No. 8:10-cv-2882-T-23TGW, 2011 WL 6846748, at *1 (M.D. Fla. Dec. 29, 2011) ("[T]he Eleventh Circuit treats *Clausen* as prior panel precedent that governs over *Walker.*"). Second, relators are not corporate insiders whose allegations are entitled to any deference. The two physician relators never worked for Healogics, and Relator Murtaugh worked for Healogics in a field-based (not home-office) position for only six months. (*See* Compl. ¶¶ 3–10.)

## II. Count IV must be dismissed for the additional reason that no plausible and particular allegations support a conspiracy.

To state an FCA conspiracy claim, a relator must first show an agreement between the defendant and another party to violate a provision of the FCA. *See* 31 U.S.C. § 3729(a)(1)(C) (liability for conspiracy to "commit a violation of [31 U.S.C. § 3729(a)(1)](A), (B), (D), (E), (F), or (G)"); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009) (civil conspiracy requires an agreement to do an unlawful act or a lawful act by unlawful means); *cf. Corsello*, 428 F.3d at 1014 (listing elements of FCA conspiracy in reliance on statutory text that has since been amended).

Relators have not alleged such an agreement. They make broad allegations of the "willing and active participation" of Healogics' hospital partners (Compl. ¶ 35), but they do not identify a single hospital executive, administrator, contracting specialist, vice president, doctor, or other official who agreed with Healogics to defraud the government, much less the substance of that agreement. In addition, it speaks volumes that relators, without explanation, dropped all these 500 purported conspirators as codefendants. Whatever else might be said for the Complaint, it certainly does not state a conspiracy claim.

## III. Supplemental jurisdiction should be declined over the state-law claims.

Because relators do not allege a viable federal FCA claim, the state law claims tethered to them must fail as well. Even if relators were to state a federal FCA claim, the conduct alleged pertains to only three states: Iowa, Illinois, and Florida. Most of the Complaint's allegations regard relators' four workplaces, in Bettendorf, Iowa; Moline, Illinois; and the Orlando area. (*See id.* ¶¶ 56, 59, 60, 67 (Dr. Van Raalte's allegations regarding facilities in Bettendorf, Iowa, and Moline, Illinois); *id.* ¶¶ 10, 72, 76, 79, 81, 85, 88–93, 103–110, 166, 187, 200, 203, 207, 217, 222, 226, 230 (Dr. Cascio's and Mr. Murtaugh's allegations regarding Dr. P. Phillips Hospital in Orlando); *id.* ¶¶ 76, 88–93, 95–96, 103–110, 113, 137, 143, 206–207, 217, 222–223, 226 (Dr. Cascio's and Mr. Murtaugh's allegations regarding South Seminole Hospital in

metro Orlando)). Additionally, Mr. Murtaugh has included scattered anecdotes related to five other centers, another one in Illinois and four more close to Orlando. (*See id.* ¶¶ 120, 161–165 (hearsay from an unnamed Healogics employee regarding OSF Saint Anthony Wound Healing Center in Rockford, Illinois); *id.* ¶¶ 93, 117, 123–124, 141–142, 147, 166, 168–175 (hearsay and surreptitious chart examination at Florida Hospital Fish Memorial and Bert Fish Medical Center); *id.* ¶¶ 125–129 (eavesdropping on physician at The Villages Regional Hospital in Florida); *id.* ¶¶ 226–230 (hearsay regarding Bartow Wound Care Center in Florida)).[12]

These allegations say absolutely nothing about the 26 other jurisdictions (25 states and D.C.) included in the Complaint. *See McInteer*, 470 F.3d at 1359 (relator's complaint deficient when it "sweeps with a much broader brush by naming as defendants [facilities] into which [relator] never stepped foot"). Relators have even mixed up the state governments on whose behalf they are purportedly suing. (*See* Compl. at 1 n.1.) The Court should decline supplemental jurisdiction over the state-law claims.

## IV. Relators at best allege a claim against only a handful of centers; if the case moves forward, it should be limited to those centers.

As just discussed, relators at best make limited specific allegations related to only nine centers: the four at which they worked, and the other five for which Mr. Murtaugh relates secondhand hearsay. While relators deny that they committed fraud at their workplaces (and thus have no fraud claim), they do at least have some personal knowledge about them. As to the other five centers, relators' allegations are secondhand and too speculative to satisfy Rule 9(b). However, if there is any debate on that point, relators' allegations still cannot reach beyond those nine centers. There are simply no allegations about any other facilities. Relators have no basis to, for example, depose a nurse in Connecticut, or request records from a center

---

[12] The Complaint also purports to allege conduct in South Carolina (*see id.* ¶¶ 153–159), but it contains no claims for violations of South Carolina law.

in Montana.  If the Court does not dismiss the case entirely, relators' claims and the scope of discovery and trial should be limited to either the four centers at which relators worked or the nine centers identified in the Complaint.

## CONCLUSION

For the reasons stated above Healogics respectfully requests that the Court dismiss relators' Corrected Second Amended Complaint for failure to state a claim with particularity upon which relief can be granted.  *See* Fed. R. Civ. P. 9(b); *id.* 12(b)(6).  *Qui tam* plaintiffs are typically given one chance to amend, but relators here have already had two years and four opportunities to plead their claims.  Any further amendment would be futile, and Healogics respectfully requests that dismissal be with prejudice.

Respectfully submitted,

/s/ William Gould
Suzanne E. Gilbert
Florida Bar No. 94048
suzanne.gilbert@hklaw.com
Lauren Millcarek
Florida Bar No. 100317
lauren.millcarek@hklaw.com
HOLLAND & KNIGHT LLP
200 S. Orange Avenue, Suite 2600
Orlando, FL 32801
(407) 425-8500

William F. Gould (*pro hac vice*)
william.gould@hklaw.com
HOLLAND & KNIGHT LLP
800 17th St. N.W., Suite 1100
Washington, DC 20006
(202) 955-3000

24

Jeremy M. Sternberg (*pro hac vice*)
jeremy.sternberg@hklaw.com
HOLLAND & KNIGHT LLP
10 St. James Ave., 11th Floor
Boston, MA 02116
(617) 523-2700

Megan Mocho Jeschke (*pro hac vice*)
megan.jeschke@hklaw.com
HOLLAND & KNIGHT LLP
1600 Tysons Blvd., Suite 700
Tysons Corner, VA 22102
(703) 720-8600

*Counsel for Defendant Healogics, Inc.*

Dated: February 5, 2016.

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2016, the foregoing was filed via the Court's CM/ECF system, which will electronically serve all counsel of record.

/s/ Lauren Millcarek
Lauren Millcarek