# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF MONTANA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WASHINGTON, STATE OF WISCONSIN, COMMONWEALTH OF MASSACHUSETTS, COMMONWEALTH OF VIRGINIA, DISTRICT OF COLUMBIA, BENJAMIN A. VAN RAALTE, MICHAEL J. CASCIO and JOHN J. MURTAUGH,**

**Plaintiffs,**

**v.**                                                              **Case No:   6:14-cv-283-Orl-31KRS**

**HEALOGICS, INC.,**

**Defendant.**

## ORDER

This matter comes before the Court on the Motion to Dismiss with Prejudice (Doc. 49) filed by the Defendant, Healogics, Inc. ("Healogics"), and the Response (Doc. 52) filed by the Plaintiffs.

**I.     Background**

According to the allegations of the Corrected Second Amended Complaint (Doc. 37), which are accepted in pertinent part as true for resolving this motion to dismiss, Healogics is the nation's largest for-profit provider of wound care services. Compl. at ¶ 12. It has partnered with more than 800 hospitals throughout the United States to operate wound care centers. *Id*. Plaintiffs/Relators, Benjamin A. Van Raalte, M.D, Michael J. Cascio, M.D., and John J. Murtaugh (collectively "Relators"), worked with or for Healogics. *Id.* at ¶¶ 3-10. Van Raalte worked in Healogics-operated wound care centers in Bettendorf, Iowa and Moline, Illinois from May 2009 to June 2012. Compl. at ¶ 4. Cascio practiced in Healogics-operated wound care centers in Orlando and Longwood, Florida from November 2007 till May 2014. Compl. at ¶ 7. He served as medical director during most of that time. Compl. at ¶ 7. Murtaugh worked for Healogics as a program director of a wound care center in Orlando from April 2013 to October 2013. Compl. at ¶ 10.

The Relators filed a Complaint (Doc. 1) under seal on February 19, 2014, alleging that Healogics violated the False Claims Act, 31 U.S.C. §§ 3729–3733 (henceforth, the "FCA"), by directing physicians to upcode or perform unnecessary procedures in order to make or cause to be made, fraudulent invoices to Medicare, Medicaid and TRICARE, among others. In addition to the federal act, Relators also brought claims under state False Claims Acts or their equivalents (henceforth, the "state FCAs") for each state in which Defendant conducts business.

On June 30, 2014, Relators filed their first Amended Complaint (Doc. 11), adding 500 hospitals as defendants; after granting a number of extensions, the Court set September 30, 2015 as the deadline for the federal government to decide whether to intervene in this case. (Doc. 25). On that date, the federal government notified the Court that it was not intervening at that time. (Doc. 27).   The Court then unsealed the Amended Complaint and the remainder of the docket

moving forward. (Doc. 29). On December 29, 2015, Relators filed a Second Amended Complaint (Doc. 35), dropping the hospitals as defendants. Relators filed the Corrected Second Amended Complaint (Doc. 37) on January 11, 2016.

Relators detail the alleged fraudulent billing scheme in 557 paragraphs over 148 pages. To briefly summarize, the allegations fall into three areas, each of which is described below.

### A. Debridements

Debridement is the removal of unhealthy tissue from a wound to promote healing. Relators allege that Healogics directed physicians in their wound care centers to upcode a more minor procedure, called "selective debridement," to a more involved (and higher revenue-producing) procedure called "surgical/excisional debridement" (henceforth, "surgical debridement"). Selective debridement does not involve the removal of subcutaneous fat, muscle tissue, or bone; surgical debridement does. *Id.* at ¶ 37.   Healogics established a benchmark for all wounds assessed by employees working in its wound care centers mandating that 60 percent of all wounds required debridement and 80 percent of all debridements required a surgical debridement. *Id.* at ¶ 48. Healogics further directed that the procedures be performed on a frequent, often weekly basis for each patient even though surgical debridements are almost never utilized on a weekly recurring basis for the same wound. *Id.* at ¶ 49. Physicians and program directors who did not meet the benchmark were punitively classified as "non-aggressive" and were targeted for replacement. *Id.* at ¶¶ 51-52.

On his first day of working as an independent contractor for Healogics, Van Raalte received a letter explaining when to charge for a surgical debridement versus a selective debridement. *Id.* at ¶ 56.[1] He concluded that the letter was intended to influence him to bill as

---

[1] Although denominated as an exhibit, the letter is not attached to the Corrected Second

though he had performed surgical debridements even though he had not performed them. *Id*. at ¶ 57. He was later constantly questioned by his medical director and program director as to why he was not conducting more debridements, especially surgical ones. *Id*. at 59. Van Raalte refused to improperly increase the number of debridements performed or billed. *Id.* at 69. As a result, Healogics did not renew his contract on June 15, 2012. *Id*.[2]

The Relators also allege that Healogics employees misinformed personnel regarding proper billing procedures so as to generate additional revenue. At a debridement education meeting in September 2013, Healogics' area medical director, Kathleen Minnick, led a meeting attended by Cascio and Murtaugh. *Id.* at 95-96. She informed those in attendance that "if a wound bleeds during a debridement, then it is automatically a surgical/excisional debridement and should be coded as such." *Id*. at ¶ 97. Cascio pulled up the Centers for Medicare & Medicaid Services Local Coverage Determination guidelines and read them out loud, advising those attending that even the lower level selective debridement occasionally bleeds and bleeding could not be a determination in deciding what to bill. *Id*. at ¶ 98. Minnick responded that the guidelines were wrong. *Id*. at ¶ 99.

Sometime in 2013, Cascio was informed by Nancy Celleri, RN, that his partner, Dr. Walter Conlan, had performed a selective, non-excisional debridement, but had circled a higher paying code on the billing sheet. When the nurse confronted him about it, he told her "this is what they [Healogics] want me to do so I'm doing it." *Id*. at ¶ 112. As a result of being confronted, Dr.

---

Amended Complaint.

[2] The Relators contend that Healogics understaffed Van Raalte's clinic while he was on duty; this led to more patient complaints, which in turn provided a pretext to terminate his contract. *Id.* at 72. The Relators contend that Healogics did the same thing with Murtaugh and Cascio. *Id.*

- 4 -

Conlan purportedly went back and adjusted the billing and dictation to reflect the lower paying debridement that he had actually performed. *Id*. at ¶ 113.

### B. Hyperbaric Oxygen Treatments

Hyperbaric Oxygen Therapy ("HBOT") involves the inhalation of 100 permission oxygen at increased atmospheric pressures. *Id*. at ¶ 129. Among other things, HBOT can induce creation of new small blood vessels, thereby promoting healing of certain wounds, such as diabetic foot ulcers ("DFU"), which do not heal due to reduced oxygen supply caused by diseased or dead capillaries. *Id*. at ¶ 130. HBOT can be a life-saving or limb-sparing treatment in certain circumstances, but there are associated side effects and complications and it is not indicated for all wound patients. *Id*. at ¶ 130. Healogics directed physicians to use hyperbaric oxygen treatments on patients unnecessarily.

Healogics set benchmarks for the amount of HBOT to be conducted in each of their wound care centers and targeted every patient for conversion to HBOT. *Id*. at ¶ 134. Healogics had its employees or contractors manipulate patients' actual diagnoses or wound classifications to create false support for providing the expensive therapy. *Id*. at ¶ 135. For example, program directors, clinical coordinators, and physicians were told that if a patient had diabetes, then the wound is automatically a diabetic wound. *Id*. at ¶ 135. In a leadership meeting at South Seminole Hospital with the program director, clinical coordinator, and the regional director of clinical operations for Healogics in 2013, Cascio attempted to explain to Healogics that venous leg ulcers are called 'venous' because the primary etiology of the wound is venous disease, not diabetes. *Id*. at ¶ 136. Nancy Helme, the regional director of clinical operations, stated her position that the wound center should be calling all venous leg ulcers in patients with diabetes, diabetic wounds of the lower extremity ("DWLE"). *Id*. She told Cascio that other centers were falling in line with this method

of reclassifying venous ulcers to diabetic wounds of the lower extremity. *Id*. Van Raalte, Cascio, and Murtaugh witnessed Healogics pressuring its wound care center employees and contracted physicians to improperly classify wounds as diabetic ulcers (so as to qualify the patients for HBOT) when the wounds should have been classified as venous leg ulcers or pressure ulcers. *Id*. at ¶ 139.

Murtaugh, who worked as a medical products sales representative before going to work for Healogics, witnessed this practice in action at the Florida Hospital Fish Memorial Wound Center: A patient on therapy requiring one of Murtaugh's products was diagnosed with a venous leg ulcer, according to the insurance authorization form submitted for the patient by the wound center. *Id*. at ¶ 140. Despite the venous leg ulcer diagnosis submitted to Medicare for Murtaugh's product, the patient received a "ton of HBO," according to wound care nurse Julie Vaught. *Id.* The HBOT was "for diabetes," according to Dr. Clarence Scott, Medical Director of the wound center. *Id*. While reviewing the patient's clinical notes, Mr. Murtaugh noticed that in the patient's Healogics chart, his diagnosis was listed as "diabetic wound of the lower extremity" (henceforth, "DWLE") rather than "venous leg ulcer." *Id*. at ¶ 141. According to Murtaugh, the wound would not have qualified for HBOT even if it had had in fact been a diabetic wound. *Id*.

In addition, Murtaugh witnessed Bert Fish Medical Center Program Director Catherine Lunde direct a nurse in the clinic to change a patient's diagnosis from venous leg ulcer to DWLE "so that they can dive him." *Id*. Cascio also noticed that one of his patients' diagnosis was changed to DWLE and was told that it was changed upon the direction of Clinical Coordinator Sue Ann Prouse, who then said that Helme "made [me] do it." *Id*. at ¶ 143. Van Raalte observed Healogics employees obtaining wound cultures by improperly running swabs across the ulcer surface; he theorized that this was done to achieve an inaccurate culture, allowing for an upgrade of the

wound to a classification that would qualify the patient for HBOT. *Id*. at ¶¶ 145-46. And Healogics created software for use in its wound centers that automatically and artificially classified wounds on the lower extremities of diabetic patients as "wounds of the lower extremity." *Id*. at 176.

On June 16, 2015, after leaving Healogics, Cascio evaluated a new wound care patient who had previously been followed at a Healogics wound care center from November 25, 2013 to May 28, 2015. *Id*. at ¶ 152. The patient told Cascio he had received over 100 hyperbaric treatments for his toe and ankle wounds while at a Healogics center in South Carolina. Cascio determined that the treatments were done based on a false diagnosis and that the patient had been billed for an excessive number of unnecessary excisional debridements. *Id*. at ¶ 158.

### C. Transcutaneous Oxygen Measurement Testing

Relators also allege that Healogics required the overutilization of Transcutaneous Oxygen Measurement ("TCOM") testing for all patients. In TCOM, oxygen tension measurements are taken transcutaneously (through unbroken skin) using an oximetry device – a sensor pad attached to the skin – to measure oxygen saturation in capillaries at various levels along the extremity. *Id*. at ¶ 208. At a quarterly meeting, Healogics employee Suemei Addington announced a new corporate-wide initiative that "every patient coming in the wound care centers would receive a TCOM test." *Id*. at ¶ 210. According to the Relators, Healogics' "true objective" for the additional TCOM testing was to justify the use of the more expensive HBO therapies. *Id*. at ¶ 211. According to Centers for Medicare & Medicaid Services Local Coverage Determination guidance, such testing is time-consuming, expensive, and is not always indicated depending on the wound. *Id*. at ¶ 212. Cascio refused to allow the two clinics in which he was medical director to comply with this mandate.

In late April or early May 2014, Murtaugh was told by Michelle DiProspero, a former HBOT technician for Healogics, that a Healogics facility in which she previously worked would perform TCOM tests, the results of which did not support HBOT. *Id.* at ¶ 218. DiProspero told Murtaugh that those tests were subsequently not billed for and results were discarded by Healogics. *Id.*

Healogics contends that the Corrected Second Amended Complaint fails to state a claim with the required particularity because Relators do not show (1) that Healogics' alleged scheme actually influenced a specific person to submit a false claim, or (2) that a false claim was in fact submitted to the government as a result of the alleged scheme.

## II.     Legal Standards

### A.     Motions to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," so as to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Conley v. Gibson*, 35 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milbum v. United States*, 734 F.2d 762, 765 (11th Cir.1984). In ruling on a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988). The Court must also limit its consideration to the pleadings and any exhibits attached thereto. FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).

The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1966, and to indicate the presence of the required elements, *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1302 (11th Cir.2007). Conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal. *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. . . . A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. at 1949 (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the plaintiff is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

### B.   False Claims Act

The FCA permits a private person – a relator -- to bring a qui tam action in the name of the Government against the alleged violator of the FCA. 31 U.S.C. § 3730(b)(1). Any person found to have violated the FCA is liable to the Government for a civil penalty of $5500 to $1100 plus three times the amount of damages sustained by the Government. 31 U.S.C. § 3729(a)(1), 28 U.S.C. § 2461. The relator receives a share of any proceeds of the action. 31 U.S.C. § 3730(d)(1).

In pertinent part, the FCA imposes liability on any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> [or]

> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

31 U.S.C. § 3729(a).

Fed.R.Civ.P. 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FCA claims are subject to Rule 9(b)'s heightened pleading requirements. *United States ex rel. Clausen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1308-09 (11th Cir.2002). In addition, then, to pleading the basic elements of § 3729(a), an FCA relator must also plead the details of the allegedly fraudulent acts, when they occurred, and who engaged in them. *Id.* at 1310 (citations omitted). It is not enough to plead fraudulent acts under the FCA based on information and belief. *Id* . (citations omitted). Furthermore, a relator must allege that a false claim was actually submitted to the government. *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1357 (11th Cir.2006) ("The submission of a false claim is the *sine qua non* of a False Claims Act violation. . . . Without the presentment of a claim, there is simply not actionable damage.") (internal quotations and citations omitted). Indeed, at least in the healthcare context, the Eleventh Circuit has held that the FCA "does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen,* 290 F.3d at 1311.

Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments *must have been submitted, were likely submitted or should have been submitted to the Government*." *Clausen*, 290 F.3d at 1311 (emphasis added). Instead, "some indicia of reliability must be given in the complaint to support the allegation of *an actual false*

- 10 -

*claim* for payment being made to the Government." *Id.* It is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices, *see id*. at 1014, to base his knowledge on rumors, *see Atkins*, 470 F.3d at 1359, or to offer only conjecture about the source of his knowledge, *see United States ex. rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 n. 4 (11th Cir. 2010).

### III.  Analysis

#### A.  Failure to State a Claim under the FCA (Counts I-III)

Simply stated, the Relators allege that Healogics violated the FCA by up-coding debridements, falsifying eligibility criteria for HBOT, and billing for unnecessary TCOM testing. (Doc. 52 at 87).   Defendant asserts that Relators fail to state a claim because the allegations in the Complaint do not identify a specific physician who was successfully influenced by Healogics to change a patient's treatment and, therefore, submitted an actual false claim to the Government as a result.

Upon review, the Court agrees with the Defendant. Although the Relators have identified numerous instances where Healogics employees encouraged medical professionals to, in essence, overcharge for their services or perform unnecessary services, they have not identified a single instance where a physician actually did so.   Just as important, they have not identified any instances where a bill was submitted to the Government for such upcoded or unneeded procedures. As described by the United States Court of Appeals for the Eleventh Circuit, the submission of a false claim to the government for payment is "the *sine qua non* of a False Claims Act violation." *Clausen,* 290 F.3d at 1311. To plead the submission of a false claim with particularity, "a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a

result." *United States ex rel. Matheny v. Medco Health Solutions Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012).

Relators detail a scheme in which Healogics encouraged upcoding and unnecessary procedures through benchmarks and mandates. However, "[i]mproper practices standing alone are insufficient to state a claim under either § 3729(a)(1) or (a)(2) absent allegations that a specific fraudulent claim was in fact submitted to the government." *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d at 1328. The allegations in the Complaint that name specific physicians do not show that they engaged in fraud. For example, Relators allege that Cascio was informed that his partner had performed a selective, non-excisional debridement but circled a higher paying code on the billing sheet. But then the Relators allege that he "went back and adjusted the billing and dictation to reflect the lower paying debridement that he had actually performed."

Relators also allege that upon reviewing the chart of a patient that had previously been followed at a Healogics wound care center in South Carolina, it "became apparent [to Cascio] that all of this patient's hyperbaric treatments were done based on a false diagnosis. It was also apparent that the patient was billed for an exorbitant amount of excisional debridements." Compl. at ¶ 152. Although Relators allege that approximately $80,000 was billed to Medicare and that "most" of that amount was fraudulently billed, they fail to provide sufficient information to satisfy the requirements of Rule 9(b).  They do not show that the South Carolina wound care center was subjected to the same pressure regarding debridements and HBOT as the Relators, or that this patient's treatment was improperly affected by such pressure.  And the same holds true for the various other instances cited by the Relators.  They do not show that any medical professional gave in to (or was misled by) Healogics' proddings to overcharge for any procedure or to perform

any procedure that should not have been performed, resulting in the submission of a false claim to the Government.[3]

The Relators contend that this case is akin to *United States ex. rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349 (11th Cir. 2005), where the court denied a motion to dismiss an FCA case even though the relator failed to specifically allege the submission of a false claim for payment. (Doc. 52 at 15). *Walker* involved allegations that a medical facility was overcharging Medicare for services performed by physician assistants and nurse practitioners. In particular, the relator in that case – a nurse practitioner – alleged that the facility was always billing Medicare for her services as though they had been performed "incident to the service of a physician" even when no physician had been in the building when she performed the service. *Id.* at 1352-53). Among other reasons, the relator knew that this was occurring because she did not have a "Unique Provider Identification Number" ("UPIN"), which would have been required to bill for her services standing alone; instead, she always had to bill for her services under a physician's UPIN, which signified that the services had been performed under that physician's supervision. *Id.* at 1352-53. (Services billed under a nurse practitioner's UPIN were paid at only 85 percent of the amount paid for the same service performed under a physician's supervision.) Thus, she could be sure that her services were being billed at an improperly inflated rate.

The situation in *Walker* is not analogous to the situation in the instant case. There is nothing that the Relators can point to in the Corrected Second Amended Complaint to overcome

---

[3] The Relators do purport to attach billing statements of Medicare patients who received HBOT unnecessarily, but no such statements are attached to the Corrected Second Amended Complaint. There are some statements attached to the Relator's previous pleading (Doc. 35), the contents of those statements show only that Medicare was billed. So far as the Court can discern, they do not specify the services that were billed for, much less provide a basis for determining that the services were not medically necessary. *See* Doc. 35-7 to Doc. 35-17.

the fact that they did not see any fraudulent bills prepared or presented to the Government for payment.   The Relators have failed to state a claim for violation of the False Claims Act, and therefore Counts I-III are due to be dismissed without prejudice.

### B.     Conspiracy to Submit False Claims (Count IV)

Count IV, which asserts that the Defendant conspired to defraud the government in violation of section 3729(a)(1)(C) of the FCA, also requires compliance with Rule 9(b). *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1014 (11th Cir. 2005). To state a claim under section 3729(a)(1)(C) a plaintiff must demonstrate "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Id.* quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co.,* 721 F.Supp. 1247, 1259 (S.D. Fla. 1989). Relators fail to state a conspiracy claim because although Relators allege that Healogics entered into agreements with each of its partner hospitals and conspired to defraud the U.S., they fail to identify, *inter alia*, any person who agreed with Healogics to defraud the government. Without at least this much, there can be no agreement, and therefore Count IV will be dismissed without prejudice.

### C.     State law claims (Counts V-XXXII)

The Relators' failure to state a claim under the FCA is also fatal to the claims they have raised under the various state equivalents of that act. Counts V-XXXII will therefore be dismissed.

## IV.     Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that Defendant's Motion to Dismiss (Doc. 49) is **GRANTED IN PART AND DENIED IN PART**. The Corrected Second Amended Complaint is **DISMISSED WITHOUT PREJUDICE**.   If the Plaintiffs wish to file another amended complaint, they must do so on or before May 25, 2016.   In all other respects, the motion is **DENIED.**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 11, 2016.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party